## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, ex rel.**<br>**[UNDER SEAL],** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No.** <u>3:19cv091-MPM-JMV</u> |
| | ) | |
| **v.** | ) | |
| | ) | **UNDER SEAL** |
| **[UNDER SEAL],** | ) | |
| | ) | **JURY DEMAND** |
| **Defendants.** | ) | |

---

### FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, ex rel. CAMERON JEHL,** | ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) ) | |
| **GGNSC SOUTHAVEN LLC D/B/A GOLDEN LIVINGCENTER-SOUTHAVEN; GGNSC ADMINISTRATIVE SERVICES LLC D/B/A GOLDEN VENTURES; GGNSC CLINICAL SERVICES LLC D/B/A GOLDEN CLINICAL SERVICES; GGNSC HOLDINGS LLC D/B/A GOLDEN HORIZONS; GOLDEN GATE NATIONAL SENIOR CARE LLC D/B/A GOLDEN LIVING; GGNSC EQUITY HOLDINGS LLC; DRUMM CORP.; AND RONALD E. SILVA,** | ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 3:19cv091-MPM-JMV<br><br><br>**UNDER SEAL**<br><br>**JURY DEMAND** |
| **Defendants.** | ) ) | |

---

## QUI TAM COMPLAINT

---

Relator, Cameron Jehl, brings this action on behalf of himself and in the name of the United States of America ("United States" or "Government"), by and through his undersigned attorneys, and alleges as follows:

### INTRODUCTION

1. Relator, a resident of Shelby County, Tennessee, acting on behalf of himself and the United States, brings this action to recover treble damages, civil penalties, attorneys' fees, and costs under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and to recover damages and other monetary relief under the common law and equitable theories of unjust enrichment and payment by mistake of fact.

2.      This action arises out of Defendants' submission of false claims to the United States and the State of Mississippi for Medicare and Medicaid reimbursement related to nursing and rehabilitation services.

3.      At all times relevant to this action, Defendants collectively owned, operated, and/or controlled Golden LivingCenter-Southaven in Southaven, DeSoto County, Mississippi ("Golden Living").  Golden Living is a nursing facility engaged in the custodial care of elderly and helpless individuals who are chronically infirm, mentally impaired, and/or in the need of nursing care and treatment.

4.      Defendant GGNSC Administrative Services LLC, acting with the assistance and at the direction of all other Defendants, submitted claims to the United States and the State of Mississippi to obtain Medicare and Medicaid reimbursement for healthcare services provided to Golden Living patients between April 23, 2013, and December 31, 2013.  In presenting these requests for reimbursement, Defendants expressly and impliedly certified to the United States and the State of Mississippi that they had complied with all conditions for Medicare and Medicaid reimbursement set forth in federal and state laws, as well as the provider agreements (hereinafter, the "Provider Agreements") executed by Defendants with the United States and the State of Mississippi.

5.      Contrary to the certifications made by Defendants, they had not, in actuality, complied with all conditions for receipt of Medicare and Medicaid payments during the period spanning from April 23, 2013, to December 31, 2013.  In violation of the Provider Agreements, applicable state laws, and federal regulations contained in 42 C.F.R. Part 483, Defendants knowingly and/or recklessly employed an individual who was not licensed to practice nursing in

2

Mississippi as Golden Living's Director of Nursing Services from April 23, 2013, to December 31, 2013.

6.      Defendants knowingly and/or recklessly violated the Provider Agreements and multiple state and federal laws affecting Medicare and Medicaid reimbursement on a continuous basis between April 23, 2013, and December 31, 2013.  Therefore, the Medicare and Medicaid reimbursement claims submitted by Defendants for this period and the attendant certifications of compliance with the Provider Agreements and applicable laws were knowingly false within the meaning of the FCA.

7.      As a result of the false claims that Defendants submitted and/or caused to be submitted to the United States and the State of Mississippi, the United States and the State of Mississippi, using federal funds, paid millions of dollars in Medicare and Medicaid reimbursement that they would not have paid had they known of Defendants' violations of the Provider Agreements and applicable laws.

## PARTIES

8.      The plaintiff in this action is Relator Cameron Jehl, acting on behalf of himself and the United States.  Relator is an attorney licensed in the State of Tennessee.

9.      Relator brings this action pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1).

10.      Relator has served a copy of this *Qui Tam* Complaint, together with a written disclosure statement setting forth and enclosing the material evidence and information he possesses upon the United States, consistent with 31 U.S.C. § 3730(b) and Fed. R. Civ. P. 4(i).

11.      Relator has complied with all other conditions precedent to bringing this action.

12.     Though Relator is aware of no public disclosures of the information contained in his *Qui Tam* Complaint, should such a disclosure exist, Relator is the original source of, and has direct and independent knowledge of, all publicly disclosed information on which any allegation herein might be deemed based, and has voluntarily provided such information to the United States before the filing of the *Qui Tam* Complaint.

13.     Through his work in litigation involving the Golden Living nursing facility in Southaven, Mississippi, Relator gained personal knowledge of the false claims that Defendants presented or caused to be presented to the United States and the State of Mississippi.

14.     Defendant GGNSC Southaven LLC is a foreign limited liability company with its principal place of business located at 2601 Network Boulevard, Suite 102, Frisco, TX 75034.  At all times material to this lawsuit, Defendant GGNSC Southaven LLC did business in Mississippi and operated the Golden Living facility located at 1730 Dorchester Drive, Southaven, MS 38671.  GGNSC Southaven LLC was the licensee authorized to operate the Golden Living facility at all times relevant hereto and was engaged in the custodial care of elderly, helpless individuals who are chronically infirm, mentally impaired, and/or in need of nursing care and treatment at Golden Living.  Defendant GGNSC Southaven LLC may be served with process through its registered agent, Corporation Service Company, 7716 Old Canton Road, Suite C, Madison, MS 39110.

