# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# OXFORD DIVISION

**UNITED STATES OF AMERICA,**
ex rel. CAMERON JEHL                                                                                       **PLAINTIFF**

**VS.**                                                                         **CIVIL ACTION: 3:19-CV-00091-MPM-JMV**

**GGNSC SOUTHAVEN, LLC et al.**                                                                            **DEFENDANTS**

## ORDER

This cause comes before the court on its own motion, giving the parties an opportunity to address certain concerns which it has developed regarding this case. This is a *qui tam* action in which plaintiff, acting pursuant to a "whistleblower" complaint filed by Relator Cameron Jehl, seeks to hold defendant GGNSC liable under the False Claims Act for seeking unlawful Medicare and Medicaid reimbursements. In alleging that the reimbursements sought by GGNSC were unlawful, plaintiff argues that they were predicated upon false information, namely that its nursing director, Lionelle Trofort, had a valid nursing license. To legally practice nursing in Mississippi and serve as Director of Nursing, Trofort had to possess either a valid Mississippi nursing license, or a valid "multi-state" license from another state that gave her the privilege to practice in Mississippi. *See* Miss. Code Ann. §§ 73-15-3, 73-15-22 (2013); 15 Miss. Admin. Code Pt. 16, Subpt. 1, R. 45.4.1 (2013).

The Complaint[1] in this case alleges that Trofort was not licensed to practice nursing at GGNSC in 2013 and 2014 pursuant to a Virginia multi-state nursing license because she was not a legal resident of Virginia and, therefore, had no "multi-state" privileges attached to her

---

[1] This court's references to the "Complaint" should be understood as referring to the Second Amended Complaint.

1

Virginia license that permitted her to practice in Mississippi. The Complaint further alleges that, as a result of Trofort's lack of a valid license to practice nursing in Mississippi while employed at Golden Living, Defendants' certifications of compliance with applicable licensure laws in their Medicare and Medicaid reimbursement requests were false within the meaning of the FCA. The FCA imposes liability on any defendant who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or who conspires to do the same, *id.* § 3729(a)(1)(C). A "claim" includes a request for Medicare or Medicaid reimbursement that contains (1) a false statement (2) made knowingly or recklessly and (3) that was material. *See United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 159 (5th Cir. 2019) (citing 31 U.S.C. § 3729(b)(2)(A)); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188-89 (5th Cir. 2009).

This court previously denied defendant's motion to dismiss this case, and, in so doing, it expressed its inclination to conclude that certain fact-intensive issues in it would require resolution by a jury. Specifically, this court wrote that:

> In reading the arguments from both sides on this issue, this court's impression is that they each appear to have good faith and reasonable arguments regarding the issue of knowledge. Given the inherently fact-intensive nature of this issue, this court has every expectation that, even after discovery is completed in this case, there will remain triable fact issues regarding the issue of knowledge which will require a jury to resolve. While this court would not be surprised if defendant were to eventually prevail before a jury on this issue, it is unable to agree with it that prior administrative findings regarding Trofort's status are, as a matter of law, sufficient to bar plaintiff's claims in this case.

[Order on dismissal at 7-8].

This court's previously-stated inclination to let a jury decide these issues was based on one overriding assumption. Namely, this court assumed that if it chose to err on the side of allowing jurors to decide these matters, then they would have the discretion to implement a fair result in this case, both as to liability and damages. This is ordinarily a safe assumption.

2

However, this court has not previously conducted an FCA trial, and the issue of potential damages was not raised in the parties' briefing on the motion to dismiss. This court was therefore surprised, in reading the parties' summary judgment briefing, to learn of the sort of damages, many of them *mandatory*, which might arise from the rather unique FCA damages scheme as applied to this case. This may be an instance of this court's broad naivete, rather than a comment on the state of the law, but it appears that calculating damages unrelated to actual harm or injury may present a potential unfairness, or even absurdity, in the law.

