**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**UNITED STATES OF AMERICA, ex rel.**
**CAMERON JEHL** **PLAINTIFFS**

**V.** **CIVIL ACTION NO. 3:19-cv-091-NBB-JMV**

**GGNSC SOUTHAVEN, LLC,**
**doing business as Golden Living Center**
**– Southaven; GGNSC ADMINISTRATIVE**
**SERVICES, LLC, doing business as**
**Golden Ventures, and GGNSC CLINICAL**
**SERVICES** **DEFENDANTS**

**MEMORANDUM OPINION**

This cause comes before the court upon the defendants' Motion for Summary Judgment. Upon due consideration of the motion, response, exhibits, and applicable authority, the court is ready to rule.

Factual Background and Procedural Posture

The relator, Cameron Jehl, a licensed attorney and resident of Shelby County, Tennessee, acting on behalf of himself and the United States, brings this *qui tam* action against the defendants GGNSC Southaven, LLC, GGNSC Administrative Services, LLC, and GGNSC Clinical Services. The relator alleges in his Second Amended Complaint[1] filed on July 10, 2020, that the defendants submitted false claims to the United States and the State of Mississippi for Medicare and Medicaid reimbursement related to nursing and rehabilitation services. He seeks to recover treble damages, civil penalties, attorneys' fees, and costs under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*. The defendants collectively owned, operated, or controlled Golden Living Center – Southaven in Southaven, Mississippi, a nursing facility engaged in the

[1] The original *qui tam* complaint was filed on April 23, 2019.

custodial care of elderly and other individuals who are chronically infirm, mentally impaired, or otherwise in need of nursing care and treatment. GGNSC Southaven, LLC, is the entity that directly operates Golden Living.

The complaint alleges that defendant GGNSC Administrative Services, LLC, acting with the assistance and direction of the other defendants, submitted claims to the United States and the State of Mississippi to obtain Medicare and Medicaid reimbursement for healthcare services provided to Golden Living patients between April 23, 2013, and March 31, 2014, certifying that the defendants had complied with all conditions for reimbursement set forth in federal and state laws, as well as the provider agreements executed by the defendants and the United States and the State of Mississippi, when in fact, the defendants had not complied with those conditions. The complaint asserts that, during the relevant time period, the defendants knowingly or recklessly employed as Golden Living's Director of Nursing Services an individual, Lionelle Trofort, who was allegedly not licensed or lawfully authorized to practice nursing in the State of Mississippi. To practice nursing legally in Mississippi and serve as Director of Nursing Services, Trofort was required to possess either a valid Mississippi nursing license or a valid multistate license from another state that gave her the privilege to practice in Mississippi. *See* Miss. Code Ann. §§ 73-15-3, 73-15-22; 15 Miss. Admin. Code Pt. 16, Subpt. 1, R. 45.4.1 (2013).

Nurse Trofort was a licensed registered nurse in Virginia at all times relevant to this lawsuit. In 2005, Trofort obtained a multistate license which permitted her to work as a nurse in states outside Virginia. In 2010, Trofort began working as a traveling nurse outside Virginia and was employed in facilities in states including Arizona, Arkansas, and Mississippi. She considered each of these locations as temporary residences, frequently living in a hotel in one state and spending weekends in another state. Trofort had served in the military while stationed

in Virginia, had longstanding family ties to Virginia, considered Virginia her permanent state of residence, and intended to return to Virginia after a period of working as a traveling nurse. She testified that this is why she had a Virginia multistate license.

Approximately two months prior to Trofort beginning her employment with defendant Golden Living in Southaven, the State of Virginia revoked her multistate credential. The license was reinstated, however, after Trofort sent a declaration on March 20, 2013, averring that Virginia was her primary state of residence ("PSOR"). The required declaration defines PSOR as simply "the state of a person's declared fixed permanent and principal home or domicile for legal purposes." On April 24, 2013, the day after Trofort began her employment with Golden Living, its employee Audra Peters confirmed that Trofort held a current active Virginia license with a multistate privilege.

During the brief period during which Virginia revoked Trofort's multistate privilege, from February 28, 2013, to March 20, 2013, Trofort worked at an Arkansas facility. Arkansas State Board of Nursing investigator Dan West investigated the matter on behalf of Arkansas and learned from the defendants in this case that Trofort held a Tennessee driver's license while employed at Golden Living during the time of West's investigation. All compact nursing boards have an affirmative duty to report and disclose relevant investigative information to the boards of other nursing compact states, which is why defendant Golden Living reported this information to West during his Arkansas investigation. West took issue with Trofort's Tennessee driver's license, considering it evidence that Tennessee, not Virginia, was Trofort's PSOR. To date, however, no nursing board has cited Trofort for her work in Southaven or in any way concluded that her work at Golden Living was improper in any fashion. No nursing board has taken action against Trofort based on her Tennessee driver's license, ostensibly because there is no law, rule,

or regulation that would invalidate a multistate license based on the existence of a driver's license outside one's PSOR.

