# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel. CAMERON JEHL,** | |
| **Plaintiffs,** | |
| **v.** | Case No. 3:19cv091-NBB-JMV |
| **GGNSC SOUTHAVEN LLC D/B/A GOLDEN LIVING CENTER-SOUTHAVEN et al.** | |
| **Defendants.** | |

**DECLARATION OF ROBERT SALCIDO IN SUPPORT OF DEFENDANTS'**
**APPLICATION FOR ATTORNEYS' FEES AND OTHER EXPENSES**

I, Robert Salcido, having personal knowledge of the facts contained in this Declaration and being competent to testify to them, hereby state as follows:

**A.      Background**

1.      I am a partner at Akin Gump Strauss Hauer & Feld, LLP ("Akin" or the "Firm") and have been representing GGNSC Southaven LLC; GGNSC Administrative Services LLC; and GGNSC Clinical Services (hereinafter "Southaven") in this litigation since November 2019.

2.      I have worked in the Health Care and Life Sciences Practice Group at Akin for approximately 30 years.  Essentially all of my work concerns responding to government investigations and defending litigation involving the False Claims Act, 31 U.S.C. §§ 3729 – 3733 (hereinafter "FCA").  I have been a partner at Akin since 1999.  From 1993 to June 2022, I worked exclusively in Akin's Washington, D.C. Office.  From June 2022 to the present, I have

split time between Akin's Washington, D.C. office and its office in Irvine (Orange County) California.

3.  Prior to joining Akin, from 1988 to 1993, I was a trial attorney with the United States Department of Justice ("DOJ") in the Civil Fraud Unit. The Civil Fraud Unit is a dedicated unit within DOJ that has nationwide jurisdiction over the FCA. While at DOJ, I prosecuted cases under the FCA, handled cases under the FCA's voluntary disclosure provisions and specialized in whistleblower actions brought under the *qui tam* provisions of the FCA.

4.  I have authored books and chapters in books regarding the FCA and health care fraud and abuse issues, including the Fourth Edition to FALSE CLAIMS ACT & THE HEALTH CARE INDUSTRY: COUNSELING & LITIGATION (American Health Law Association 2022), a 1,050-page treatise. I have also authored a number of articles related to the FCA and health care fraud and abuse law, including many that have been cited to and relied upon by federal appellate and district courts. I have successfully litigated a number of FCA actions at the pleading, summary judgment and trial stages, as well as on appeal. I have lectured extensively, at over 70 conferences, on defenses to FCA actions, health care coding compliance and FCA whistleblower litigation. I have also received many awards and accommodations for successfully defending FCA actions, including being named by THE NATIONAL LAW JOURNAL in its 2019 inaugural list of Health Care Law Trailblazers—a list honoring those who have made an impact through new strategies or innovative court cases—for several notable FCA wins; being listed continuously in CHAMBERS USA: AMERICA'S LEADING LAWYERS FOR BUSINESS since 2011 in Band 1 as a leading healthcare attorney; and, in 2012, being selected by *Law360* as one of the four Health Care MVPs for 2012, based upon a successful trial verdict obtained in defense of a national skilled nursing facility chain in a $895 million FCA lawsuit the government filed. Similarly,

while a DOJ lawyer prosecuting FCA actions, I won multiple awards for government service, including in 1993 the Department of Health and Human Services Office of Inspector General ("OIG") Integrity Award (the highest award OIG bestows to individuals outside of the OIG) and in 1991 and 1992, a DOJ Special Achievement Award (for Sustained Superior Performance of Duty). *See* Attached Biography setting forth FCA work at Ex. A.

5.      The FCA is a specialized area of law.  DOJ has a dedicated core unit that enforces the FCA, there are counsel who frequently act as Relator's counsel and market themselves as such, and there are defense counsel, like me, who primarily or exclusively, work in defending FCA actions.

6.      There is a substantial body of FCA case law that construes each of its provisions. A search on Lexis of the "False Claims Act," for example, results in more than 10,000 cases that use that phrase.

**B.      Akin**

7.      Akin is one of the world's largest law firms, with 20 offices, 85 practices and over 800 lawyers and professionals.  Akin has a core group of approximately 80 lawyers and advisors devoted exclusively to representing clients' interests in the health care sector.

8.      Over the past decade, Akin has been named repeatedly a *Law360* Practice Group of the Year in health care.  The award is based on the number of deals closed or suits won over the last year and the significance, size and complexity of these wins or deals.

