# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel.** **CAMERON JEHL,** **Plaintiffs,** **v.** **GGNSC SOUTHAVEN LLC D/B/A** **GOLDEN LIVING CENTER- SOUTHAVEN et al.** **Defendants.** | Case No. 3:19cv091-MPM-JMV |

**DECLARATION OF PAUL KILLEEN IN SUPPORT OF DEFENDANTS' APPLICATION FOR ATTORNEYS' FEES AND OTHER EXPENSES**

I, Paul Killeen, having personal knowledge of the facts contained in this Declaration and being competent to testify to them, hereby state as follows:

1. I am an attorney, presently living in Lenox, MA. I was admitted to the Bar of the Supreme Judicial Court of Massachusetts in 1978, and practiced law in Massachusetts until 2006, when I was hired by GGNSC Administrative Services LLC ("Admin") to serve as Senior Vice President of Litigation. I have also been admitted to the Bar of the Court of Appeals of Maryland (2016) and to the Bars of the United

States District Court of Massachusetts, the U.S. Court of Appeals for the First Circuit and the United States Supreme Court. In 2022, I registered in Massachusetts and Maryland as "retired" and confine my present-day employment to occasional service as a mediator or arbitrator. I represented Defendants in this matter.

2. I worked full-time at Admin from July of 2006 to April of 2017, after which I continued to serve as SVP of Litigation in a part-time capacity. My employment with Admin ended in December of 2020.

3. Admin provided a full menu of administrative services, such as accounting, payroll, legal, risk management, compliance, human resources, data processing and more to a group of more than 300 operating entities that were affiliated by ownership. We commonly referred to the collection of entities by the brand name "Golden Living."

4. Some of the Golden Living entities were licensed healthcare providers, like the nursing home that was the subject of this litigation, some were holding companies, and some were dedicated to management functions. During much of my tenure there were well in excess of 700 individuals employed by Admin to provide the above-described "core services" thus freeing the people employed in healthcare businesses to focus on healthcare.

5. The events that gave rise to the instant case arose in 2013, when I was employed by Admin full-time. By the time this lawsuit was commenced in 2019, however, Golden Living was completing the process of winding down the health care operating businesses. That process had begun in Fall 2016 and was substantially

complete by the time the companies learned by service of process of the pendency of this action.

6. By December of 2020, when I was first contacted about potentially assisting in the defense of this matter, Golden Living had largely exited the skilled nursing business and had either sold or contracted to sell the ancillary therapy and hospice businesses that it owned. The licenses and business operations of the approximately 300 nursing homes that Admin had supported had been transferred to independent third parties. The staffs of the facilities were no longer employed by Golden Living entities, and the personnel who had served in district and regional support functions had all moved on to other employment. Facility records had either been left with succeeding owners, or packed and removed to warehouses. Many centrally-operated electronic information systems had been taken off-line and archived. By the end of 2020, the process of winding down business operations was nearly complete and Admin had laid off or lost most of its workforce, because there was no longer a need for the extensive support functions.

7. Most of the people who might have been knowledgeable about the topics of discovery that were likely to arise in this case were no longer employed at Admin, or by the companies which Admin had served. Compliance with the defendants' pre-trial obligations would have been practically impossible unless the defendants could secure the assistance of someone possessed of extensive knowledge of the way that the various businesses functioned in 2013 and 2014. I was possessed of that knowledge, and I agreed to serve as a legal resource to the defendants.

8. As reflected by my three monthly statements, true copies of which have been attached hereto at Exhibit A, I performed the following tasks:

- Undertook a preliminary investigation of all of Nurse Trofort's interactions with state nursing boards, before and after her employment at Southaven

- Drafted and continuously revised a detailed chronology of events surrounding Trofort's hiring and discharge from employ at Southaven, and of the events following that tenure, for use by the outside counsel who appeared for the defendants in this case

- Conducted interviews of former employees, or identified such individuals for interview by others, concerning the manner in which background checks and other onboarding procedures were conducted in 2013

- Reviewed large volumes of emails generated and/or kept by former employees, searching for communications that might be responsive to the plaintiff's wide-ranging discovery requests

- Researched legal issues involved in the litigation, particularly in connection with the formalities of regulations governing multi-state nursing practice

- Reviewed pleadings, discovery responses and objections, motions and the like, to ensure that the facts presented therein were accurate, to the best of my ability to recall and/or reconstruct events long gone by

- Worked with the paralegal who had been on my own support staff and who remained at Admin, to ensure that searches and reviews in support of discovery requests were directed toward the places where records might be retained

- Helped to prepare the Rule 30 (b) (6) witness who was retained to testify in "person most knowledgeable" depositions noticed by the plaintiff
- Assisted in the identification of expert witnesses for the defendants
- Participated in telephone conferences with the client, local counsel, and amongst the legal team.

4. I charged the defendants for my services at the rate of $300 per hour. This was the same rate that I offered to other clients for limited engagements such as my work in this case. This rate was more than reasonable, in my opinion, given that I have more than 40 years of complex litigation experience, and charged at the rate of $525 per hour when I last worked in private practice at my firm in Boston. I also believe that my rate is consistent with customary legal rates in the relevant community.

5. The number of hours I expended on all legal tasks was reasonable, given the complexity, length, and importance of this case—a $30 million FCA case involving complex legal issues that progressed through a motion to dismiss, discovery, briefing on a show cause order and summary judgment.

6. In addition to the effort above-described, I expended approximately two hours preparing this declaration, for which I will bill the defendants $600.

DocuSigned by:

*Paul Killeen*

Paul Killeen

Executed on this 26th day of April, 2023

5