IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. CAMERON JEHL, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:19-cv-091-NBB-JMV |
| GGNSC SOUTHAVEN LLC D/B/A GOLDEN LIVING CENTER-SOUTHAVEN; GGNSC ADMINISTRATIVE SERVICES LLC D/B/A GOLDEN VENTURES; AND GGNSC CLINICAL SERVICES LLC D/B/A GOLDEN CLINICAL SERVICES, | ) ) ) ) ) ) ) ) | Oral Argument Requested |
| Defendants. | ) ) | |

### REPLY IN SUPPORT OF RELATOR'S MOTION FOR RECONSIDERATION

This brief replies to the defendants' response, docket 355, to the relator's motion for reconsideration. Docket 353.

**The Defendants' Recent Motion for Over Two Million Dollars in Fees Contains Key Statements that Support the Motion for Reconsideration**

In a moment we will address the defendants' point that the arguments in the motion to reconsider were previously raised. But first we address two relevant points made in the defendants' motion late last week asking for over *two million dollars* in fees.

First, the defendants admit in their latest fee motion that "this case has involved difficult legal questions," docket 357 at 14, and admit that it is "a complex FCA case" that "presented complex theories of FCA liability." Docket 356-5 at ¶¶ 13, 44. These assertions are contrary to the defendants' contention in their original motion to assess fees that relator's second amended

1

complaint was frivolous from the outset because it "assert[ed] a theory that is directly contrary to 'clear' and 'unequivocal[]' federal law." Docket 331 at 16. Those portrayal of a purportedly simple case based on clear legal principles is at odds with the defendants' new admissions correctly recognizing that this is a "complex" case that "has involved difficult legal questions."

Second, the motion highlights lead defense counsel Robert Salcido's "experience in FCA litigation, accumulated over the course of a 5-year career practicing FCA litigation at the Department of Justice . . . and a 30-year career practicing FCA litigation and investigations work at Akin," as well as a host of "awards, litigation wins, lectures and publications, *including a 1,050-page treatise on the FCA published by the American Health Law Association*." Docket 357 at 9 (emphasis added). But as noted in our motion to reconsider, Mr. Salcido and the defendants apparently did not notice what they recently called the "'clear' and 'unequivocal' federal law" at the time of the motion to dismiss inasmuch as they failed to raise the CMS guidance in that motion. If it was as "clear" and "unequivocal" as they said it was, it would have been raised and would have led the original judge to grant the motion to dismiss.

Right after admitting in their motion requesting two million dollars that "this case has involved difficult legal questions," the defendants added that the legal theory of the second amended complaint "was ultimately shown to be frivolous." Docket 357 at 14. But obviously, this "difficult legal question" was not "ultimately shown to be frivolous" during the motion to dismiss *because it wasn't raised*. After we pointed out this omission in the motion to reconsider, the defendants failed to explain why they did not raise it. Instead, in their opposition to the motion to reconsider, the defendants simply claimed that "[r]elator's counsel . . . should be aware of what the law actually provides, including the relevant federal agency's authoritative public interpretation of the law." Docket 355 at 5 n.1. *But how is the relator's counsel supposed to be*

2

*aware of it when the author of the 1,050 page treatise on the False Claims Act apparently was not?*

We will address the CMS guidance later in this reply brief. But before doing so, we reply to the defendants' contention that the motion to reconsider raises points already raised. We follow that by esponding to the defendants' argument regarding the original judge's denial of the motion of dismiss.

### Rule 54(b) Allows Reconsideration for Any Reason, Including Arguments Already Raised

The motion to reconsider was submitted to emphasize the highly unusual circumstances of this case, where the original judge concluded that one party's argument was "reasonable" and made in "good faith" and where a subsequent judge assessed what could be a seven-figure fee award after concluding that it was "frivolous." While it is true that the same arguments were presented by the relator in an earlier and longer pleading, Rule 54(b) does not prohibit that sort of reconsideration. Instead, it grants broad discretion to a court to reconsider any interlocutory order "for *any* reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (emphasis added).

The defendants claim in their opposition that this Court should apply the Rule 59(e) standard, which would not allow submission of prior arguments. Docket 355 at 6. But that is contrary to the Fifth Circuit's governing precedent in *Austin*, where it reversed the denial of a motion to reconsider because "the district court applied Federal Rule of Civil Procedure 59(e) when it should have applied Federal Rule of Civil Procedure 54(b)." *Id.* at 336. "Rule 54(b) is less stringent than Rule 59(e)," and "[t]he district court therefore abused its discretion by relying on the wrong rule to deny Austin's motion for reconsideration." *Id.*

3

In this unusual case, the relator is simply requesting that the Court exercise its discretion to reconsider its ruling for the reasons set forth in his seven-page motion to reconsider.

