# False Claims Act & the Health Care Industry

## *Counseling & Litigation*

### Third Edition

### Robert S. Salcido



# False Claims Act & the Health Care Industry: *Counseling & Litigation*

## Third Edition

Robert S. Salcido



**American Health Lawyers Association**

**AMERICAN HEALTH LAWYERS ASSOCIATION**
1620 Eye Street, NW, 6th Floor
Washington, DC 20006-4010
Web site: www.healthlawyers.org
E-Mail: info@healthlawyers.org

Copyright © 2018 Matthew Bender & Company, Inc., a member of LexisNexis.
All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form, or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the express, written permission of the publisher.

Printed in the United States of America

ISBN: 978-0-7698-8458-5

978-0-7698-8457-8 (Members)

978-0-7698-8460-8 (eBook)

978-0-7698-8459-2 (eBook, Members)

*"This publication is designed to provide accurate and authoritative information with respect to the subject matter covered. It is provided with the understanding that the publisher is not engaged in rendering legal or other professional services. If legal advice or other expert assistance is required, the services of a competent professional person should be sought."*

—from a declaration of the American Bar Association

regulations, the government paid the hospitals according to the previously determined PRG [sic] rate, which has nothing to do with the particular drugs prescribed or used in the patient's treatment. Under the circumstances, the allegedly false claims do not meet of the Seventh Circuit's materiality requirement, because there is no causal relationship between the alleged falsehood and amount the government paid. *See id.* (claim must be "knowingly and falsely made in order to deceive the government"); *Luckey,* 183 F.3d at 732–33 (false statement must be material to government's decision to pay the claim). Because relators cannot show that individual patient bills were material to the government's decision to pay, they cannot prove an essential element of their claim.[57]

---

[57] *Id.* **Statements are not material if the false statements had no impact on federal payment.** *See, e.g.:*

*Third Circuit:* United States ex rel. Magid v. Wilderman, No. 96-CV-4346, 2004 U.S. Dist. LEXIS 8459, at *24–28 (E.D. Pa. Apr. 29, 2004) (hospital's allegedly falsely billed lab tests not actionable because hospital was paid a "bundled" payment which was unaffected by allegedly false lab tests and hence alleged falsity did not have effect of causing the government to pay money it is not obligated to pay); *see generally* United States ex rel. Portilla v. Riverview Post Acute Care Ctr., No. 12-1842, 2014 U.S. Dist. LEXIS 44002, at *44 (D.N.J. Mar. 31, 2014) (dismissing action where relator "has not pleaded . . . that the inclusion of individual false items in a § 413.20 certification would necessarily affect the per diem rate at which the facility was compensated, in light of the alternative calculations that went into determining such a rate").

*Sixth Circuit:* United States ex rel. Schell v. Battle Creek Health Sys., No. 1:00-CV-143, 2004 U.S. Dist. LEXIS 3186, at *1,*13 (W.D. Mich. Fed. 23, 2004) (alleged false claims for multi-dose anesthetic medication not actionable because hospital reimbursed on flat fee PPS basis and hence "no additional payment would be received by the hospital as a result of increasing charges for services" covered under PPS), *rev'd on other grounds*, 419 F.3d 535 (6th Cir. 2005).

*Seventh Circuit:* United States ex rel. Rockey v. Ear Inst. Of Chi., LLC., 92 F. Supp. 3d 804 (N. D. Ill. 2015) (finding no materiality when defendant disclosed to government that it had erroneously used the national provider identification number of physicians rather than audiologists because Medicare would have paid the claims even if the audiologists had been listed on the claim forms and thus "Defendants' failure to use the correct NPI could not have 'influence[d] the payment or receipt of money' by the government because the government would have paid the claim regardless of whose NPI was on the form"); United States ex rel. Kennedy v. Aventis Pharms., Inc., No. 03 C 2750, 2008 U.S. Dist. LEXIS 100444, at *8–11 (N.D. Ill. Dec. 10, 2008) (hospital's alleged charges for off-label drugs not actionable because Medicare and Medicaid "reimburse hospitals for inpatient services under a prospective payment system" and noting "[s]everal other courts have recognized that individual charges on a patient bill are immaterial to the government's Medicare/Medicaid reimbursement decisions and, therefore, cannot serve as the basis of FCA liability" because "there is no