15.     Defendant GGNSC Administrative Services LLC is a foreign limited liability company with its principal place of business at 1000 Fianna Way, Fort Smith, AR 72919.  At all times material to this lawsuit, Defendant GGNSC Administrative Services LLC did business in Mississippi.  Defendant GGNSC Administrative Services LLC was formed for the purpose of providing management and consulting services to certain nursing facilities, including the Golden Living facility in Southaven, Mississippi.  Consistent with this purpose, Defendant GGNSC

4

Administrative Services LLC entered into an "Administrative Services Agreement" with GGNSC Southaven LLC to provide GGNSC Southaven LLC certain contractual services, including but not limited to, the recruiting, hiring, and training of Golden Living's managers, including the Director of Nursing Services; developing and implementing clinical and personnel policies for the Golden Living facility; employment verification and background checks for all employees of the Golden Living facility, including the Director of Nursing Services; preparing cost reports and Minimum Data Sets that were submitted to state and federal governments under penalty of perjury; and ensuring regulatory compliance in accordance with the Provider Agreements. In exchange for these contractual services, GGNSC Southaven LLC paid GGNSC Administrative Services LLC a monthly service fee that came, in part, from revenues GGNSC Southaven LLC received from Medicare and Medicaid for providing care to elderly and infirm residents at Golden Living during the relevant time period. Defendant GGNSC Administrative Services LLC may be served with process through its registered agent, Corporation Service Company, 5760 I-55 North, Suite 150, Jackson, MS 39211.

16. Defendant GGNSC Clinical Services LLC is a foreign limited liability company with its principal place of business at 2601 Network Boulevard, Suite 102, Frisco, TX 75034. At all times material to this lawsuit, Defendant GGNSC Clinical Services LLC did business in Mississippi. Defendant GGNSC Clinical Services LLC entered into a "Clinical Services Agreement" with GGNSC Southaven LLC to provide certain contractual services to GGNSC Southaven LLC, including but not limited to, recruiting, interviewing, and hiring the Director of Nursing Services; oversight and supervision of the Director of Nursing Services; monitoring the delivery of nursing services at the Golden Living facility; and monitoring and ensuring regulatory compliance regarding the provision and delivery of nursing services at Golden Living.

In exchange for these contractual services, GGNSC Southaven LLC paid GGNSC Clinical Services LLC a monthly service fee that came, in part, from revenues GGNSC Southaven LLC received from Medicare and Medicaid for providing care to elderly and infirm residents at Golden Living during the relevant time period. Defendant GGNSC Clinical Services LLC may be served with process through its registered agent, Corporation Service Company, 5760 I-55 North, Suite 150, Jackson, MS 39211.

17.     Defendant GGNSC Holdings LLC is a foreign limited liability company formed in Delaware with its principal place of business at 2601 Network Boulevard, Suite 102, Frisco, TX 75034. At all times material to this action, GGNSC Holdings LLC was the sole member of GGNSC Administrative Services LLC. GGNSC Holdings LLC also shared common managers and officers with GGNSC Southaven LLC. As the sole member of GGNSC Administrative Services LLC, GGNSC Holdings LLC completely dominated and controlled GGNSC Administrative Services LLC. GGNSC Holdings LLC therefore was responsible for the delivery of services to GGNSC Southaven LLC under the Administrative Services Agreement. As the sole member of GGNSC Administrative Services LLC, GGNSC Holdings LLC received the monthly service fee paid by GGNSC Southaven LLC to GGNSC Administrative Services LLC under the Administrative Services Agreement, which fee came, in part, from revenues GGNSC Southaven LLC received from Medicare and Medicaid for providing care to elderly and infirm residents at Golden Living during the relevant time period. GGNSC Holdings LLC may be served with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

18.     Defendant Golden Gate National Senior Care LLC is a foreign limited liability company formed in Delaware with its principal place of business at 2601 Network Boulevard,

Suite 102, Frisco, TX 75034. At all times material to this action, Golden Gate National Senior Care LLC was the sole member of GGNSC Clinical Services LLC. Golden Gate National Senior Care LLC also shared common managers and officers with GGNSC Southaven LLC. As the sole member of GGNSC Clinical Services LLC, Golden Gate National Senior Care LLC completely dominated and controlled GGNSC Clinical Services LLC. Golden Gate National Senior Care LLC therefore was responsible for the delivery of services to GGNSC Southaven LLC under the Clinical Services Agreement. As the sole member of GGNSC Clinical Services LLC, Golden Gate National Senior Care LLC received the monthly service fee paid by GGNSC Southaven LLC to GGNSC Clinical Services LLC under the Clinical Services Agreement, which fee came, in part, from revenues GGNSC Southaven LLC received from Medicare and Medicaid for providing care to elderly and infirm residents at Golden Living during the relevant time period. Golden Gate National Senior Care LLC may be served with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