Relator notes in his briefing that the FCA provides for a civil penalty of between $5,000 and $10,000 for each false claim, even absent a showing of actual damages. Specifically, Relator writes that:

> In this False Claims Act ("FCA") case, one of the remedies is a civil penalty of not Less than $5,000 and not more than $10,000. 31 U.S.C. § 3729(a)(1).1 The FCA requires the award of civil penalties for each false claim or statement even if no damages were caused by the false claims. *Id.*; *United States ex rel. Rudd v. Schimmels*, 85 F.3d 416, 419 n.1 (9th Cir. 1996); *United States ex rel. Longhi v. Lithium Power Tech., Inc.*, 530 F. Supp. 2d 888, 891 (S.D. Tex. 2008) (stating that "the court must assess a civil penalty" for each false claim). Relator included civil penalties in his relief requested. (See Second Am. Compl., Dkt. No. 90 at PageID: 927.)

For its part, GGNSC does not appear to dispute that the interaction between the FCA's penalty scheme and the number of Medicaid claims which it submitted in this case would result in a staggering amount of *mandatory* damages, the minimum amount of which is completely outside of a jury's (or this court's) discretion.

Indeed, GGNSC itself notes in its briefing that "the FCA provides for a civil penalty of not less than $5,000 and not more than $10,000 … because of the act of that person," and in moving to strike the supplemental report of Relator's expert Scott Mertie, it noted that "[b]y submitting Mertie's new opinion, Relator seeks to increase the award potentially by

3

$13,930,000." [245-1 at , citing 31 U.S.C. § 3729(a)(1),] This figure is based upon Merties' estimate of the number of claims during the period when Trofort allegedly lacked proper licensing, which was 1,393. While this court does not assume that this estimate is precisely correct, even the rough estimate represents a staggering sum (half of it mandatory) which is difficult to reconcile with any considerations of proportionality and fairness.

In seeking to combat these astronomical sums in claimed damages, GGNSC relies upon arguments that discovery violations and missed deadlines specific to this particular case should prevent Relator from obtaining access to the number of Medicaid claims filed by defendant, thereby preventing him from proving damages. This court regards this as a highly unsatisfactory approach to this issue, for a number of reasons. First of all, this court emphasizes that GGNSC clearly knows how many claims it filed during the relevant period, and it is not particularly comfortable with a position that "we know this information, but we won't reveal it since you didn't ask for it on time." A trial is a search for truth, and this court's general practice is to err on the side of a jury having all important information at its disposal, even at the expense of tolerating some degree of discovery violations.

This court also finds the prospect of deciding this issue on the basis of discovery lapses to be unsatisfactory because it must be concerned not only with the result in this case, but in future ones as well. If this case were to serve as precedent that the FCA opens the door to eight-figure recoveries for claims made based on rather minor licensing issues, if only the applicable discovery deadlines are met, then this court suspects that nursing homes would be inundated with similar whistleblower actions. This court's goal in any case is to reach a fair result both as to liability and damages, and if the FCA provides no option but to award an unjustifiable amount of damages, then this gives it cause to reconsider whether it is the proper vehicle for handling

4

allegations such as those here. In so stating, this court presumes that Congress did not intend absurd results when it enacted the FCA, and a scheme whereby the rather underwhelming allegations in this case might give rise to an eight-figure recovery in damages and penalties, much of it mandatory, is, in fact, absurd.

It should be noted that, in his briefing, Relator makes it clear that he is not satisfied with even the prospect of an eight-figure recovery in penalties, and that he is further seeking an astronomical additional award of "damages." This court places "damages" in quotes, since Relator appears to acknowledge that the issues arising from Nurse Trofort's licensing status had no actual impact upon patient care. Instead, Relator argues that:

> In cases where the contract between the defendant and the government calls for the defendants "to produce a tangible structure or asset of ascertainable value" or to provide the government with tangible goods, then the benefit-of-the bargain measure demanded by Defendants is often the appropriate measure of damages. *See United States v. TDC Mgmt. Corp., Inc.*, 288 F.3d 421, 428 (D.C. Cir. 2002); *United States ex rel. Antidiscrimination Ctr. of Metro N.Y., Inc. v. Westchester Cty.*, 2009 WL 1108517, at *3 (S.D.N.Y. Apr. 24, 2009). On the other hand, "where there is no tangible benefit to the government and the intangible benefit is impossible to calculate, it is appropriate to value damages in the amount the government actually paid to the Defendants." *United State ex rel. Longhi v. United States*, 575 F.3d 458, 473 (5th Cir. 2009).