On February 28, 2014, Golden Living nevertheless suspended Trofort, and she performed no additional work at the facility. Her termination was effective a few days later on March 4, 2014. Fifteen months after Trofort's Golden Living employment ended, Virginia issued a final adverse action in a public ruling revoking Trofort's multistate credential effective May 31, 2015, based upon an administrative settlement Trofort consummated with Arizona based on her work in Arizona, unrelated to the facts of the present action.

The Second Amended Complaint alleges that, as a result of Trofort's lack of a valid license to practice nursing in Mississippi while employed at Golden Living, the defendants' certifications of compliance with applicable licensure laws in their Medicare and Medicaid reimbursement requests were false within the meaning of the FCA. The FCA imposes liability on any defendant who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who conspires to do the same. 31 U.S.C. § 3729(a)(1)(A) and (C). A "claim" includes a request for Medicare or Medicaid reimbursement that contains (1) a false statement (2) made knowingly or recklessly and (3) that was material. *See United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 159 (5th Cir. 2019) (citing 31 U.S.C. § 3729(b)(2)(A)); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188-89 (5th Cir. 2009).

The relator seeks damages, including treble damages, under the FCA for each alleged violation. The FCA provides "for a civil penalty of not less than $5,000 and not more than $10,000" for each act in violation of the statute. 31 U.S.C. § 3729(a)(1). The FCA requires the award of civil penalties for each false claim or statement even if no actual damages resulted from

the false claims. *United States ex rel. Rudd v. Schimmels*, 85 F.3d 416, 419 n.1 (9th Cir. 1996); *United States ex rel. Longhi v. Lithium Power Tech., Inc.*, 530 F. Supp. 2d 888, 891 (S.D. Tex. 2008) (stating that "the court must assess a civil penalty" for each false claim). The relator estimates the number of claims submitted during the period when Trofort allegedly lacked proper licensing as 1,393. The relator therefore seeks a base of $13,930,000, half of it mandatory. This civil penalty scheme is just one of the remedies the relator seeks. He also seeks damages in the amount the government paid to the defendants during the applicable period, a figure of approximately $7 million dollars. When the requested treble damages are factored in, the relator appears to seek well in excess of $30 million or more, minimum, with several million dollars of the recovery in mandatory penalties.

Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the movant has the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant makes such a showing, the burden then shifts to the non-movant to "go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When deciding a motion for summary judgment, the court must view the underlying facts in the "light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). As such, all reasonable inferences must be drawn in favor of the non-

movant. *Id.* Before finding that no genuine issue for trial exists, the court must first be satisfied that no rational trier of fact could find for the non-movant. *Matsushita*, 475 U.S. at 587 (1986). "Summary judgment, although a useful device, must be employed cautiously because it is a final adjudication on the merits." *Jackson v. Cain*, 864 F.2d 1235, 1241 (5th Cir. 1989).

## Analysis

The Second Amended Complaint alleges that, as a result of Trofort's lack of a valid license to practice nursing in Mississippi while employed at Golden Living, the defendants' certifications of compliance with applicable licensure laws in their Medicare and Medicaid reimbursement requests were false within the meaning of the FCA. The relator contends that Trofort's representation that Virginia is her PSOR is false because she listed a Tennessee address where she was staying, paid taxes outside Virginia as required by the locale where she was staying, obtained a Tennessee driver's license to have legal permission to drive there, and registered to vote to fulfil her civic obligations in the community while she resided outside her fixed, permanent home state of Virginia. Regarding these matters, Trofort testified in her deposition as follows: "Q. And did you believe it was a legal requirement that you get a license in Tennessee? A. Yes. Because two out of the three had to match. Q. When you say two out of the three, you needed between the insurance, the car registration, the license, at least two of those needed to be from the state you were in? A. Yes." She further testified, "Q. You became a registered – or you applied to be a registered voter that day? A. Yes. I want to vote where I am." Trofort Dep. [Doc. 246-5].