9.      Akin is ranked both nationally and in Washington, D.C. as a top tier health care practice by *Chambers USA*.

**C.      Golden Living**

10.     Before 2016, when it began to wind down its operations as a nationwide operator of skilled nursing facilities ("SNFs"), GGNSC Holdings LLC and its affiliates (collectively, the "Company"), including Defendants here, operated SNFs nationwide.

11.     As a nationwide SNF operator, the Company employed approximately 60,000 employees at its peak and operated more than 300 SNFs, including Defendant GGNSC Southaven, LLC, a Defendant in this action.

12.     The Company first retained me to defend its FCA litigation in 2008.  Since that time, I have handled multiple FCA lawsuits and investigations involving the Company in this District, *see, e.g., United States of America ex rel. Jamison v. McKesson Corp.*, 900 F. Supp. 2d 683 (N.D. Miss. 2012) ("*Jamison*"), and throughout the country, *see, e.g., United States ex rel. Lawson v. Aegis Therapies, Inc.*, 2015 U.S. Dist. LEXIS 45221 (S.D. Ga. Mar. 31, 2015) ("*Lawson*").

### D.     This Litigation

13.     Relator filed this lawsuit under seal on April 23, 2019.  Relator named in that initial lawsuit eight Defendants: Drumm Corp., GGNSC Administrative Services LLC, GGNSC Clinical Services LLC, GGNSC Equity Holding LLC, GGNSC Holdings LLC, GGNSC Southaven LLC, GGNSC National Senior Care LLC, and Ronald E. Silva.  I was retained by all Defendants except Drumm Corp. and Ronald E. Silva.  Lily North entered an appearance for those Defendants.

14.     This case has been heavily litigated through summary judgment and included, to date, one trip to the Fifth Circuit.  The district court docket includes, to date, 355 entries.  The Relator filed three complaints, including making a substantial shift in theory from Nurse Trofort had no multistate license to—after learning from Defendants that instead she always had a

current active multistate license during her employment and public information confirmed that fact—Nurse Trofort did not have a "valid" license because the Centers for Medicare & Medicaid Services ("CMS")'s only interpretation of the governing regulation that her license was in fact valid should be disregarded. Because Relator disagreed with CMS's interpretation of its own regulation, he sued Defendants to recover more than $30 million dollars. After discovery closed, Relator engaged in what the court described as a discovery violation, included in briefing discussions of a non-Medicare, non-Medicaid beneficiary for the first time in the litigation as an example of alleged substandard care, and breached a prior confidentiality agreement with Defendant. The switch in theory, vast amount of damages claimed, multiple acts of discovery abuse, and breach of confidentiality provision substantially increased the complexity of this action and the costs and expenses the Company has had to bear in defending, what the court has found to be, a frivolous lawsuit.

### E.     Legal Fees Akin Charged to Company in this Matter

15.     Because of the high volume of work I performed on the Company's behalf, it negotiated a rate for my services, beginning in 2018, at $770 per hour, without annual increases related to litigation while the Company operated SNFs.

16.     As a result of this agreement, my hourly rate for services in this matter when I was retained in November 2019 was $770 and remained at that rate throughout this litigation. The rate of $770 is substantially below my standard rate. My standard rate in the years applicable to this lawsuit is as follow:

**Table 1**

| Year | Rate Description | Rate |
|------|------------------|------|
| 2019 | Standard | $1,040.00 |
| 2020 | Standard | $1,155.00 |
| 2021 | Standard | $1,235.00 |

| 2022 | Standard | $1,345.00 |
| 2023 | Global Standard Rate | $1,480.00 |

17.     These standard fees are commensurate with the rates other specialized partners at Akin charge.  They are also commensurate with other partners in Akin's Health Industry Practice Group.

18.     As a result of the negotiated rate with the Company, in 2019, the Company paid a 26% discount off my standard rate.  In 2020, the Company paid a 33% discount off my standard rate.  In 2021, the Company paid a 38% discount off my standard rate.  In 2022, the Company paid a 43% discount off my standard rate.  And, in 2023, the Company paid a 48% discount off my standard rate.

19.     The rates charged to the Company from 2019-2023 was also substantially below the average amount charged to all other clients for whom I performed legal services.  Below are charts reflecting the average amount billed to all clients for my legal services during 2019-2023 and the average amount billed to all clients for my legal services during 2019-2023 except the Company in this litigation.