### Defendants Wrongly Claim that Seven "Facts" Arising After the Motion to Dismiss Was Denied Show the Case Was Frivolous From the Outset

The motion to reconsider is based largely on the original judge's denial of the motion to dismiss in which he noted the relator's allegation in the second amended complaint that Nurse Trofort obtained reinstatement by "fraudulently misrepresent[ing] to the Virginia Board of Nursing that she was still a resident of Virginia," which led Virginia to "mistakenly chang[e] its record-keeping system to reflect that Ms. Trofort had an active Virginia multi-state license." Docket 131 at 6, quoting Second Amended Complaint, docket 90 at 18. The original judge explained that "[t]he complaint thus alleges that Defendant knew that Trofort lacked a valid license in spite of administrative findings otherwise, and there appears to be evidence in the record which gives plaintiff a *good faith argument* in this regard." Docket 131 at 6 (emphasis added). *See also id.* at 9 (describing "arguments from both sides" as "reasonable"). The defendants respond in their opposition by listing seven items, denominated (i)-(vii), and claiming that "[n]one of these facts were before the district at the time it ruled at the . . . motion to dismiss stage and . . . all these facts . . . demonstrate[] that Relator's action is clearly frivolous." Docket 355 at 9-11.

Because of the defendant's heavy reliance on these seven "facts," we address them in turn:

(i). ". . . Relator's counsel brought this action without any inside first-hand knowledge of company operations (such that it routinely confirms the licensure status of professionals . . .)." Docket 355 at 9. But this formal licensure status was known at the time of the second amended complaint. Neither that status nor the "inside first-hand knowledge of company operations"

4

retroactively undermines the allegation in the second amended complaint that Nurse Trofort's misrepresentation meant she lacked what the original judge called "a valid license in spite of administrative findings otherwise," and does not undermine his ruling that this was "a good faith argument" by the relator that was "reasonable." Docket 131 at 6, 9.

(ii) ". . . Relator failed to undertake even a minimal investigation in the validity of his allegations even though a 5 minute check . . . would have revealed to him that the core allegation was demonstrably false." Docket 355 at 9. But again, the results of that investigation were known at the time of the second amended complaint. Even after it was clear that Trofort had managed to have her license reinstated in Virginia, the original judge held that her misrepresentation as described in the second amended complaint gave the relator a good faith and reasonable argument.[1]

(iii) " . . . [O]nce learning . . . that Nurse Trofort . . . always had an active license --- Relator simply decided to try to plead around that inconvenient fact by deriving a theory of a professional's license being invalid that is directly contrary to the relevant federal agency's interpretation of when that professional's license becomes invalid . . ." *Id.* at 10. Of course, what the defendants call "pleading around" is what lawyers often do when they raise an alternative theory of liability in response to a development in the case. Here, that alternative theory was set forth in the second amended complaint and was found by the original judge to be a good faith and reasonable argument. As for the federal agency's interpretation, we addressed that in the motion to reconsider and will address it again later in this reply brief, but suffice it to say for now that this interpretation was not sufficiently obvious to be raised by the defendants ---

---

[1] It also bears mention that, despite claiming that a simple "5 minute check" would have uncovered the relevant Virginia records, defendants latest fee motion reveals that they retained a separate law firm in Virginia "to investigate the licensure in the Commonwealth of Virginia of Lionelle Trofort," Docket 356-16 at ¶ 2, and paid that firm several thousand dollars to do so, Docket 356-17.

5

and their attorney who is an expert in this field --- in their motion to dismiss. *See* Docket 353 at 6. The subsequent discovery of the argument by the defendants does not demonstrate bad faith by the relator in failing to consider it when pleading his claim in the second amended complaint. To the extent the defendant implies that the original judge would have ruled differently if the interpretation had been submitted to him (which is not necessarily accurate), it is the fault of the defendants that it was not submitted. The relator should not be charged with failing to notice something that the defendants did not notice. *See, Gonzalez v. Planned Parenthood of L.A.,* 2015 WL 12659936 at *12 (C.D. Cal. 2015) ("[T]he fact that Defendants did not argue the issue of scienter in seeking dismissal of Plaintiff's Third Amended Complaint . . . undercuts Defendants' assertion now that the result was obvious from the start of the litigation.").