*(Text continued on page 337)*

causal relationship between the alleged falsehood and the amount the government paid"). The court, in *Aventis*, pointed out that hospitals can receive an additional payment in Medicare "outlier" cases—where the hospitals receive additional compensation for particular patients whose conditions are extraordinarily costly to treat—but that here the relators had not identified a single outlier claim that included the off-label prescription and thus could not comply with Fed. R. Civ. P. 9(b). *Id.*, 2008 U.S. Dist. LEXIS 11904 at *4. In a subsequent ruling, the district court found that the relator stated a claim related to outlier payments because "[b]ased on relator's description of how outlier payments are calculated, a reasonable inference may be drawn that the inclusion of non-reimbursable charges in a cost report does, in fact, increase outlier payments to the hospital. This, combined with relators' allegations that the hospitals in question actually received significant outlier payments for the relevant time periods, is sufficient to satisfy any separate materiality requirement that may exist." United States ex rel. Kennedy v. Aventis Pharms., Inc., 610 F. Supp. 2d 938, 945 (N.D. Ill. 2009).

*Eleventh Circuit:* United States ex rel. Stephens v. Tissue Sci. Labs., Inc., 664 F. Supp. 2d 1310, 1317–19 (N.D. Ga. 2009) (because under PPS, hospital would be paid same amount regardless of improper billing of drug, relator could not allege FCA action); United States ex rel. Digiovann v. St. Joseph's/Candler Health Sys., Inc., No. CV404-190, 2008 U.S. Dist. LEXIS 9935, at *2, *17–18 (S.D. Ga. Feb. 8, 2008) (alleged false claims for equipment not actionable because hospital received PPS reimbursement and hence even if hospital "was improperly including charges for reusable equipment in claims submitted to Medicare, this improper submission of claims would have no effect on the amount of reimbursement").

regulatory, or contractual requirements makes those representations misleading half-truths." 136 S. Ct. at 2001. Relator's allegations do not satisfy either condition. Relator does not allege that any Defendant billed any false nursing-related goods or services at all because nursing services are not a line item on the claim for payment. Specifically, the MDS contains information concerning the patient's medical condition and does not contain any "specific representation about the goods or services" Nurse Trofort provided. As a result, there could never be any representation that was a misleading half-truth. Relator's implied certification theory therefore fails.[7]