19. GGNSC Equity Holdings LLC is a foreign limited liability company formed in Delaware with its principal place of business at 2601 Network Boulevard, Suite 102, Frisco, TX 75034. At all times material to this action, GGNSC Equity Holdings LLC was the sole owner and member of GGNSC Southaven LLC. GGNSC Equity Holdings LLC also shared common managers and officers with GGNSC Southaven LLC. As the sole owner and member of GGNSC Southaven LLC, GGNSC Equity Holdings LLC completely dominated and controlled GGNSC Southaven LLC. As the sole owner and member of GGNSC Southaven LLC, GGNSC Equity Holdings LLC received revenues during the relevant time period that consisted, in part, of Medicare and Medicaid payments that GGNSC Southaven LLC received for providing care to elderly and infirm residents of Golden Living. GGNSC Equity Holdings LLC may be served

with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

20.     Defendant Drumm Corp. is a Delaware corporation with its principal place of business at 1000 Fianna Way, Fort Smith, AR 72919-9008. At all times material to this action, Drumm Corp. was the ultimate parent company of GGNSC Southaven LLC, GGNSC Administrative Services LLC, GGNSC Clinical Services LLC, GGNSC Holdings LLC, Golden Gate National Senior Care LLC, and GGNSC Equity Holdings LLC (collectively, the "Golden Defendants"). As the ultimate parent company of the Golden Defendants, Drumm Corp. completely dominated and controlled the Golden Defendants. Through its domination and control of the Golden Defendants, Drumm Corp. controlled the operation of Golden Living, including the hiring of personnel at Golden Living. As the ultimate parent company of the Golden Defendants, Drumm Corp. received revenues during the relevant time period that consisted, in part, of Medicare and Medicaid payments that GGNSC Southaven LLC received for providing care to elderly and infirm residents of Golden Living. Drumm Corp. may be served with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

21.     Upon information and belief, Defendant Ronald E. Silva was at all times material to this lawsuit an owner, manager, member, and/or officer of each of the other Defendants named in this Complaint. Mr. Silva was, at all times material to this lawsuit, engaged in business in Mississippi, and dominated and controlled, directly or indirectly, each of the other named Defendants. Through his domination and control of the other Defendants, Mr. Silva controlled the operation of Golden Living, including the hiring of personnel at Golden Living. At all relevant times, Mr. Silva received revenues through the other Defendants that consisted, in part,

8

of Medicare and Medicaid payments that GGNSC Southaven LLC received for providing care to elderly and infirm residents of Golden Living. Mr. Silva may be served with process at Four Embarcadero Center, Suite 710, San Francisco, CA, 94111.

## NATURE OF DEFENDANTS' LIABILITY

22. By virtue of their joint operation and control of the Golden Living facility—including the hiring of personnel for Golden Living and the submission of false claims to the United States and the State of Mississippi for Medicare and Medicaid reimbursement—all Defendants are directly liable under the FCA for presenting false claims for Medicare and Medicaid reimbursement, causing false claims for Medicare and Medicaid reimbursement to be presented, and/or conspiring to submit false claims for Medicare and Medicaid reimbursement.

23. **Alter Ego**: In addition, or in the alternative, at all times material to this lawsuit, Defendants, GGNSC Holdings LLC, Golden Gate National Senior Care LLC, GGNSC Equity Holdings LLC, Drumm Corp., and Ronald E. Silva (collectively, the five "Controlling Defendants") are liable as the alter egos of Defendants, GGNSC Southaven LLC, GGNSC Administrative Services LLC, and GGNSC Clinical Services LLC (collectively, the three "Controlled Defendants"). At all times material to this lawsuit, the Controlled Defendants were completely dominated and controlled by the Controlling Defendants, and were mere conduits through which the Controlling Defendants conducted business. The management and operations of the Controlled Defendants were conducted by the Controlling Defendants to such a degree that the Controlled Defendants were effectively shell companies through which the Controlling Defendants conducted business. Moreover, GGNSC Holdings LLC, Golden Gate National Senior Care LLC, and GGNSC Equity Holdings LLC represented to the public that all of the

corporate Defendants were part of one single economic enterprise known as Golden LivingCenter-Southaven.

24. **Respondeat Superior**: In addition, or in the alternative, at all times material to this lawsuit, the Controlled Defendants acted as agents of the Controlling Defendants. The Controlling Defendants ratified or authorized the acts or omissions of the Controlled Defendants. The Controlling Defendants are therefore liable under the theory of respondeat superior.

25. **Joint Enterprise**: In the alternative, to the extent that Defendants are found to be separate corporate entities and are not liable under theories of direct liability, alter ego liability, or respondeat superior, each Defendant is liable for the acts of the other Defendants because Defendants operated Golden Living as a joint enterprise. All Defendants engaged in a joint venture insofar as they acted in concert with respect to the operation, management, and maintenance of Golden Living, as well as the submission of false Medicare and Medicaid reimbursement claims to the United States and the State of Mississippi. Each of the Defendants had an equal right to control Golden Living as a whole, as well as to control the operation and management of Golden Living.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367, and 31 U.S.C. §§ 3730 and 3732.

27. The Court has personal jurisdiction over Defendants because (a) they are citizens and residents of the United States, and (b) Relator's claims arise out of Defendants' operation of the Golden Living facility in Mississippi and Defendants' submission of false claims for Medicare and Medicaid reimbursement within the United States.

28.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because all Defendants have transacted business in this District through their operation of Golden Living.

## LEGAL BACKGROUND

### *The False Claims Act*

29.     The FCA, 31 U.S.C. § 3729 *et seq*., gives rise to liability in this case. Section 3729(a)(1)(A) creates liability for anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the Government, and Section 3729(a)(1)(C) creates liability for anyone who "conspires to commit a violation of subparagraph (A)."