[Docket entry 266-1 at 6]. Relator thus seeks for this court to reject the "benefit-of-the-bargain" element of damages which requires actual proof of damages in favor of one which awards what are essentially presumed damages, above and beyond the enormous penalty already imposed.

If there were an "Exhibit A" for the notion that Relator's FCA claim is completely divorced from any considerations of proportionality and fairness, it would have to be Mertie's supplemental report. [Docket entry 244-3]. In addition to the estimate of the number of claims (1393) referenced above, Mertie estimates that GGNSC's total payments to provider (which Relator contends is the proper means of calculating damages in this case) is approximately $7 million dollars. [244-3 at 4]. In his response to the motion to strike Mertie's testimony, Relator

5

notes that "[t]he FCA does not specify how damages are to be measured, stating only that one who violates the act is liable for civil penalties 'plus three times the amount of damages which the Government sustains because of the act of that person.' 31 U.S.C. § 3729(a)(1)." [Brief at 6].

When the requested treble damages are factored in, it appears that Relator is seeking well in excess of thirty million dollars in total damages in this case, several million of it in mandatory penalties. When considering this staggering sum, this court believes that it is helpful to remember exactly what allegations of alleged wrongdoing support this sum. Namely, Relator argues in its summary judgment brief that:

> [S]ubject to a 30-day grace period, multi-state privileges granted by a state like Virginia terminate by operation of law when a nurse leaves Virginia and establishes primary residency in another Compact state—at that point, the privileges are issued by a *former* home state to a *former* resident in that state, and the nurse no longer satisfies the residency requirements imposed by Virginia law for retaining multi-state privileges. …
>
> Although Ms. Trofort purported to rely on multi-state privileges from Virginia during her tenure at Golden Living, those privileges had terminated as a matter of law before she began working there because she had established Tennessee, and not Virginia, as her primary state of residence. Her primary residency in Tennessee is demonstrated by, *inter alia*, a Tennessee driver's license, voter registration in Tennessee, and tax forms for Ms. Trofort listing a Tennessee address.
>
> Her Tennessee residency was known to Defendants because she repeatedly told them that she was living in Tennessee, they knew she claimed Tennessee as her primary state of residence, they possessed a copy of her Tennessee driver's license, and they filled out W-2 tax forms for her listing a Tennessee address. (*See supra* n.2.) Despite the fact that Ms. Trofort was not lawfully authorized to work as a nurse or director of nursing in a Mississippi nursing facility, Defendants repeatedly made express and implied false certifications to the State of Mississippi and the United States that they were in compliance with their Medicare and Medicaid provider agreements, as well as Mississippi and federal laws, requiring nurses and directors of nursing to be validly licensed. These express and implied false certifications were set forth in Minimum Data Sets ("MDS"), universal billing claims, and cost reports that Defendants presented to the State of Mississippi and the United States as part of the process for obtaining Medicare and Medicaid reimbursement for care provided during Ms. Trofort's tenure.

[Relator's response to summary judgment at 5-7].