The certification of PSOR required by the Virginia Nursing Board defines PSOR as "the state of a person's declared fixed permanent and principal home or domicile for legal purposes." There is no further definition. Trofort stated that Virginia was her fixed permanent and principal

home and the state in which her family resides. She testified, "Q. You mentioned the word domicile. What does that mean to you? A. Where I claim my primary residence, different from where I lay my head, where I sleep at night …. I was still travel nursing. I had not decided to stay in Tennessee…. Q. Okay. Any other basis that you have for claiming that Virginia was your primary state of residence as of March 2013? A. I had just lost my job in Arkansas. I hadn't yet started at Golden Living, so I was still in limbo. I didn't know where I was going, so Virginia was my default, where I go back to because my family lived there, and that's where I had all my licensures." *Id.*

There is no statute or regulation that invalidates a multistate license merely because a nurse lists an address outside her PSOR, pays taxes outside her PSOR, or obtains a driver's license outside her PSOR. There is no statute or regulation that states that the licensing body cannot, or does not, take into account a nurse's longstanding family ties to a state in determining what state is a nurse's fixed, principal home. The relator's own regulatory expert testified to this effect: "Q. I'm asking, are you aware of any law, statute, or regulation that states that a primary state of residence cannot be established by the objective evidence of longstanding family ties in one's home state? A. No." Nyangoro Dep. [Doc. 246-11].

The Center for Medicare and Medicaid Services ("CMS") publishes extensive authoritative interpretative guidance regarding the meaning and effect of its nursing facility regulations in its publication, *State Operations Manual*. *See* Harris Declaration [Doc. 246-2]. Courts afford substantial deference to CMS's manual provisions interpreting CMS's own regulations. *See Baylor County Hosp. Dist. v. Burwell*, 163 F. Supp. 3d 372, 384 (N.D. Tex. 2016), *aff'd sub nom. Baylor County Hosp. Dist. v. Price*, 850 F.3d 257 (5th Cir. 2017) (deferring to the CMS *State Operations Manual* and recognizing "the Supreme Court's repeated

suggestion that [Department of] HHS interpretations, in particular, should receive more respect than the mine-run of agency interpretations"). Indeed, the level of deference approaches that afforded to regulations promulgated through notice-and-comment rulemaking. *See id.* ("In cases such as those involving Medicare and Medicaid, in which CMS, a highly expert agency, administers a large complex regulatory scheme in cooperation with many other institutional actors, the various possible standards for deference – namely, *Chevron*[2] and *Skidmore*[3] – begin to converge.").

As the relator notes, federal law requires that the "facility must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility." [Doc. 89]. To ensure objective rules guide a facility's conduct, CMS issued bright line rules so that facilities have guidance regarding when they must terminate needed healthcare professionals and so that the presumption of innocence and due process applies. Specifically, CMS ruled that a facility breaches the governing regulation only when (i) the authority having jurisdiction regarding noncompliance with its applicable laws issues a final adverse action and (ii) that action is not under appeal or litigation by the facility or the professional providing services:

> The intent of these requirements is to ensure that a facility is in compliance with Federal, State, and local laws, regulations, codes, and with accepted professional standards and principles that apply to professionals providing services in [long term care] facilities. However, we believe that a facility is not "in compliance with Federal, State, and local laws, regulations [and] codes" only when a final adverse action has been taken by the authority having jurisdiction regarding noncompliance with its applicable laws, regulations, codes and/or standards.
>
> ***

---

[2] *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).
[3] *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

> A "final adverse action" means an adverse action imposed by the authority having jurisdiction that is more than a corrective action plan or the imposition of a civil money penalty, such as a ban on admissions, suspension or loss of a facility or professional license, etc., and is NOT under appeal or litigation by the facility or the professional providing services in the facility. The authority having jurisdiction is the public agency or official(s) having the authority to make a determination of noncompliance, and is responsible for providing and signing official correspondence notifying the facility or professional of the final adverse action.
>
> ***
>
> Failure of the [long term care] facility to meet a Federal, State or local law, regulation, code, or accepted professional standards and principles that apply to professionals providing services in [long term care] facilities may only be cited:
>
> • When the Federal, State or local authority having jurisdiction has both made a determination of non-compliance AND has taken a final adverse action.

CMS *State Operations Manual*, App. PP.

The defendants have set forth the following undisputed facts in their memorandum of law in support of their motion for summary judgment:

(a) Trofort was a duly educated and licensed registered nurse when she began her employment with Golden Living;

(b) The defendants verified that Trofort's license was current active at the time of her employment and during her employment and retained copies of the Virginia Nursing Board's records reflecting "current active" licensure status in Trofort's personnel file;

(c) The Center for Medicare and Medicaid Services ("CMS") provides unambiguous guidance during the relevant time period that under its regulations, a nursing license only becomes subject to citation when a final adverse action has been taken against a license by the licensing body with jurisdiction over the license and the nurse takes no appeal from that final adverse action;

(d) During the relevant time period when Trofort worked at Golden Living, the Virginia Nursing Board had not – nor had any nursing board – taken any action, let alone a final

adverse action, against Trofort's professional license, meaning that under CMS's clear rules, her nursing license was current active and, therefore, valid during the entire period of her employment at Golden Living.