**Table 2**

| All Clients | | | | |
|---|---|---|---|---|
| Year | Billed Hours | Billed Fees | | Average Billed Rate |
| 2019 | 2415.4 | $ | 2,248,194.59 | $            930.78 |
| 2020 | 2391.9 | $ | 2,171,631.28 | $            907.91 |
| 2021 | 2565.3 | $ | 2,542,768.08 | $            991.22 |
| 2022 | 2697.9 | $ | 3,083,187.84 | $          1,142.81 |
| 2023 | 693.2 | $ | 872,848.55 | $          1,259.16[1] |

---

[1] The 2023 Row on both Table 2 and Table 3 is current as of March 31, 2023.  These numbers will be supplemented based upon the fees and expenses the Company incurred for Akin preparing a Response to Relator's Motion for Reconsideration (*see* ECF 354, 355) and in preparing Defendants' Motion and Memorandum in Support of Attorneys' Fees and Expenses which occurred after March 31, 2023.

**Table 3**

| All Clients Excluding GGNSC Southaven | | | |
|---|---|---|---|
| Year | Billed Hours | Billed Fees | Average Billed Rate |
| 2019 | 2358.1 | $ 2,204,073.59 | $ 934.68 |
| 2020 | 1667.1 | $ 1,613,535.28 | $ 967.87 |
| 2021 | 1673.9 | $ 1,856,390.08 | $ 1,109.02 |
| 2022 | 2477.7 | $ 2,913,633.84 | $ 1,175.94 |
| 2023 | 693.2 | $ 872,848.55 | $ 1,259.16 |

20.     These charts reflect that the Company paid significantly below the value the legal market otherwise was willing to pay for my FCA expertise.

21.     Additionally, the overall amount the Company has paid Akin in this FCA litigation is substantially *lower* than comparable FCA cases I have defended for the Company in prior years that were determined on the merits.  For example, in *Jamison*, an FCA action litigated in this district between 2008 to 2012, the United States filed an FCA action against the Company in which the Company prevailed on the merits.  The amount the Company paid in attorneys' fees to Akin to successfully defend that action was approximately $4.3 million.  In *Lawson*, an FCA action the United States filed against the Company in the Southern District of Georgia and litigated between 2012 to 2015, the Company paid Akin approximately $2.3 million in attorneys' fees to successfully defend that FCA case on the merits.  Here, in this action, which has lasted from 2019 to 2023, where the Company similarly succeeded at the merits stage in this FCA action, the Company paid to Akin in attorneys' approximately $1.6 million in attorneys' fees.

F.     **Attorney Fees in This Litigation**

22.     My role in this lawsuit was to provide FCA expertise, such as writing briefs that focused on the application of the FCA, preparing fact and expert witnesses where testimony was relevant to the FCA, and participating in discovery issues and depositions that particularly concerned facts and issues pertinent to the FCA elements of liability.

23. In discharging this role, I enlisted the help of various Akin counsel and associates, particularly those who provided assistance to me in other significant FCA litigation. At earlier stages of the litigation, I was assisted by Catherine Creely and Maureen McDonald, both of whom assisted me in multiple FCA litigations and investigations, as well as at trial. The firm charged $720 an hour for Ms. Creely's time and between $695 and $740 for Ms. McDonald's time. As litigation progressed, I was assisted by Emily Gerry, who has assisted me in more than a dozen FCA investigations and litigation. The firm charged $500 for Ms. Gerry's time. Because of the focus of Akin's work in this matter was centered on the FCA, roughly 90 percent of the time billed for attorneys other than me were from these three attorneys, who extensively assisted me in FCA matters. All of these rates are commensurate with the rates of other similarly experienced and educated associates at both Akin and other large Washington D.C. firms.

24. Of important note, all of the above attorneys who assisted me on this case have specialized knowledge regarding the matters implicated by the lawsuit. I also worked closely with them to ensure that they were working efficiently on all matters. The number of hours expended in this litigated was reasonable, given the complexity, length and importance of this case and the multiple filings in this action as reflected on the docket sheet, and the amount of damages Relator sought. Further, the amount charged was lower than what has been billed in comparable FCA litigation I have lead, such as in *Jamison* and *Lawson*, as referenced above.