(iv) ". . . [O]nce Defendants informed Relator's counsel that CMS's plain language interpretation . . . foreclosed Relator's theory that Nurse Trofort's nursing license was invalid . . ., Relator decided to engage in discovery abuse to create an issue of fact by enlisting a representative of the State to submit a declaration when CMS would not respond to Relator's discovery request . . ." Docket 355 at 10. Whether "discovery abuse" is the right term for submitting a declaration after the discovery period has expired, the important point is this: The post-discovery submission of this declaration is not something that --- had the original judge been aware it would happen --- would have led him to conclude that the good faith and reasonable argument in the second amended complaint was suddenly a frivolous argument. There is nothing about the original judge's assessment that would be undermined by the relator later making a post-discovery submission. On a separate point, if that post-discovery submission is somehow considered vexatious and harassing, any fee award against the relator

6

should be assessed for defense counsel's time in responding to the declaration, not for the entire case or the two million dollars the defendants seek in fees.

(v) ". . . [O]nce the Court in a Show Cause Order characterized Relator's action as "unfair[]," "absurd[]," "unjustifiable," "disproportionate," and "unjust," ECF 303 at 3-4, 7, 10-11, Relator, in desperation, engaged in the same discovery abuse the Court previously identified by filing into the docket "irrelevant, inflammatory and uncross-examined information . . . months after the close of discovery." Docket 355 at 10. Again, this post-discovery submission, had it been forecast by the original judge, would not have turned the theory of the second amended complaint from a good faith and reasonable argument to a frivolous one. Nothing about the submission undermines the original judge's analysis. Further, if the submission was vexatious, any award of fees would encompass only defense counsel's time in responding to it. (Regarding the words "unfair," "absurd," etc. cited by defendant, the Court was discussing the potential outcome if the False Claims Act was interpreted to require many millions of dollars in damages).

(vi) ". . . Relator would also, in response to the Show Cause Order, assert that 'Defendants['] False Certifications Were Material' by relying only upon alleged care provided to a non-Medicare, non-Medicaid patient, a contention that a Circuit Court of Appeals had branded facially frivolous in a public ruling on the FCA fee-shifting provision, see ECF 338 at 14-15; see also ECF 331 at 7 n.3." Docket 355 at 10. As explained at docket no. 334 at 17-18, this a mischaracterization of relator's argument, and the relator's reference to the non-Medicare, non-Medicaid patient was proper and also was completely different from the Second Circuit case cited by the defendant. Regardless, the inclusion of this argument would not convert the original judge's holding that the second amended complaint contained a good faith and reasonable theory

into a holding that the theory was frivolous. And again, if fees are to be assessed for making that argument, the fees should encompass only the time that defense counsel spent in responding to it.

(vii) ". . . Relator caused a client to breach a confidentiality provision to attempt to prolong the inevitable dismissal of this lawsuit. *See* ECF 331 at 9-10; ECF 338 at 15-16." Docket 355 at 10-11. For reasons stated in docket 334 at 21-22, there was no breach of a confidentiality provision. But even if there was, it does not alter the original judge's assessment that the second amended complaint was based on a good faith and reasonable argument. To the extent it was vexatious, as defendants claim, any fees assessed for it should be limited to the time required to respond to it.

For all of these reasons, none of these so-called "facts" undermine the original judge's conclusions in his opinion denying the motion to dismiss. Accordingly, it would be unfair to assess fees against the relator for proceeding with a case that the original judge allowed to go forward when he denied the motion to dismiss.

### The Issue Surrounding the CMS Guidance Is, At the Very Least, One of the "Difficult Legal Questions" That Defendants Admit Exist in this Case, and the Relator's Position Is Not Frivolous

The next issue is whether, once the relator was informed by the defendant of the CMS guidance well after the denial of the motion to dismiss, any further pursuit of the case by the relator was frivolous and warrants an assessment of fees from that point forward. While this Court obviously granted summary judgment due to the CMS guidance, the defendants are correct in their recognition that this is a "complex" case that "involved difficult legal questions." The CMS guidance is one of those questions and the defendants have not demonstrated frivolousness on this issue that was central to the Court's ruling.

8

Indeed, as noted in our motion to reconsider, after the relator addressed the CMS guidance in response to the show cause order, the original judge specifically referred to the relator's response and concluded that, with respect to the "issues of law" pending in the case, "both sides have a legitimate position." Doc. 314 at 2. Like the defendants in their fee motion, he recognized this is a "complex" case with "difficult legal questions."