---

[7] This District's recent ruling in *U.S. ex rel. Sibley v. Delta Reg'l Med. Ctr.,* No. 4:17-cv-000053-GHD-RP, 2019 U.S. Dist. LEXIS 48150, (N.D. Miss. Mar. 21, 2019) illustrates this principle. There the court rejected the relator's implied false certification theory that the hospital's violation of the Emergency Medical Treatment and Active Labor Act (EMTALA), which requires that hospitals that receive federal funds do not transfer patients in need of emergency medical treatment under certain circumstances, because liability under the implied certification theory can only arise out of claims that "make[] specific representations about the goods and services provided" and the relator did not plead how purported EMTALA violations were incorporated into the bills for payment that the hospital submitted. *Id.* at *5, *35-36. Here, similarly, there is no specific entry on any actual claim for payment concerning Nurse Trofort's nursing services that the government reimburses. Relator contends that his implied false certification theory has merit because the facts are consistent with those in *Escobar* and because the cost reports purportedly contain data regarding patient days and nurses' salaries. *See* ECF 53 at 3. Relator's contentions lack merit. First, in *Escobar*, unlike here, the health care professionals had National Provider Identification numbers under which they falsely billed for services they were unqualified to perform, and for which the government paid. Here, by contrast, there are no such pled facts as to Nurse Trofort because registered nurses do not have National Provider Identification numbers and do not bill directly for their time. *See Sibley,* 2019 U.S. Dist. LEXIS 48150, at *34-35 (rejecting the same argument Relator raises here). Second, Relator's contention that cost reports contained a false certification because of their alleged entry of patient days and nurses' salaries is mistaken in two respects. First, those entries are facially true and accurate, not false. Even if Nurse Trofort had a single state license and not a multistate, her licensure status would not make entries related to nursing salaries and patient days false. Second, and more fundamentally, to establish FCA liability, the purported false statement must have an impact on payment on a purported false claim. Here Relator does not plead anywhere that the listing for nurses' salaries or patient days on cost reports has any correlation to the *per diem* payment amount Southaven receives. Nor could he because there is no such relationship. Because Relator does not plead, and could never establish, that any alleged falsity related to patient days or nurses' salaries on a cost report in any way effects the prospectively-determined *per diem* rate that Southaven receives, Relator cannot state an FCA cause of action. *See, e.g.*, *U.S. ex rel. Portilla v. Riverview Post Acute Care Ctr.*, No. 12-1842, 2014 U.S. Dist. LEXIS 44002, at *44 (D.N.J. Mar. 31, 2014) (dismissing action against nursing facility where relator "has not pleaded … that the inclusion of individual false items in a [cost report] certification would necessarily affect the per diem rate at which the facility was compensated, in light of the alternative calculations that went into determining such a rate"); *U.S. ex rel. Stephens v. Tissue Sci. Labs, Inc.*, 664 F. Supp. 2d 1310, 1317-19 (N.D. Ga. 2009) (because a hospital would have been paid the same amount under a prospective payment plan regardless of improper billing of a particular drug, the relator could not allege an FCA violation); *U.S. ex rel. Digiovanni v. St.*

7

Relator contends that the Fourth Circuit's decision in *United States v. Triple Canopy, Inc.*, 857 F.3d 174 (4th Cir. 2017) supports his implied false certification theory. *See* ECF 53 at 3-5. In *Triple Canopy,* the government contracted with defendant to provide security services in an active combat zone in Iraq. *Id.* at 175-76. Contrary to the contract's express requirements, the defendant hired 332 Ugandan guards who could not satisfy the Army's marksmanship requirements. Then, to perpetrate the fraud, the defendant undertook multiple steps to deceive the government, including creating false scorecard sheets indicating that the guards satisfied the marksmanship standard, and included those falsified results in the guards' personnel folders. *Id.* at 175-76. Then, when replacement Ugandan guards arrived and could not satisfy the marksmanship requirement, the defendant created additional fake scorecards.[8] The defendant listed each guard on the invoice it presented and the government paid a rate of $1,100 per month for each guard. *See* 775 F.3d at 633. The government intervened in the relator's allegations. *Id.*

The facts in *Triple Canopy* illustrate its obvious differences with this case. First, unlike Nurse Trofort, the guards appeared on the invoice individually and the government paid directly for demonstrably unqualified personnel.[9] Here, by contrast, Relator does not plead, because he

---

*Joseph's/Candler Health Sys., .*, No. CV 404-190, 2008 WL 395012, at *6 (S.D. Ga. Feb. 8, 2008) (because hospital received prospective payment reimbursement, even if the hospital was "improperly including charges for reusable equipment in claims submitted to Medicare, this improper submission of claims would have no effect on the amount of reimbursement" and was not actionable under the FCA).