30.     The FCA defines the term "claim" to mean

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that -- (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government -- (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729(b)(2)(A).

31.     The FCA defines the terms "knowing" and "knowingly" to "mean that a person, with respect to information -- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The FCA further provides that "no proof of specific intent to defraud" is required. *Id.* § 3729(b)(1)(B).

*Medicare and Medicaid*

32.     In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for people age 65 or older, people under age 65 with certain disabilities, and people of all ages with end-stage renal disease (a permanent kidney failure requiring dialysis or a kidney transplant).

33.     Medicare has multiple parts, including Medicare Part A, which helps cover skilled nursing facility care, certain nursing home care, hospice care, hospital care, and home health services. Medicare Part B helps to cover medically necessary health services and/or supplies that are needed to diagnose or treat an individual's medical condition, as well as some preventative health care services.

34.     The Medicare program is administered through the United States Department of Health and Human Services and, more specifically, CMS.

35.     Before a healthcare provider may participate in Medicare and obtain reimbursement from the United States, it must enter into a provider agreement with the United States. CMS Form 1561 is the standard provider agreement executed by health care providers and the Government. Form 1561 provides that "[i]n order to receive payment" under Medicare, a healthcare provider must "agree[] to conform to the . . . provisions in 42 CFR."

36.     Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act. The Medicaid program aids the states in furnishing medical assistance to eligible persons, including indigent and disabled people.

37.     Medicaid is a cooperative federal-state public assistance program which is administered by the states.  The Mississippi Division of Medicaid is the state agency responsible for administering Medicaid in Mississippi.

38.     Funding for Medicaid is shared between the United States and state governments choosing to participate in the program.  Federal support for Medicaid in Mississippi was significant in fiscal year 2013, as the United States provided approximately 73.43% of the funding for Mississippi Medicaid.

39.     To qualify for participation in Mississippi's Medicaid program, a nursing facility is required to enter into a provider agreement with the State of Mississippi.  In its provider agreement with the State, a nursing facility must agree to comply with applicable federal and state laws related to the delivery of healthcare services, including state licensing requirements and the federal regulations contained in 42 C.F.R. Part 483, in order to participate in and obtain payment through Medicaid.

*Nursing Home Reform Act and Accompanying Regulations*

40.     To qualify for participation in, and receive payment from, Medicare, nursing facilities must comply with the regulations promulgated under the Nursing Home Reform Act ("NHRA").  Those regulations are codified under 42 C.F.R Part 483.

41.     One of the regulations promulgated under the NHRA mandates that a nursing facility "must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility." 42 C.F.R. § 483.70(b).

42.     Similarly, the NHRA regulations mandate that "[p]rofessional staff must be licensed, certified, or registered in accordance with applicable State laws."  42 C.F.R. § 483.70(f)(2).

43.     A third regulation requires a nursing facility to "designate a registered nurse to serve as the director of nursing on a full time basis." 42 C.F.R. § 483.35(b)(2).  Although a state may waive the requirement that the director of nursing be a registered nurse, the State of Mississippi did not waive this requirement for Golden Living, nor was there a basis for doing so.

44.     Addressing patient assessments conducted by nursing facilities for purposes of obtaining Medicare and Medicaid reimbursement, another federal regulation states that "[a] registered nurse must conduct or coordinate each [patient] assessment with the appropriate participation of health professionals." 42 C.F.R. § 483.20(h).

## FACTUAL ALLEGATIONS

### *Defendants' Presentment of Medicare and Medicaid Reimbursement Claims*

45.     Golden Living is a nursing facility engaged in the custodial care of elderly and helpless individuals who are chronically infirm, mentally impaired, and/or in the need of nursing care and treatment.  On information and belief, around 140 patients were in the care of Golden Living in 2013.  Many of Golden Living's patients received healthcare services in 2013 that were reimbursable through Medicare and/or Medicaid.

46.     Acting with the assistance and at the direction of the other Defendants, GGNSC Southaven LLC executed a Provider Agreement with the United States so that Defendants could obtain Medicare reimbursement for care provided to Golden Living's patients.  On information and belief, the Provider Agreement was created using CMS Form 1561.  Pursuant to the Provider

Agreement, Defendants agreed that "[i]n order to receive payment" under Medicare, they would "conform to the . . . provisions in 42 CFR."

47.     Acting with the assistance and at the direction of the other Defendants, GGNSC Southaven LLC also executed a Provider Agreement with the State of Mississippi so that Defendants could obtain Medicaid reimbursement for care provided to Golden Living's patients. Pursuant to the Provider Agreement with Mississippi, Defendants agreed that in order to receive payment under Medicaid, they would comply with all applicable federal and state laws related to the delivery of healthcare services, including state licensing requirements and the federal regulations contained in 42 C.F.R. Part 483.

48.     In addition to the conditions set forth in the Provider Agreement with the State of Mississippi, Mississippi's Medicaid Plan expressly conditions Medicaid payments on compliance with applicable laws. It provides that "[t]he State will pay a . . . long-term care facility with a valid provider agreement, furnishing services in accordance with these and other regulations of the Mississippi Medical Assistance Program in accordance with the requirements of applicable State and Federal regulations." *See* MS Medicaid Plan 4.19-D, at p. 34.

49.     GGNSC Administrative Services LLC, acting with the assistance and at the direction of all Defendants, presented claims to the United States and the State of Mississippi to obtain reimbursement under Medicare and Medicaid for healthcare services provided to patients of Golden Living between April 23, 2013, and December 31, 2013 (hereinafter, the "Relevant Time Period").