Relator thus contends that GGNSC's rather bland and generic allegations in Medicare and Medicaid billings that it was "in compliance with their Medicare and Medicaid provider agreements," considered in conjunction with the residence practices of one of its nurses, has somehow given rise to a thirty-million dollar plus lawsuit, much of it involving millions in mandatory penalties. For its part, this court is highly skeptical that any issues arising from the fact that Nurse Trofolt (allegedly) chose to establish permanent residence in Tennessee, thereby endangering her Virginia multi-state certification, could have resulted in anything approaching the damages which plaintiff argues is appropriate in this case. In so stating, this court notes that Nurse Trofolt did not forget anything she previously knew about nursing when she took this step, and it doubts whether a single GGNSC patient cared in the slightest whether her permanent residence was in Virginia, Tennessee, or Alaska for that matter. That being the case, the sort of million-dollar verdict which Relator argues is appropriate strikes this court as being completely disproportionate in this case.

This court's doubts regarding the applicability of the FCA to plaintiff's claims are not assuaged by the notion, which is no doubt true, that a jury could prevent any damages at all from being awarded simply by ruling in favor of defendant. While this court suspects that a jury would, in fact, make short work of the Relator's claims in this case, it cannot be certain that this would occur. In considering whether an FCA claim should be held potentially valid in this case, this court wishes to ensure that both sides will have a fair opportunity to make their case and to obtain a fair verdict both as to liability and damages. In so stating, this court notes that, if FCA plaintiffs with even factually weak claims are able to threaten nursing homes with staggering sums in mandatory penalties in the event that liability is found by a jury, then this will give them great leverage to compel settlements on unjust terms.

7

The Relator is essentially asking this court to recognize an entirely new cause of action in this case, and, in considering whether it should do so, it is not engaged in a theoretical, academic exercise. Rather, this court must consider the impact of recognizing such a new cause of action on real businesses, and the real-life impact of recognizing an FCA claim in this case give it great cause for concern. In particular, this court has developed grave concerns that applying the FCA to allegations such as those here would create a lucrative new cause of action which would, in cases where liability is found, likely result in crippling financial penalties against nursing homes which are far out of proportion to any alleged wrongdoing. This, in turn, would likely lead to a flood of litigation in which "whistleblowers" seek eight-figure damage awards, much of it mandatory and out of a jury's discretion, based on the fact that a single nursing home employee lacked appropriate licensing for a certain period of time.

This court's new-found skepticism regarding the Relator's claim has led it to take a harder look at the authority which he cites in support of his claims.[2] In its summary judgment brief, Relator cites *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 743 (10th Cir. 2018) and *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) in support of his claims. [Docket entry 249-1 at 12-13]. However, neither of these cases involved fact patterns analogous to the licensing issue here, and they each strike this court as presenting much stronger claims than the ones at issue in this case.

In *Polukoff*, for example, the Tenth Circuit noted that:

Dr. Polukoff alleges Dr. Sorensen performed thousands of unnecessary heart surgeries and received reimbursement through the Medicare Act by fraudulently certifying that the

---

[2] In providing its reasons in this regard, this court recognizes that, to some extent, it is revisiting issues it previously addressed at the Rule 12 dismissal stage. Thus, to avoid any law of the case issues in this regard, this court will therefore consider both the parties' Rule 12 and Rule 56 arguments *de novo*, albeit armed with a greater understanding of the manner in which Relator is actually seeking to employ its claims in this case and the unfairness which this presents.

surgeries were medically necessary. Dr. Polukoff further alleges the hospitals where Dr. Sorensen worked were complicit in and profited from Dr. Sorensen's fraud.

*Polukoff*, 895 F.3d at 734. Thus, the focus in *Polukoff* was on alleged misrepresentations regarding the *services* which were being billed, and not simply the licensing status of one of the nurses on staff, and this provides a much stronger argument that U.S. Supreme Court's stringent FCA jurisprudence was met in that case.