CMS's *State Operations Manual* provides dispositive guidance in issuing a clarification regarding the precise issue in the present litigation as to when a professional's license becomes invalid. The defendants take the position that the license is invalid only after a state governing board determines it is invalid in a final adverse action from which there is no appeal. The relator takes the position that the license becomes invalid once any conduct inconsistent with the license occurs but before a state governing board determines the conduct violated its rules and before the nurse has a chance to appeal. As set forth above, CMS unequivocally took the former position, not the latter, and that fact resolves this case, as it is undisputed that no final adverse action was taken against Trofort's license during her employment at Golden Living.

"In determining whether liability attaches under the FCA, this court asks (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Harman v. Trinity Industries, Inc.*, 872 F.3d 645, 653-54 (5th Cir. 2017) (quoting *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012)). Assuming some underlying requirement was not met, FCA liability turns on "whether the defendant knowingly violated a requirement that the defendant knows is material to the government's payment decision." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

Here, the relator's entire FCA claim is based upon an allegation that the defendants employed a Virginia licensed nurse who lacked a valid multistate credential. The relator then

asserts that because the nurse allegedly lacked a valid multistate credential, the defendants made false claims for payment in violation of the FCA. The undisputed facts do not establish material evidence from which a reasonable jury can find a violation of the FCA's falsity, knowledge, or materiality elements. First, the relator cannot satisfy the FCA's falsity element because the summary judgment evidence shows that under CMS's regulations and interpretative guidance the defendants' certifications that it acted in compliance with Medicare and Medicaid law are demonstrably true and accurate, not false. Second, the relator cannot satisfy the FCA claim's knowledge element because CMS's clear, unambiguous guidelines demonstrate that the defendants' certifications were proper. Third, as to materiality, courts have found the following evidence relevant in determining whether the alleged falsity is material to the government's determination to pay: "(1) the government's decision to expressly identify a provision as a condition of payment and (2) evidence that the defendant knows that the government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" and (3) "materiality cannot be found where noncompliance is minor or insubstantial." *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 159-63 (5th Cir. 2019).

The relator does not possess summary judgment evidence showing that the defendants knowingly violated a requirement that they know is material to the government's payment decision. First, the regulations the relator contends were breached, 42 C.F.R. Part 483, are expressly characterized as "Conditions of Participation." 42 C.F.R. § 483.1(b) (defining "Scope" of this Part as containing "the requirements that an institution must meet in order to qualify to participate as a Skilled Nursing Facility in the Medicare program, and as a nursing facility in the

Medicaid program. They serve as the basis for survey activities for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid").

The relator points to nothing more than broad certification language to support his contention that the certifications in the relevant provider agreement and cost reports were conditions of payment. The Supreme Court and the Fifth Circuit, however, have expressly rejected the relator's approach, as have other courts post-*Escobar*. *See, e.g.*, *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 242 (5th Cir. 2020) ("Here, the district court concluded that contracts between Magnolia and Mississippi CAN 'contain broad boilerplate language generally requiring a contractor to follow all laws, which is the same type of language [*Escobar*] found too general to support an FCA claim.' We agree.").

Second, because of CMS's unambiguous guidance, the defendants could not have known that the government would characterize Trofort's license as an invalid license when no adverse final adverse action had been taken against her license because CMS's rules provide otherwise.

Third, not surprisingly, court precedent does not support the relator's assertion that if the government identifies an otherwise licensed individual whose license the relator claims possesses some defect, the government will demand repayment. *See, e.g.*, *United States ex rel. Hughes v. Cook*, 498 F. Supp. 784, 787-88 (S.D. Miss. 1980) (Although physicians may not have complied with the technical requirements of Mississippi medical licensure law, relator could not bring an FCA action because the physicians committed no fraud and did "nothing but submit perfectly appropriate Medicaid claims after performing valuable and necessary medical services," and any licensing defect was between the Board of Health and physician and should not be the subject of an FCA lawsuit because "[n]o court would impose the terrific consequences of the False Claims Act under such circumstances.").

Moreover, the relator cannot establish FCA materiality because to do so he must demonstrate that the alleged falsity (here an alleged false certification related to a regulation regarding professional licenses) has an impact on payment on a purported false claim. The summary judgment evidence shows no linkage between nurse licensure and the amount the government pays to the defendants in satisfaction of their submitted claims. Hence, the relator cannot establish FCA materiality.