25. Throughout the litigation, I also worked closely with the attorneys at Mitchell, McNutt & Sams, P.A., particularly with Margaret Sams Gratz. Ms. Gratz took the lead in handling many discovery matters and disputes. By dividing the legal labor between matters that involved a primary emphasis on FCA expertise, where I took the lead, and all other matters,

where Ms. Gratz took the lead, we were able to efficiently represent the client and reduce overall cost. Moreover, Ms. Gratz's experience and expertise with litigation in this district proved invaluable to our mutual defense.

**G.    Attorney Rates for the D.C. Market**

26.    My discounted rate is consistent with, and in fact, significantly lower than, customary fees charged by law firm partners in Washington, D.C., according to the biennial *Partner Compensation Survey* promulgated by Major, Lindsey & Africa.[2]

**Table 4**

| Year | Average Rate for Washington, D.C. Law Firm Partner |
|------|----------------------------------------------------|
| 2018 | $885.00 |
| 2020 | $988.00 |
| 2022 | $1,048.00 |

**H.    Akin's Submitted and Paid Invoices**

27.    Our firm's billing statements detail the work that was done on this case. *See* Exhibit B. Some of the entries have been redacted to protect privileged attorney-client information.

28.    Regarding billing at Akin, each client the Firm represents is assigned a six-digit client number and a four-digit matter number. Each attorney records the time spent on a matter onto a timesheet. The timekeeper accounts for time in 1/10-of-an-hour increments. In addition

---

[2] *See* Jeffrey A. Lowe, *2022 Partner Compensation Survey* at Appendix VI, Major, Lindsey & Africa (Oct. 18, 2022), https://209075.fs1.hubspotusercontentna1.net/ hubfs/209075/MLA%20%20Web%20Research%20Page%20PDFs/2022_Partner%20Compensat ion%20Survey_FINAL101822.pdf; Jeffrey A. Lowe, *2020 Partner Compensation Survey* at Appendix VI, Major, Lindsey & Africa (Dec. 5, 2020), https://f.hubspotusercontent20.net/hubfs/209075/2020%20pcs-1.pdf; Jeffrey A. Lowe, *2018 Partner Compensation Survey* at Appendix VI, Major, Lindsey & Africa (Dec. 6, 2018), https://209075.fs1.hubspotusercontent-na1.net/hubfs/209075/MLA%20%20Web% 20Research%20Page%20PDFs/2022_Partner%20Compensation%20Survey_FINAL101822.pdf.

to the client and matter number and the amount of time spent on the matter, the timekeeper provides a detailed description of the work performed for the matter during that time. The information on that timesheet is entered into an automated system called "Aderant." At the end of each month, Aderant generates a bill for each client matter number.

29.     Expenses are charged to a client much the same as attorney time. When the Firm incurs an expense on behalf of a client matter, the client and matter numbers are recorded with the expense. The Firm's Accounting department tracks all expenses the client incurs and inputs the expenses into the Firm's Chrome River system by client and matter number. When the client's monthly bill is generated by Aderant, the expenses incurred during the period billed appears on the bill.

30.     The Firm's bill indicates the date worked, the timekeeper's name, the description of the work performed and the amount of time spent for each day worked on that matter during the billing period. The bill then summarizes total time the timekeeper expended, the timekeeper's rate and the total value of the work the timekeeper performed. The bill sums the total value of work all timekeepers performed who worked on the matter during the billing period. The bill also itemizes expenses incurred on the matter, providing a description of the expense and the cost, and sums the total cost of expenses. Finally, the bill provides a total amount of the invoice, which includes the total value of the timekeepers' time and the expenses.

31.     The Firm's bills are reviewed each month before they are submitted to the client. If applicable, all mistakes are corrected and revised bills are generated. This process was followed for all bills pertaining to this matter.

32.     At Exhibit C is a summary chart of all time and expenses charged and the amount paid for this litigation. The total number of hours for each timekeeper was multiplied by the

applicable rate. After the total attorneys' fees were calculated on the Fees and Other Expenses Exhibit, the total expenses for the month were added to the Exhibit. The total dollar amount for expenses was taken from each bill.

33. The amount of Akin's fees and expenses in this litigation through August 2022, when filing was complete on Relator's Fifth Circuit appeal, was $1,664,196.00.

34. Given what was at stake in this case—Relator seeking an award of more than $30 million dollars—as well as the burden and cost associated with responding to multiple, shifting theories of liability Relator raised and discovery abuse that occurred, the number of hours that all Akin attorneys spent on this matter is reasonable for what was required to defend this matter.

_____
Robert Salcido

Executed on this 27th day of April, 2023

11