Our motion to reconsider pointed out the distinction between the survey and certification guidance in the relevant portions of CMS State Operations Manual on one hand and the separate issue of billing to Medicare and Medicaid on the other. Docket 353 at 5. In response, the defendants contend that this "distinction . . . has no meaning . . . [when nurses] do not bill for their services." Docket 355 at 11. But even if nurses do not bill for their services as line items on an invoice, the submissions from nursing facilities like the one where Nurse Trofort was the director of nursing, necessarily seek payment for the nursing care that is provided. As the relator explained in his Reply in Further Response to the Show Cause Order:

> Mr. Jehl is not alleging that Defendants' violations would have resulted in a different, lower per diem rate. He is alleging—with substantial documentary and testimonial support—that the Government would not have made the per diem payments during Ms. Trofort's tenure had it known that all of the nursing care provided in the Golden Living facility was being supervised by a director of nursing who was unlicensed and could not be licensed because her long history of disciplinary problems. See, e.g., United States v. Visiting Nurse Serv. of N.Y., 2017 WL 5515860, at *12 (S.D.N.Y. Sept. 26, 2017) ("[T]he question is not whether [Defendants' violations] caused CMS to pay extra but whether, had CMS known [of the violations], it would have naturally tended to not pay those claims.").

Docket 325 at 26-27.

In an earlier response to the show cause order, the relator also pointed to documents and deposition testimony in the record showing (among other things) that defendant Admin described valid nursing licenses as "a condition of payment for Medicare and Medicaid" and that defendants' Medicaid provider agreement required them "[t]o abide by federal and state laws and

9

regulations affecting delivery of services" and "[t]o comply with all federal and state standards of practice, including licensure" in exchange for the State's agreement "[t]o pay for Medicaid covered services." Docket 312 at 32.

Thus, the distinction between surveys and billing exists even though there is no line-item billing for the time of nurses. Nursing homes bill Medicare and Medicaid with the understanding that they are employing qualified and licensed nurses. Accordingly, for reasons mentioned in our motion to reconsider, there is a credible argument that the CMS guidance for surveys does not apply to billing in this situation and the relator had what the original judge described as a "legitimate position" that the guidance did not control.[2] At the very least, as defendants seem to acknowledge in their recent fee motion, this issue is more "complex" and "difficult" than they argue in the response to the reconsideration motion. Even though the Court ruled in the defendant's favor on summary judgment, the relator's position is not frivolous and he should not be sanctioned for contending that the CMS survey guidance did not control for purposes of his claim.

## Conclusion

The original judge held that the relator's theory of liability was reasonable and was presented in good faith even in the face of Virginia's reinstatement of Nurse Trofort's license. That was not undermined by subsequent developments. After the defendants later raised the CMS guidance, the original judge indicated that the relator's contention that the guidance did not preclude his claim was a "legitimate position." Both of those conclusions by the original judge

---

[2] For this reason, while the defendants attempt to distinguish *United States ex rel. Johnson v. Golden Gate National Senior Care LLC*, 223 F.Supp.3d 882 (D. Minn. 2016) because it was not a licensure case and it involved therapists who submitted line item bills, docket 355 at 11-12 n.5, the underlying principle from *Johnson* is still relevant to this case: "Survey and Certification is separate and distinct from Medicare payment determinations." *Id.* at 909.

10

were justified. They were, to use the words of the defendants in the most recent fee motion, "part of a complex theory of FCA liability" that "involved difficult legal questions." Even though the later judge rejected those positions when granting summary judgment, these positions were not frivolous and do not warrant the imposition of the staggering amount of fees sought by the defendants. For the reasons stated, this Court should grant the motion to reconsider and hold that the relator is not required to pay the defendants' attorneys' fees.

Respectfully submitted,

*s/ Robert B. McDuff*
Robert B. McDuff (MSB # 2532)
Law Office of Robert B. McDuff
767 North Congress St.
Jackson, MS 39202
601.259.8484 (Telephone)
rbm@mcdufflaw.com

Richard R. Barrett (MSB #99108)
Law Office of Richard R. Barrett, PLLC
2086 Old Taylor Road
Suite 1011
Oxford, MS 38655
662.380.5018 (Telephone)
rrb@rrblawfirm.net

Philip N. Elbert (admitted pro hac vice)
Kendra E. Samson (admitted pro hac vice)
Nathan C. Sanders (admitted pro hac vice)
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
(615) 244-1713 – Telephone
pelbert@nealharwell.com
ksamson@nealharwell.com
nsanders@nealharwell.com

Counsel for Relator

CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of May, 2023, the following counsel were served by operation of the Court's electronic filing system:

Margaret Sams Gratz, Esq.
Mitchell, McNutt & Sams, P.A.
P. O. Box 7120
Tupelo, MS 38802-7120
mgratz@mitchellmcnutt.com

Robert Salcido, Esq.
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street NW
Washington, DC 20006-1037
rsalcido@akingump.com

Counsel for Defendants
J. Harland Webster, Assistant U.S. Attorney
Office of the United States Attorney
Northern District of Mississippi
900 Jefferson Avenue
Oxford, MS 38655-3608
joseph.webster@usdoj.gov

Counsel for the United States of America

                                                 */s/ Robert B. McDuff*               . .