[8] *See id.,* 775 F.3d 628, 632-33 (4th Cir. 2015), *vacated by, remanded by, Triple Canopy, Inc. v. United States ex rel. Badr,* 136 S. Ct. 2504 (2016). This initial panel decision was vacated and remanded for the circuit court to consider in light of *Escobar. See* 857 F.3d at 175. Ultimately, the Fourth Circuit, in its subsequent decision, reaffirmed its prior ruling and relied upon the facts set forth in its prior decision. *Id.*

[9] In *Triple Canopy*, there were 332 "guards" and later replacements who could not hit a target causing the Court to conclude, "common sense strongly suggests that the Government's decision to pay a contractor for providing base security in an active combat zone would be influenced by knowledge that the guards could not, for lack of a better term shoot straight." 775 F.3d at 637-38. Here, by contrast, not only common sense, but also, as noted later, actual experience with how Mississippi's Nursing Board addresses this issue, *see* ECF 43-1, shows that the government does not retroactively deny per diem claims that compensate a nursing facility for the vast array of physicians, therapists, dieticians, social workers, nurses and other

8

**whether a facility meets the requirements for participation in Medicare and Medicaid**") (emphasis added).[22]

Relator points to nothing more than broad certification language to support his contention that the certifications in the Provider Agreement and Cost Reports were conditions of payment. *See* SAC ¶¶ 41-42, 49. But the Supreme Court and the Fifth Circuit have expressly rejected this argument, as have other courts post-*Escobar*.[23]

Second, Relator's SAC does not plead any plausible facts indicating that the government will not pay for care provided in a nursing facility when the state believes the license to be valid, but Relator disagrees. The actual public evidence demonstrates that far from routinely (or in "the mine run of cases") demanding repayment of the per diem payment when, unlike the situation here, an actually unlicensed nurse practices nursing, the public reports indicate that such deficiencies are routinely addressed by nursing boards with reprimands, or education, or small fines. These

---

[22] *See also U.S. ex rel. Lacy v. New Horizons, Inc.,* No. CIV-07-0137, 2008 U.S. Dist. LEXIS 73814, at *15 (W.D. Okla. Sept. 25, 2008); *U.S. ex rel. Swan v. Covenant Care, Inc.*, No. S-99-1891, 2000 U.S. Dist. LEXIS 22526, at *9-10 (E.D. Cal. June 20, 2000); *Sweeney v. ManorCare Health Servs.,* No. C03-5320, 2005 U.S. Dist. LEXIS 45216, at *6-14 (W.D. Wash. Mar. 4, 2005) (regulations governing standard of care provided in nursing facility in Part 483 are conditions of participation, not payment, because there are other administrative remedies for violations); *see also United States v. N. Am. Health Care, Inc.*, 173 F. Supp. 3d 943, 951-52 (N.D. Cal. 2016). Additionally, to establish FCA liability, the purported false statement must have an impact on payment on a purported false claim. Here Relator does not plead anywhere that there is any linkage between a nurse's licensure and the prosetively-determined per diem rate that Southaven receives. Thus, Relator cannot state an FCA cause of action. *See, e.g., U.S. ex rel. Portilla v. Riverview Post Acute Care Ctr.,* No. 12-1842, 2014 U.S. Dist. LEXIS 44002, at *44 (D.N.J. Mar. 31, 2014) (dismissing action against nursing facility where relator "has not pleaded … that the inclusion of individual false items in a [cost report] certification would necessarily affect the per diem rate at which the facility was compensated, in light of the alternative calculations that went into determining such a rate"); *U.S. ex rel. Stephens v. Tissue Sci. Labs, Inc.*, 664 F. Supp. 2d 1310, 1317-19 (N.D. Ga. 2009) (because a hospital would have been paid the same amount under a prospective payment plan regardless of improper billing of a particular drug, the relator could not allege an FCA violation); *U.S. ex rel. Digiovanni v. St. Joseph's/Candler Health Sys., .*, No. CV 404-190, 2008 WL 395012, at *6 (S.D. Ga. Feb. 8, 2008) (same).

[23] *See Escobar*, 136 S. Ct. at 2003; *U.S. ex rel. Porter v. Magnolia Health Plan, Inc.*, No. 18-60746, 2020 U.S. App. LEXIS 12166, at *11 (5th Cir. Apr. 15, 2020) ("Here, the district court concluded that contracts between Magnolia and Mississippi CAN 'contain broad boilerplate language generally requiring a contractor to follow all laws, which is the same type of language [*Universal Health Servs. Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016)] found too general to support a FCA claim'. We agree").

action had been taken against her license because CMS's rules provide otherwise let alone Southaven would not know that the government would seek repayment under these circumstances of a current active license.