50.     On a periodic basis during and after the Relevant Time Period, Defendants submitted Minimum Data Sets to CMS under penalty of perjury in order to obtain conditional Medicare and Medicaid payments from the United States and the State of Mississippi. Minimum

Data Sets contain an assessment of each patient's condition and are used to determine the Medicare and Medicaid reimbursement rates for healthcare services provided to the patient.

51.     In submitting the Minimum Data Sets to obtain conditional Medicare and Medicaid payments, Defendants impliedly certified that they were entitled to receive such payments because they had complied with all of the conditions for payment contained in the Provider Agreements, and applicable federal and state laws.

52.     Defendants also made express certifications when GGNSC Administrative Services LLC submitted Minimum Data Sets to CMS. Each Minimum Data Set submitted by Defendants during and after the Relevant Time Period contained a signed certification stating that the information in the data set "was collected in accordance with applicable Medicare and Medicaid requirements." The Minimum Data Sets further stated that the information in the sets would be used "as a basis for federal funds" and that the "payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of [the] information" contained in the Minimum Data Sets.

53.     After December 31, 2013, GGNSC Administrative Services LLC, acting with the assistance and at the direction of all Defendants, submitted an annual cost report to the United States using CMS Form 2540-10 for final reconciliation and payment of the Medicare reimbursement requests associated with Golden Living patients. On or around the same time, GGNSC Administrative Services LLC, acting with the assistance and at the direction of all Defendants, submitted an annual cost report to the State of Mississippi for final reconciliation and payment of the facility's Medicaid reimbursement requests.

54.     In submitting the annual cost reports to the United States and the State of Mississippi, Defendants impliedly certified that they had complied with all of the conditions for

16

receipt of Medicare and Medicaid payments set forth in the Provider Agreements, and applicable federal and state laws.

55.     Defendants also made express certifications in the annual cost reports.  For example, in submitting the cost report to the United States using CMS Form 2540-10, Defendants expressly certified that they were "familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."  The cost report further stated that "if services identified in this report . . . were otherwise illegal, criminal, civil, and administrative action, fines and/or imprisonment may result."

56.     On information and belief, the United States and the State of Mississippi paid the Medicare and Medicaid reimbursement claims submitted by Defendants for healthcare services provided during the Relevant Time Period.  The Medicaid reimbursement payments made by the State of Mississippi to Defendants during and after the Relevant Time Period consisted primarily of federal funds.

57.     Defendants' express and implied certifications that they had complied with the conditions for payment set forth in the Provider Agreements, the Minimum Data Sets, and federal and state law were material to the United States' and the State of Mississippi's decisions to pay reimbursement to Defendants under Medicare and Medicaid.

### Lionelle Trofort's Employment at Golden Living

58.     Contrary to the certifications made by Defendants to the United States and the State of Mississippi, Defendants failed to comply with all of the conditions for receiving Medicare and Medicaid payments during the Relevant Time Period.

17

59.     On or around April 23, 2013, Defendants hired Lionelle Trofort to serve as the Director of Nursing Services at Golden Living.  Ms. Trofort was terminated as Director of Nursing Services on December 31, 2013.

60.     As the Director of Nursing Services at Golden Living, Ms. Trofort was responsible for managing, overseeing, and supervising the daily nursing services and care provided by the nurses and staff of Golden Living.  She reviewed patient charts, care plans, and staff assignments, and met with other employees of Golden Living on a weekly basis to discuss patients' health and care plans.  During Ms. Trofort's tenure as Director of Nursing Services, the medical care at Golden Living was rendered almost exclusively by the nursing staff that Ms. Trofort supervised.

61.     Ms. Trofort was also responsible for, among other things, determining the staffing needs of Golden Living based on the "census" (*i.e.*, volume) and "acuity" (*i.e.*, care needs) of the facility's patients; implementing policies and procedures related to nursing personnel and patient care; investigating accidents and incidents involving residents; monitoring whether the facility was complying with applicable laws and regulations governing the provision of nursing services; and ensuring the nursing staff at Golden Living maintained the requisite licenses and certifications.

62.     Ms. Trofort also supervised and coordinated the patient assessments and data collections that were used to complete the Minimum Data Sets provided to CMS for purposes of obtaining Medicare and Medicaid reimbursement.

63.     During the time Ms. Trofort served as Golden Living's Director of Nursing Services (*i.e.*, the Relevant Time Period), Ms. Trofort was not licensed to practice nursing in Mississippi.  In fact, Ms. Trofort has never held a Mississippi nursing license.

64.     Furthermore, Ms. Trofort did not possess a valid multistate license or other privilege during the Relevant Time Period that allowed her to practice nursing in Mississippi. Before Golden Living hired her, Ms. Trofort held a multistate nursing license issued by the State of Virginia.    However, on or around February 27, 2013, the State of Virginia revoked her multistate license and changed it to single-state status.  It was never reinstated to multistate status.  Thus, Ms. Trofort did not possess a valid multistate license during the Relevant Time Period.

65.     Despite the fact that Ms. Trofort was not permitted to practice nursing in Mississippi during the Relevant Time Period, Defendants knowingly employed Ms. Trofort as the Director of Nursing Services at Golden Living.

66.     Mississippi law requires nursing facilities to perform a background check of new employees with the relevant professional licensing agency to determine if any action has been taken against the new employee's license. *See Mississippi Minimum Standards for Institutions for the Aged or Infirmed*, Chapter 45.16.3.