In *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), the Supreme Court recognized an implied certification theory in FCA cases when (1) the claim for payment "makes specific representations about the goods or services provided" and (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." 136 S. Ct. at 2001. In the court's view, the allegations at issue in *Polukoff* provided a much stronger argument that the defendants had made "specific representations about the goods or services provided" within the meaning of *Escobar* than anything which GGNSC is alleged to have done in this case. In *Thompson,* the other case cited by Relator, the plaintiff alleged that defendants violated the FCA by committing violations of Medicare kickback and other laws which strike this court as being much more serious than the rather minor licensing issue in this case. *Thompson,* 125 F.3d at 901. In cases where a plaintiff asserts a novel theory of liability which relies upon a very limited amount of precedent which presents a much stronger factual case than his own case, this necessarily raises skepticism in this court's eyes.

The above-stated concerns also give this court cause to reconsider its prior conclusion that the issue of the state of GGNSC'S knowledge should be regarded as a triable jury issue in this case. While knowledge is, in fact, generally a jury issue, this court is now inclined to conclude that if a finding of FCA liability is to result in the sort of mandatory penalties

9

mentioned above, then considerations of fairness and due process require that knowledge be proven with something considerably stronger than the vague and indirect evidence which Relator has produced in this case. In so stating, this court notes that the allegations of knowledge in *Polukoff* and *Thompson* were far greater than that here. In *Polukoff*, for example, the Tenth Circuit noted that:

> Dr. Polukoff adequately alleges St. Mark's and Intermountain submitted these false certifications "knowingly." As to St. Mark's, Dr. Polukoff alleges that he personally told the CEO about the circumstances surrounding Dr. Sorensen's suspension from Intermountain for performing unnecessary PFO closures. Nonetheless, according to Dr. Polukoff, St. Mark's continued to recruit Dr. Sorensen's business.

*Id.* at 744.

While the Fifth Circuit did not specifically discuss the issue of knowledge in *Thomson,* that case involved physicians taking steps that constituted a violation of Medicare anti-kickback laws, such as by providing physicians with perks and other benefits to refer Medicare patients to their hospitals. *Thompson,* 125 F.3d 901. This court can discern a much stronger argument that the defendants in *Thompson* had the requisite degree of knowledge with regard to their own ethically and legally questionable conduct in this regard, than anything which is present here. In this case, Relator seeks to infer knowledge from facts such as Nurse Trofort's Tennessee driver's license being on file at GGNSC, but this evidence supports a quite weak inference that, in submitting Medicaid billings, defendant was aware either that Trofort had established permanent residence in Tennessee or that this endangered her Virginia multi-state licensure.

This court thus finds the evidence of knowledge in this case to be rather weak, but it emphasizes that, even assuming that GGNSC was, in fact, aware of the lapse in Nurse Trofort's multi-state licensing privileges, more than six million dollars in mandatory penalties is an unjustifiably harsh penalty for this offense. In the court's view, six million dollars is the kind of

verdict it might expect to see for a nursing home which had egregiously neglected to care for one of its residents, thereby resulting in her death, not for a nursing home which allowed a licensing lapse to occur with regard to one of its otherwise qualified nurses. This court thus finds the mandatory FCA penalties, as applied to this case, to be fundamentally unjust, and it does not wish to permit what it believes to be an unjust result to occur in its courtroom, barring clear precedent indicating that it must do so.

While it still seems plausible to this court that there might have been a minor licensing violation in this case, it is now inclined to conclude that any such violation should be addressed, if at all, by state and federal regulators and not by private fortune-seekers filing FCA claims. The mandatory penalties and treble damages which exist in FCA claims are much too strong medicine for the conduct alleged in this case, and the sheer dollar amounts at issue might serve to create perverse incentives for unethical and illegal behavior among potential FCA plaintiffs and nursing home employees. For example, it seems quite realistic to imagine a scenario in which a disgruntled employee of a nursing home deliberately allows her nursing license to expire so that she might collude with a private "whistleblower" in filing a lucrative FCA claim against her employer. By leaving violations such as the one alleged in this case to state and federal regulators, courts would ensure that any actual violations are dealt with in a more reasonable, professional and objective manner, and there are far fewer concerns about matters such as collusion.