For any one of the foregoing reasons, the court finds that the defendants' motion for summary judgment is well taken and should be granted. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and "mandates the entry of summary judgment for the moving party." *See United States ex rel. Jamison v. McKesson Corp.*, 784 F. Supp. 2d 664, 675 (N.D. Miss. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). The defendants here have demonstrated a complete failure of proof on each of the essential elements of the relator's claims. Thus, summary judgment in favor of the defendants is appropriate.

The court also notes without ruling on the matter that, but for the government's objection addressed below, the relator's action would likely fail because it appears to be barred under the FCA's public disclosure bar. To ensure that only those who bring valuable information to the United States are those who get to share in the bounty, the FCA public disclosure bar prohibits *qui tam* actions that are "substantially the same" as allegations previously publicly disclosed in federal reports or from the news media unless the *qui tam* relator is the "original source of the information" on which the allegations are based. 31 U.S.C. § 3730(e)(4). As the Fifth Circuit has explained, the public disclosure bar represents an accommodation of both the FCA's goals of "promoting private citizen involvement in exposing fraud against the government" and

"preventing parasitic suits by opportunistic late-comers who add nothing to the exposure of the fraud." *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 174 (5th Cir. 2004).

The Virginia Board of Nursing makes available on its website disciplinary proceedings against its nurses. Related to this action, the Virginia Board of Nursing placed three documents on its website that are publicly available at no cost and are word searchable. The relator is an attorney. He has never worked at Golden Living or for any of the defendants. On January 11, 2017, the relator deposed Trofort in an unrelated lawsuit. Before he deposed Trofort, the relator gained access to this public website. Specifically, the relator read the public Virginia Board of Nursing decision that "From February 27, 2013 to March 19, 2013, Ms. Trofort practiced professional nursing without a valid license or multistate compact license." The relator further read in the public documents that Trofort thereupon submitted her application for employment at Golden Living a few days later on March 22, 2013. From these public pronouncements, the relator concluded, wrongfully, that Trofort must not have possessed a current active license while employed at Golden Living because her license was revoked. According to the Department of Justice ("DOJ"), prior to filing this action on April 23, 2019, the relator neither communicated with nor provided information to the government regarding the allegations in the complaint. To file a *qui tam* action, the FCA mandates that the relator file a Statement of Material Evidence setting forth the information that supports the lawsuit. 31 U.S.C. § 3730(b)(2). According to DOJ, the disclosures the relator claims that were "voluntarily" provided to the government "before" filing the *qui tam* action were actually attachments to Relator's Statement of Material Evidence sent to the government on the date of filing.

The relator's action seems to be the type of action that the FCA expressly bars because it appears to be based upon publicly disclosed allegations that he merely repeated in the form of a *qui tam* complaint. First, the relator's complaint is expressly based upon publicly disclosed allegations contained in Virginia Board of Nursing administrative rulings, which are publicly available at no cost on the internet. The relator, who was never employed by any defendant, does not appear to qualify as an original source. His purported knowledge is totally dependent on, not independent of, the publicly disclosed information; his purported allegations do not materially add to information already in the public domain; and it appears he did not properly provide the information to the government before filing the lawsuit.

The United States declined to intervene in this *qui tam* action, allowing the relator to proceed in the named of the United States. [Doc. 12]. The government requested, however, pursuant to 31 U.S.C. § 3730(b)(1) that the action be dismissed "only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." The United States therefore requested that this court solicit the written consent of the United States before ruling or granting its approval. Subsequently, the government filed its "Notice of Opposition to Dismissal on the Basis of the Public Disclosure Bar," citing 31 U.S.C. § 3730(e)(4)(A), which provides that if the United States objects, the court may not dismiss the action on the ground of the public disclosure bar. The government further stated, however, that "[t]he United States takes no position on the remaining grounds asserted for dismissal in the defendants' Joint Motion for Summary Judgment." As outlined above, this court dismisses this action on grounds separate and distinct from the public disclosure bar and makes no ruling in regard to the latter. Accordingly, this court finds that the consent requirement set forth in 31 U.S.C. § 3730(b)(1) is satisfied.

## Conclusion

For the foregoing reasons, the court finds that the defendants' motion for summary judgment is well taken and should be granted. A separate order in accord with this opinion will issue this day.

This 30th day of March, 2022.

/s/ Neal Biggers
NEAL B. BIGGERS, JR.
UNITED STATES DISTRICT JUDGE