Third, not surprisingly, court precedent does not support Relator's assertion that if the government identifies an otherwise licensed individual whose license Relator claims possesses some defect, the government will demand repayment.[26]

Additionally, and independently, Relator cannot establish FCA materiality because to do so Relator must demonstrate that the alleged falsity (here an alleged false certification related to a regulation regarding professional licenses) has an impact on payment on a purported false claim. Here summary judgment evidence shows that there is no linkage between nurse licensure and the amount the government pays on any prospectively-determined per diem rate that Southaven receives and hence Relator cannot establish FCA materiality.[27]

---

[26] *See U.S. ex rel. Hughes v. Cook*, 498 F. Supp. 784, 787-88 (S.D. Miss. 1980) (although physicians may not have complied with the technical requirements of Mississippi medical licensure law, relator could not bring an FCA action because the physicians committed no fraud and did "nothing but submit perfectly appropriate Medicaid claims after performing valuable and necessary medical services," and any licensing defect was between the Board of Health and physician and should not be the subject of an FCA lawsuit because "[n]o court would impose the terrific consequences of the False Claims Act under such circumstances"); *see also U.S. ex rel. Ortolano v. Amin Radiology*, No. 5:10-cv-583, 2015 U.S. Dist. LEXIS 9724, at *29-30 (M.D. Fla. Jan. 28, 2015) (rejecting relator's contention that use of non-qualified nuclear medicine technologist was a condition of payment), *aff'd*, 649 F. App'x 725 (11th Cir. 2016); *United States v. Dialysis Clinic, Inc.*, No. 5:09-CV-00710, 2011 U.S. Dist. LEXIS 4862, at *43-44 (N.D.N.Y. Jan. 19, 2011) (rejecting relator's contention that use of unqualified personnel was a condition of payment); *see generally Glynn v. EDO Corp.*, 710 F.3d 209, 216-18 (4th Cir. 2013) (finding no materiality when the government received the fair value of goods notwithstanding any technical breach). Indeed, condition of participation violations are typically deemed to be minor or insubstantial by definition. *See, e.g., Dialysis Clinic*, 2011 U.S. Dist. LEXIS 4862, at *56-57; *U.S. ex rel. Landers v. Baptist Mem'l Health Care Corp.*, 525 F. Supp. 2d 972, 978 (W.D. Tenn. 2007); *see also United States v. N. Am. Health Care, Inc.*, 173 F. Supp. 3d 943, 951-52 (N.D. Cal. 2016).

[27] *See* Defs.' Mot. for Summ. J. at Ex. B, Tab 1 at 5-8. *See, e.g., U.S. ex rel. Portilla v. Riverview Post Acute Care Ctr.*, No. 12-1842, 2014 U.S. Dist. LEXIS 44002, at *44 (D.N.J. Mar. 31, 2014) (dismissing action against nursing facility where relator "has not pleaded … that the inclusion of individual false items in a [cost report] certification would necessarily affect the per diem rate at which the facility was compensated, in light of the alternative calculations that went into determining such a rate"); *U.S. ex rel. Stephens v. Tissue Sci. Labs, Inc.*, 664 F. Supp. 2d 1310, 1317-19 (N.D. Ga. 2009) (because a hospital

## B. Relator's Action is Barred under the FCA's Public Disclosure Bar

Over the years, Congress through amendments has sought "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 294 (2010) (citation omitted). Because of the potential for opportunistic lawsuits by non-insiders hoping to obtain a portion of the government's recovery, the FCA includes a "public disclosure bar" that operates to prohibit actions that are based on fraudulent allegations or transactions that have already been publicly disclosed. *See* 31 U.S.C. § 3730(e)(4); *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 412-13 (2011). This Circuit applies a three-part test to determine whether the bar applies: "1) whether there has been a 'public disclosure' of allegations or transactions, 2) whether the *qui tam* action is 'based upon' such publicly disclosed allegations, and 3) if so, whether the relator is the 'original source' of the information." *See U.S. ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 373 (5th Cir. 2017). Because Relator's allegations have been publicly disclosed and he is not an original source, his action should be dismissed.