67.     A proper check of Ms. Trofort's license and background would have revealed not only that she lacked a license to practice nursing in Mississippi, but also that Ms. Trofort had been terminated from prior positions under troubling circumstances.  For example, Ms. Trofort was terminated from her position at Chinle Nursing Home in Chinle, Arizona, on or about January 31, 2012, after she admitted that she had falsified documents.  In addition, immediately before she was hired by Defendants as Director of Nursing Services at Golden Living, Ms. Trofort was terminated by Harris Hospital in Little Rock, Arkansas, on March 23, 2013, for practicing nursing without a valid license.  Despite knowing that her multistate license had been

19

revoked on February 27, 2013, Ms. Trofort continued to practice nursing at Harris Hospital without a valid license.

68. Defendants conducted the background check of Ms. Trofort that is required by Mississippi law. In hiring Ms. Trofort as Director of Nursing Services for Golden Living, Defendants knowingly disregarded Ms. Trofort's prior work history and the fact that she did not have a valid license that permitted her to practice nursing in Mississippi.

69. Moreover, given her termination at Harris Hospital and notices she received from the State of Virginia related to her license, Ms. Trofort knew that she was not licensed to practice nursing in Mississippi during the Relevant Time Period. Ms. Trofort's knowledge may be imputed to Defendants because she served as a managerial employee at Golden Living.

70. In the alternative to Defendants' actual knowledge that Ms. Trofort was not licensed to practice nursing in Mississippi, Defendants recklessly failed to perform the background and license check required by Mississippi law.

71. By allowing Ms. Trofort to serve as Director of Nursing Services during the Relevant Time Period despite the fact that she was not qualified to do so, Golden Living endangered the health and welfare of its elder and infirm residents, and provided substandard care to its residents. The substandard care provided by Golden Living during Ms. Trofort's tenure as Director of Nursing Services is evidenced by Golden Living's substandard Medicare rating, deficient survey performance, and the amount of litigation filed by residents and their families alleging repeated personal injuries and wrongful deaths due to substandard care.

72. At the very latest, Defendants knew by December 2013 that Ms. Trofort did not possess a license that permitted her to practice nursing in the State of Mississippi. However,

Defendants never disclosed to state or federal authorities that Ms. Trofort lacked a valid nursing license during her employment at Golden Living.

### Defendants' Continuous Violations of the Provider Agreements and Applicable Laws

73.     By employing Ms. Trofort as Golden Living's Director of Nursing Services between April 23, 2013, and December 31, 2013, even though she did not possess a valid Mississippi nursing license or a privilege to practice nursing in Mississippi, Defendants violated numerous federal and state laws.     Consequently, Defendants also violated the Provider Agreements, which require compliance with federal and state laws.

74.     Ms. Trofort's employment violated state laws governing the practice of nursing and federal regulations that require nursing facilities to comply with state law.

75.     Under 42 C.F.R. § 483.70(b), a nursing facility "must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility."

76.     Similarly, under 42 C.F.R. § 483.70(f)(2), the "[p]rofessional staff" employed by the facility "must be licensed, certified, or registered in accordance with applicable State laws."

77.     Under Mississippi law, an individual must hold a valid Mississippi nursing license or a valid multistate nursing license in order to practice as a registered nurse in Mississippi. *See* Miss. Code Ann. §§ 73-15-3, 73-15-201.

78.     In Mississippi, "the 'practice of nursing' by a registered nurse means the performance for compensation of services which requires substantial knowledge of the biological, physical, behavioral, psychological and sociological sciences and of nursing theory as the basis for assessment, diagnosis, planning, intervention and evaluation in the promotion and

21

maintenance of health; management of individuals' responses to illness, injury or infirmity; the restoration of optimum function; or the achievement of a dignified death." The practice of nursing by a registered nurse also "includes, but is not limited to, administration, teaching, counseling, delegation and supervision of nursing, and execution of the medical regimen." Miss. Code Ann. § 73-15-5.

79. By providing numerous nursing services to residents of Golden Living and supervising the nursing services provided by other nurses at Golden Living on a daily basis, *see supra* ¶¶ 60-62, Ms. Trofort continuously practiced as a registered nurse within the meaning of Mississippi law during her time as Director of Nursing Services at Golden Living. Ms. Trofort's continuous practice as a registered nurse while serving as the Director of Nursing Services at Golden Living violated Mississippi law because Ms. Trofort did not have a Mississippi nursing license or a multistate nursing license that allowed her to practice nursing in Mississippi.

80. In addition, Mississippi's Minimum Standards for Institutions for the Aged or Infirmed, which govern nursing facilities, further require each facility to have "[a] registered nurse designated as the Director of Nursing Services." *Mississippi Minimum Standards for Institutions for the Aged or Infirmed*, Rule 45.4.1. The term "registered nurse" refers to "a person who is currently licensed by the Nurses' Board of Examination and Registration of Mississippi Board of Nursing as a registered nurse." *Id.*, Rule 45.2.31.

81. Because Ms. Trofort held neither a Mississippi nursing license nor a valid multi-state nursing license during the Relevant Time Period, she was not permitted to practice as a registered nurse in Mississippi or serve as a director of nursing under Mississippi law. Thus, Defendants violated Mississippi law and, consequently, 42 C.F.R. §§ 483.70(b), (f)(2), by

employing Ms. Trofort as Director of Nursing Services at Golden Living from April 23, 2013, to December 31, 2013, and allowing her to practice as a registered nurse during that time period.