That brings this court to the fact that evidence was developed during discovery in this case which suggests that actual Medicaid regulators would not have regarded the alleged violation in this case as something worthy of their time. The evidence in question is described in GGNSC's brief as follows:

11

> The controlling laws for determining whether Southaven's certifications are correct are codified at 42 C.F.R. § 483.75 (2013), which sets forth CMS's regulation regarding "accepted professional standards and principles" regarding licensure, and CMS's State Operations Manual where CMS publishes the meaning and "intent" behind its own regulations. Specifically, regarding when a current active valid license is no longer current active and valid, CMS provided that a license is no longer valid: "When the Federal, State or the local authority having jurisdiction has both made a determination of non-compliance AND has taken a final adverse action." ECF 247 at 10 (quoting CMS's State Operations Manual). CMS directed that a "final adverse action," only occurs when two events happen: (1) loss of professional license and (2) the loss of professional license is NOT under appeal or litigation by the facility or the professional providing services in the facility. *Id.* (providing "A 'final adverse action' means .. loss of a … professional license .. and is NOT under appeal or litigation by the facility or the professional providing services in the facility").
> CMS instructed that the meaning of its regulation was that even if the governing jurisdiction found a violation but that no final adverse action had been taken against the licensee, the facility should not be found to have violated its law. See ECF 247 at 10 (instructing regulators "Do not cite [a violation] when a determination is made by the authority having jurisdiction that a facility is not in compliance with Federal, State or local requirements, regulations, codes and/or standards and a final adverse action has NOT been taken by the authority having jurisdiction").

[Brief at  ]

GGNSC relies heavily upon this CMS guidance, which, as quoted above, provides that a license is no longer valid "[w]hen the Federal, State or the local authority having jurisdiction has both made a determination of non-compliance AND has taken a final adverse action." It is undisputed that there was no "final adverse action" taken with regard to Nurse Trofort's licensing status, and GGNSC thus argues that it is entitled to summary judgment based on this guidance. For its part, the Relator has filed a motion to prevent GGNSC's expert from presenting his interpretation of this regulation, arguing that it dealt with the Medicaid "survey" process and not the billing process which is at issue in this case. Specifically, GGNSC argues that:

> Mr. Harris intends to offer his opinion that the fact that Lionelle Trofort was not validly licensed to practice nursing in the State of Mississippi at the time she worked for Defendants was not something that surveyors would have considered violative of regulatory provisions. This is because, according to Mr. Harris, surveyors will not cite

12

> noncompliance with state licensure requirements unless the licensing authority has taken a final adverse action against the individual. …
>
> Mr. Harris admits that the guidance upon which he relies for his opinions only relates to surveys, not Medicare or Medicaid billing, which is the issue in this case. He further admits that it is not the surveyor's role to determine whether a claim should be paid or whether funds should be recouped. In fact, Mr. Harris agreed that the survey and billing processes are two different things. Mr. Harris's opinions are solely in the survey context, which he admits is completely different from the billing process. Consequently, his opinions do not meet the requirement of Fed. R. Evid. 702 that his expert opinion must help the trier of fact to understand the evidence or to determine a fact in issue.

[Motion to strike at 1-3].

While it may well be true that the survey context is distinct from the billing context, the official CMS guidance clearly tends to reduce the importance of the licensing issues raised in this case, at least in this court's eyes. In so stating, this court reiterates that Relator is essentially seeking for it to recognize what amounts to a new FCA cause of action, in such a manner as to open the door to staggering financial recoveries on his part. In this court's experience, matters such as licensing violations by individual employees are typically left to the jurisdiction of state and federal regulators, not private plaintiffs seeking to enrich themselves, and a closer examination of this case leads it to conclude that this is a wise practice. The desirability of recognizing a private FCA cause of action in this case seems even more suspect in light of the CMS guidance. Indeed, it is difficult to discern why this court should open the door to tens of millions of dollars in potential recovery over an alleged violation which Relator appears to concede would not have been regarded as sufficiently serious to concern CMS's own surveyors.[3]