### 1. The Allegation Underlying Relator's Action Was Publicly Disclosed

The public disclosure bar applies "whenever *qui tam* relators bring a suit based on publicly available information." *U.S. ex rel. Jamison v. McKesson Corp.,* 649 F.3d 322, 327 (5th Cir. 2011); *U.S. ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 332 (3d Cir. 2005) (public disclosure bar

---

would have been paid the same amount under a prospective payment plan regardless of improper billing of a particular drug, the relator could not allege an FCA violation); *U.S. ex rel. Digiovanni v. St. Joseph's/Candler Health Sys.,* ., No. CV 404-190, 2008 U.S. Dist. LEXIS 9935, at *17-18 (S.D. Ga. Feb. 8, 2008) (because hospital received prospective payment reimbursement, even if the hospital was "improperly including charges for reusable equipment in claims submitted to Medicare, this improper submission of claims would have no effect on the amount of reimbursement" and was not actionable under the FCA).

21

***Third***, Relator cannot establish FCA materiality because to do so, Relator must demonstrate that the alleged falsity (here an alleged false certification related to a regulation regarding professional licenses) has an impact on payment on a purported false claim. Here, summary judgment evidence shows that there is no linkage between nurse licensure and the amount the government pays on any prospectively-determined per diem rate that Southaven receives. Hence, Relator cannot establish FCA materiality.[31]

---

Relator's burden "substantially increases" when the government does not withhold any payments notwithstanding the alleged breach. The cases Relator cites are inapposite and address instances in which there was, at a minimum, a violation of CMS's rules – unlike here, when there was compliance with CMS's interpretation of its own regulations. *See* ECF 312 at 33-34. Moreover, notwithstanding Relator's burden under *Escobar* and *Porter*, Relator knows that he will not be able to cite any case in which repayment was sought when a nurse held a current active license under CMS's rules but a health care provider was compelled to remit a repayment merely because someone raised concerns that, if litigated, a nursing board might conclude that the nurse committed some breach related to the license. Indeed, Relator's own expert affirmatively testified that he is unaware of any such recoupment actually occurring in situations like this case where the nurse always had a current active nursing license. *See* Mertie Dep. 73:21-74:3 ("Q. And are you aware of a single instance in which the United States had recouped cost report payments when a nurse has a confirmed active license during the entire course of her employment but someone claims that that nursing license should not have been granted? … A. Not specifically, no") (excerpts attached at ECF 260-3). This, by itself, like several other grounds, is enough to dispose of Relator's claim.

[31] *See* ECF 246-3 at 5-8. *See also, e.g.*, *U.S. ex rel. Portilla v. Riverview Post Acute Care Ctr.*, No. 12-1842, 2014 WL 1293882, at *16 (D.N.J. Mar. 31, 2014) (dismissing action against nursing facility where relator "has not pleaded … that the inclusion of individual false items in a [cost report] certification would necessarily affect the *per diem* rate at which the facility was compensated, in light of the alternative calculations that went into determining such a rate"); *U.S. ex rel. Stephens v. Tissue Sci. Labs, Inc.*, 664 F. Supp. 2d 1310, 1317-19 (N.D. Ga. 2009) (because a hospital would have been paid the same amount under a prospective payment plan regardless of improper billing of a particular drug, the relator could not allege an FCA violation); *U.S. ex rel. Digiovanni v. St. Joseph's/Candler Health Sys., Inc.*, No. CV 404-190, 2008 WL 395012, at *6 (S.D. Ga. Feb. 8, 2008) (because hospital received prospective payment reimbursement, even if the hospital was "improperly including charges for reusable equipment in claims submitted to Medicare, this improper submission of claims would have no effect on the amount of reimbursement" and was not actionable under the FCA).