82.     Ms. Trofort did not have a Mississippi nursing license or a multi-state license that allowed her to practice as a registered nurse in Mississippi during the Relevant Time Period. Therefore, Ms. Trofort's employment violated a federal regulation requiring a nursing facility to "designate a registered nurse to serve as the director of nursing on a full-time basis." 42 C.F.R. § 483.35(b)(2).

83.     Ms. Trofort was allowed by Defendants to supervise and coordinate patient assessments and data collections that were used to complete Minimum Data Sets provided to CMS by Defendants for purposes of obtaining Medicare and Medicaid reimbursement. *See supra* ¶ 62.  Therefore, Defendants violated a federal regulation providing that "[a] registered nurse must conduct or coordinate each [patient] assessment with the appropriate participation of health professionals." 42 C.F.R. § 483.20(h).  Because Ms. Trofort was not permitted to practice as a registered nurse in Mississippi during the Relevant Time Period, she was prohibited by 42 C.F.R. § 483.20(h) from conducting or coordinating patient assessments at Golden Living.

84.     Defendants continuously violated multiple federal and state laws—and the Provider Agreements requiring compliance with federal and state laws—by knowingly and/or recklessly employing Ms. Trofort as Golden Living's Director of Nursing Services despite the fact that she was not authorized to practice nursing in Mississippi.  Therefore, the express and implied certifications made in the Minimum Data Sets and annual cost reports corresponding to the Relevant Time Period stating that Defendants had complied with the Provider Agreements and all applicable laws were knowingly false within the meaning of the FCA.

85.     Further, the certifications made by Defendants in the Minimum Data Sets provided to CMS stating that the information in the data sets "was collected in accordance with applicable Medicare and Medicaid requirements" was also knowingly false.   Because Ms. Trofort was not authorized to practice nursing in Mississippi during the Relevant Time Period, her acts of supervising and coordinating the patient assessments reflected in the Minimum Data Sets violated the federal regulation requiring that a registered nurse coordinate and conduct the patient assessments.

86.     Compliance with the laws violated by Ms. Trofort's employment was material to the United States' and the State of Mississippi's decisions to pay Defendants' Medicare and Medicaid reimbursement claims.

87.     The Provider Agreement that Defendants caused GGNSC Southaven LLC to execute with the United States expressly conditioned the payment of Medicare funds on the facility's compliance with the federal regulations contained in 42 C.F.R Part 483 that Defendants violated by employing Ms. Trofort as Director of Nursing Services at Golden Living.  The cost report submitted to the United States further demonstrates that compliance with the laws violated by Defendants was a material condition of payment.  Specifically, the report required Defendants to certify that the services identified in the report were provided in compliance with applicable laws and regulations and warned Defendants that the inclusion of illegal services in the report could lead to criminal and civil penalties.

88.     The State of Mississippi also conditioned payment of Medicaid reimbursement on compliance with the federal and state laws violated by Defendants.   In causing GGNSC Southaven LLC to execute a Provider Agreement with the State of Mississippi, Defendants agreed to comply with applicable federal and state laws related to the delivery of healthcare

24

services, including the state licensing laws and federal regulations contained in 42 C.F.R. Part 483 that Defendants violated, in order to receive payment under Medicaid. Moreover, Mississippi's Medicaid Plan expressly conditions Medicaid payments on compliance with applicable laws. *See supra* ¶ 48.

89.     The Minimum Data Set forms submitted by Defendants to CMS also conditioned payment of Medicare and Medicaid reimbursement on compliance with a federal regulation Defendants violated by employing Ms. Trofort. Specifically, the Minimum Data Sets provided that the "payment of . . . federal funds . . . is conditioned on the accuracy and truthfulness of [the] information" contained in the Minimum Data Sets, including the truthfulness of the statement made in each Minimum Data Set that patient data "was collected in accordance with applicable Medicare and Medicaid requirements." As noted, Defendants did not collect patient data in accordance with applicable Medicare and Medicaid requirements because the patient assessments were conducted by an unlicensed nurse.

90.     Finally, federal statutes demonstrate that compliance with the NHRA and the regulations promulgated thereunder (including the regulations violated by Defendants) is material to the decision to reimburse a provider under Medicare and Medicaid. *See, e.g.*, 42 U.S.C. §§ 1395i–3(h)(2)(B), (D).

91.     The United States and the State of Mississippi would not have paid the Medicare and Medicaid reimbursement claims submitted by Defendants had they known that during the Relevant Time Period, Defendants violated numerous conditions for receipt of Medicare and Medicaid payments contained in the Provider Agreements and applicable federal and state laws.

## COUNTS

### COUNT I
### VIOLATIONS OF THE FALSE CLAIMS ACT
31 U.S.C. § 3729(a)(1)(A)
"Presentment False Claims"

92.     Relator, on behalf of himself and the United States, re-alleges and incorporates paragraphs 1 through 91 above, as if set forth herein verbatim.

93.     Defendants have knowingly presented or caused to be presented false or fraudulent claims to the United States and the State of Mississippi for payment, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

94.     Despite knowing that Ms. Trofort's employment at Golden Living violated conditions on payment of Medicare and Medicaid reimbursement contained in the Provider Agreements and federal and state law, Defendants knowingly submitted, or caused to be submitted, Minimum Data Sets, cost reports, and other requests to the United States Government and the State of Mississippi containing claims for Medicare and Medicaid reimbursement for nursing services provided to patients of Golden Living during Ms. Trofort's tenure with the facility from April 23, 2013, to December 31, 2013.  In submitting or causing to be submitted these Medicare and Medicaid reimbursement requests, Defendants falsely certified to the United States and the State of Mississippi that Defendants were complying with the Provider Agreements and all applicable Medicare and Medicaid rules, regulations, and statutes. Defendants submitted the false Medicare and Medicaid reimbursement requests for the purpose of obtaining payment of federal funds.