---

[3] This court notes that, late in this case and after discovery deadlines had passed, Relator sought to produce an affidavit from a Mississippi state Medicaid official in which he offered his opinion that the licensing violation in this case would, in fact, have been considered material by his office. Even if this court were to excuse this discovery violation, however, it regards the opinion of a single state official, offered in support of litigation, to be much less reliable than formal guidance issued by CMS to its surveyors. In his briefing, Relator questions the importance of the CMS guidance because it was not subject to a formal rule-making process, but it should be apparent that the CMS guidance in question is far more reliable than the opinion of a single state

This court acknowledges that, considered in the abstract, there is a coherent argument that the FCA should apply in the licensing context, and it is not suggesting that FCA actions have no role whatsoever to play in combatting licensing or regulatory violations. This court does suggest, however, that courts must tread very carefully in recognizing FCA claims in a new regulatory or licensing context, and they must carefully consider the public policy implications of placing a matter previously left to the discretion of state and federal regulators to private FCA plaintiffs. After considering the parties' summary judgment briefing in this case, this court has come to the realization that the Relator in this case is seeking for this court to recognize what amounts to an entirely new and highly disruptive cause of action which, if successful, is likely to lead to many other such actions. Even more disturbingly, this court was unable to satisfy itself that, if it were to stand by its original inclination to let this matter go to trial, it would be able to implement some of the rigid mechanisms of the FCA, including its scheme for mandatory minimum penalties, in a way which guaranteed basic fairness and due process for both sides in this case.

In hearing a case, this court's basic responsibility is to guarantee a fair hearing and fair proceedings to both sides. In expressing its initial inclinations regarding this case, this court assumed that, if held applicable to the claims in this case, the FCA would allow it to do so. This court has since developed grave misgivings on this issue, and a closer look at the stringent requirements of the FCA lead it to conclude that they are stringent for a reason. Namely, this court has concluded that the requirements of the FCA are so stringent precisely because, in cases

---

official offered in support of litigation. Moreover, defendant argues that federal Medicaid guidance is much more relevant in this case than state Medicaid guidance is, and this appears to be correct. This court therefore regards the CMS guidance as much stronger evidence than the affidavit submitted by Relator.

where its requirements are met, the mandatory penalties, treble damages and other remedies are so crippling. That being the case, considerations of fairness and due process require that courts take great care in recognizing FCA actions in new contexts, and this obviously requires that already-stringent FCA precedent such as the Supreme Court's decision in *Escobar* be met. It also strikes this court as advisable, however, for courts to consider whether the FCA's strict and rigid damages scheme renders it an unsuitable vehicle to address the alleged licensing or regulatory violation at issue in a particular case.

For example, if the FCA's minimum penalty, which was recently raised above $10,000 for each false claim,[4] would result in a penalty, outside of the jury's discretion, which no responsible person could regard as reasonable, then this would, in the court's view, suggest that the FCA is not the "correct tool for the job." In light of the foregoing, this court is inclined to conclude that this particular case is not one in which an FCA claim should be recognized and that it should be dismissed. In the interests of fairness to Relator, however, this court has determined that, since it is raising certain issues on its own motion in this order, he should have an opportunity to respond to them. This court therefore grants Relator three (3) weeks to address the issues raised in this order and to show cause why it should not be dismissed on the basis of the arguments therein. GGNSC shall have three (3) weeks to respond to that submission, and Relator may file a reply brief within seven (7) days, if he wishes to do so. Pending a resolution of these matters, the trial scheduled in this case is hereby continued indefinitely.

---

[4] See https://www.hallrender.com/2020/07/01/false-claims-cost-more-doj-increases-civil-penalties-for-false-claims-act-violations/ citing https://www.federalregister.gov/documents/2020/06/19/2020-10905/civil-monetary-penalties-inflation-adjustment

This, the 6th day of July, 2021

                                  /s/ Michael P. Mills
                                  U.S. DISTRICT COURT