95.     The false certifications that Defendants complied with the Provider Agreements and all applicable Medicare and Medicaid rules, regulations, and statutes, made in the course of submitting numerous Medicare and Medicaid reimbursement claims to the United States and the

26

State of Mississippi during and after the Relevant Time Period, were material to the United States' and the State of Mississippi's decisions to pay the reimbursement requests, and make Defendants liable under the FCA. The United States would not have paid the false Medicare reimbursement requests if it had known that Defendants violated conditions for receipt of payment contained in the Provider Agreements, and federal and state law. The State of Mississippi would not have used federal funds to pay false Medicaid reimbursement requests if it had known that Defendants violated conditions for receipt of payment contained in the Provider Agreements, and federal and state law.

96.     By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## COUNT II
## VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(C)
### "Conspiracy False Claims"

97.     Relator, on behalf of himself and the United States, re-alleges and incorporates paragraphs 1 through 96 above, as if set forth herein verbatim.

98.     Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A), in violation of 31 U.S.C. § 3729(a)(1)(C), making Defendants liable under the False Claims Act. Defendants have taken one or more overt acts in furtherance of the conspiracy.

99.     Defendants conspired with one another, had the mutual understanding, and had the common design and purpose to own, manage, operate, and control Golden Living in a manner that allowed them to extract maximum revenues from Golden Living for their own profit and financial gain, with reckless disregard for the health, safety, and welfare of the residents of Golden Living.

27

100.     In furtherance of this conspiracy, Defendants knowingly hired personnel, including Ms. Trofort, who were not qualified to provide care to patients at Golden Living in order to reduce expenses.

101.     With full knowledge that Ms. Trofort's employment as Director of Nursing Services at Golden Living violated conditions for receipt of Medicare and Medicaid reimbursement contained in the Provider Agreements and federal and state laws, Defendants further conspired to submit Medicare and Medicaid reimbursement claims to the United States and the State of Mississippi that falsely certified compliance with all conditions for payment. This conspiracy resulted in the presentation of numerous false claims to the United States and the State of Mississippi in violation of 31 U.S.C. § 3729(a)(1)(A).

102.     By virtue of this conspiracy, the United States suffered damages in an amount to be determined at trial.

### COUNT III
### PAYMENT BY MISTAKE OF FACT

103.     Relator, on behalf of himself and the United States, re-alleges and incorporates paragraphs 1 through 102 above, as if set forth herein verbatim.

104.     This is a claim for the recovery of monies paid by the United States and the State of Mississippi to Defendants by mistake.

105.     The claims made by Defendants to the United States and the State of Mississippi were false, fraudulent, and otherwise unallowable, as described above, for failure to comply with the Provider Agreements and applicable federal and state laws that were conditions of payment.

106.     The United States and the State of Mississippi, acting in reasonable reliance on the accuracy and truthfulness of the information contained in these claims, as described above, paid to the Defendants certain sums of federal money to which they were not entitled, and

Defendants are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

## COUNT IV
## UNJUST ENRICHMENT

107.     Relator, on behalf of himself and the United States, re-alleges and incorporates paragraphs 1 through 106 above, as if set forth herein verbatim.

108.     This is a claim for the recovery of monies by which Defendants have been unjustly enriched.

109.     As described above, Defendants received, and/or have continued to maintain control over, monies of the United States to which they are not entitled.

110.     By directly or indirectly obtaining monies of the United States to which they are not entitled, as described above, Defendants were unjustly enriched and are liable to account and pay such amounts, or the proceeds thereof, which are to be determined at trial, to the United States.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of himself and the United States, demands and prays that judgment be entered in his favor against Defendants as follows:

1.     That a jury be impaneled to try this cause;

2.     On Counts I and II, under the False Claims Act, for triple the amount of the United States' damages plus interest and such civil penalties as are allowable by law, together with the costs and expenses of this action and attorneys' fees, and such other and further relief as may be just and proper;

3.      On Count III, for payment by mistake of fact, for the damages sustained, plus pre-judgment and post-judgment interest, costs, attorneys' fees, and all such further relief as may be just and proper;

4.      On Count IV, for unjust enrichment, for the amount of unjust enrichment, plus pre-judgment and post-judgment interest, costs, attorneys' fees, and all such further relief as may be just and proper; and

5.      That judgment be entered in favor of the United States against the Defendants for actual damages, pre-judgment and post-judgment interest, litigation costs and expenses, attorneys' fees on all Counts, investigative costs, disgorgement of all profits, an accounting, to the fullest extent allowed by law, and for such further relief as may be just and proper.

Respectfully submitted,

NEAL & HARWELL, PLC

By: _____
Philip N. Elbert (*pro hac vice* application to be filed)
Lisa P. Binder
Nathan C. Sanders (*pro hac vice* application to be filed)
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
(615) 244-1713
pelbert@nealharwell.com
lbinder@nealharwell.com
nsanders@nealharwell.com

*Counsel for Relator*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served via certified mail upon the

following:

> United States Attorney's Office
> Northern District of Mississippi
> Ethridge Building
> 900 Jefferson Avenue
> Oxford, MS  38655

> United States Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, D.C.  20530

this the 23rd day of April, 2019.