**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA, ex rel.** ) | |
| **CAMERON JEHL,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No. 3:19-cv-091-NBB-JMV** |
| ) | |
| **GGNSC SOUTHAVEN LLC D/B/A GOLDEN** ) | |
| **LIVINGCENTER-SOUTHAVEN; GGNSC** ) | |
| **ADMINISTRATIVE SERVICES LLC D/B/A** ) | |
| **GOLDEN VENTURES; AND GGNSC** ) | |
| **CLINICAL SERVICES LLC D/B/A GOLDEN** ) | |
| **CLINICAL SERVICES,** ) | |
| ) | |
| **Defendants.** ) | |

---

**RELATOR'S MEMORANDUM IN RESPONSE TO DEFENDANTS'**
**MOTION FOR AWARD OF ATTORNEYS' FEES AND OTHER EXPENSES**

---

Two million dollars is a lot of money in attorneys' fees for a case that defendants previously claimed was frivolous from the outset because it "assert[ed] a theory that is directly contrary to 'clear' and 'unequivocal[]' federal law." Docket 331 at 16. After they made this claim in their memorandum in support of their motion to assess attorneys' fees, this Court granted the motion, holding that the "the relator ignored the CMS rules published in its State Operations Manual" which contained "the plain language of public federal law." Docket 350 at 6. Pending before the Court is the relator's motion for reconsideration of the order granting attorneys' fees in the first place. If that motion is denied and the Court's order remains in effect, this fee motion must be evaluated in light of the defendants' claim and the Court's holding that

this was a fairly simple case based on what the Court described as "the plain language of public federal law."

It is notable that the lion's share of this two million dollars comes from the fees requested for lead defense counsel Robert Salcido. The motion emphasizes his "experience in FCA litigation, accumulated over the course of a 5-year career practicing FCA litigation at the Department of Justice . . . and a 30-year career practicing FCA litigation and investigations work at Akin," as well as a host of "awards, litigation wins, lectures and publications, *including a 1,050-page treatise on the FCA published by the American Health Law Association.*" Docket 357 at 9 (emphasis added). Salcido notes that his clients paid a "discounted" Washington, D.C., rate of $770 per hour, but states that he should receive an upward adjustment so that his time is compensated between $930.78 per hour and $1,259.16 per hour depending on the year the work was done. Docket 357 at 9, 13-16.

It also is notable that this expert in FCA litigation, who is requesting these high hourly rates, actually failed to raise this "'clear' and 'unequivocal[]' federal law" in his motion to dismiss even though, if the defendants are correct, this would have demonstrated the case was frivolous and led to the dismissal of the case much sooner than actually occurred. Moreover, as we noted in our reply brief on the motion for reconsideration, the relator and his counsel cannot be expected to know of this language when the author of the 1,050-page treatise on the False Claims Act apparently did not.

As explained in this response, the relator should not be required to pay for any of defense counsel's time prior to being informed by defense counsel of the CMS guidance that purportedly rendered his claim frivolous. Alternatively, even if this Court concludes the relator should have known about it even before the FCA expert attorney raised it, the relator should not have to pay

2

for the additional time Salcido and his co-counsel spent on the case that would (under the defendants' view of the controlling law) have been unnecessary had he raised this "'clear' and 'unequivocal[]' federal law" in the motion to dismiss. Further, under the controlling case law, Salcido cannot receive Washington, D.C., rates given that there are several qualified Mississippi attorneys with False Claims Act experience who could have represented the defendants at less expensive Mississippi rates. In addition, Salcido is not entitled to the upward adjustment in rates that he seeks. Moreover, the fees and expenses sought by all of the defense counsel should be reduced significantly because they are, in whole or in part, excessive, duplicative, not properly documented, and otherwise not compensable. Finally, the motion for reconsideration remains pending and the arguments in this response support the equitable arguments in that motion. All of this will be addressed in greater detail in this memorandum.

I.  **GIVEN THAT DEFENDANTS' COUNSEL DID NOT RAISE THE ALLEGEDLY "CLEAR" AND "UNEQUIVOCAL" CMS GUIDANCE UNTIL WELL AFTER THE MOTION TO DISMISS WAS DENIED, NO FEES SHOULD BE ASSESSED FOR DEFENSE COUNSEL'S TIME PRIOR TO RAISING IT.**

"If it is not apparent that an action lacks merit at its inception, but the result becomes obvious at some point in the litigation, a prevailing defendant may recover fees incurred after that point." *Palazzolo v. Sonne*, 2009 WL 86706, at *1 (N.D. Cal. Jan. 9, 2009). Here, defense counsel Salcido, despite his years of experience and extensive knowledge, did not mention the CMS guidance to relator until he served an expert report on April 19, 2021, that explained it. Docket 224 (notice of service of expert report). He did not mention it to the Court until he filed the defendants' motion for summary judgment on May 13, 2021. Docket 247 at 10 and n. 13. Given that he apparently did not know about it when he filed the motion to dismiss, or if he did know, did not deem it of sufficient importance to mention it, how was the relator supposed to

know about it?  The relator should not be charged with failing to notice something that the defendants did not mention in their pleadings.  *See Gonzalez v. Planned Parenthood of L.A.*, 2015 WL 12659936, at *12 (C.D. Cal. 2015) ("[T]he fact that Defendants did not argue the issue of scienter in seeking dismissal of Plaintiff's Third Amended Complaint . . .  undercuts Defendants' assertion now that the result was obvious from the start of the litigation.").

In ruling on the motion to dismiss, the Court noted the relator's allegation in the second amended complaint that Nurse Trofort obtained reinstatement by "fraudulently misrepresent[ing] to the Virginia Board of Nursing that she was still a resident of Virginia," which led Virginia to "mistakenly chang[e] its record-keeping system to reflect that Ms. Trofort had an active Virginia multi-state license."  Docket 131 at 6, quoting Second Amended Complaint, docket 90 at 18. The Court then explained that "[t]he complaint thus alleges that Defendant knew that Trofort lacked a valid license in spite of administrative findings otherwise, and there appears to be evidence in the record which gives plaintiff a *good faith argument in this regard.*"  Docket 131 at 6 (emphasis added).  The Court described the "arguments from both sides" as "reasonable."  *Id.* at 9.

While the defendants contended --- and the Court later held on summary judgment --- that the CMS guidance foreclosed the theory of the second amended complaint, that guidance was not before the Court during the motion to dismiss.  Given the Court's denial of that motion, the relator had good reason to believe the case was not frivolous and could proceed.  To the extent the theory was frivolous because of the CMS guidance, the relator became aware of it much later.

Accordingly, the defendants should not recover fees for the time prior to raising the CMS guidance on April 19, 2021.

II.    **ALTERNATIVELY, EVEN IF THE RELATOR SHOULD HAVE BEEN AWARE OF THE CMS GUIDANCE AT THE OUTSET, THE DENIAL OF THE MOTION TO DISMISS WAS THE DEFENDANTS' OWN FAULT SINCE THEY DID NOT RAISE THE GUIDANCE AT THAT POINT AND ANY TIME THEY SPENT ON THE CASE THEREAFTER IS NOT COMPENSABLE.**

Alternatively, in the event this Court concludes that the relator should have known about the CMS guidance at the outset even though the author of the FCA treatise apparently did not, the relator should not be required to pay the fees of defense counsel after the denial of the motion to dismiss.

In responding to the Relator's motion for reconsideration, the defendants said that when the motion to dismiss was denied, "the Court did not know" a number of things, including that the theory of the Relator's second amended complaint was "directly contrary to the relevant federal agency's interpretation of when that professional's license becomes invalid." Docket 355 at 9-10. According to the defendants, this demonstrated the relator's claim was "clearly frivolous." *Id.* at 11.[1]   As it turned out, the Court did not know about "the plain language of public federal law," docket 350 at 6, *because the defendants did not mention it in the motion to dismiss*.   Clearly, they should have.  Because it is a matter of "public federal *law*" (emphasis added) that the defendants contend was controlling, it could and should have been raised in a motion to dismiss, unlike a factual development that can only be raised on summary judgment.

Indeed, after the defendants finally raised the CMS interpretation in their motion for summary judgment, the Court granted summary judgment and later held that the relator acted frivolously in bringing the case.  Given the clarity that the Court and the defendants attach to the CMS interpretation, the Court presumably would have granted the motion to dismiss had it been

---

[1] In that response to the motion for reconsideration, the defendants listed the agency interpretation as one of a number of other "facts" which, "whether taken individually or collectively, demonstrate that Relator's action is clearly frivolous."  Docket 355 at 9-10.

raised then and the case would have been over. Because the defendants did not do so, the denial of the motion to dismiss and the expenditure of time on subsequent proceedings was their own fault.

To put it another way, assuming the Court believes that the relator should not have pursued the theory of his initial complaint because Nurse Trofort's Virginia multistate license had been reinstated, and should not have pursued the theory of his second amended complaint because the CMS interpretation foreclosed it, the only time that is compensable is the time the defendants needed to spend moving to dismiss those complaints. Any time they spent thereafter was their own fault for failing to raise this "clear" and "unequivocal" and "plain" language which they say "demonstrate[d] Relator's action [was] clearly frivolous."

Accordingly, they should not be compensated for any time spent after the motion to dismiss was denied on December 14, 2020. Docket 131.

## III. THE DEFENDANTS HAVE NOT PROVEN THAT IT WAS NECESSARY TO HIRE OUT-OF-STATE COUNSEL AND ANY FEES AWARDED TO OUT-OF-STATE COUNSEL SHOULD BE BASED ON LOCAL RATES.

The primary lawyer in the case for the defendants, Robert Salcido of the international law firm of Akin Gump, seeks a rate of $770 per hour, which he says reflects a discount that he is giving to one of the defendants who has been a long-time client over the years. The Fifth Circuit has said local rates should be awarded unless the party seeking out-of-state rates presents "abundant and uncontradicted evidence prov[ing] the necessity of . . . turning to out-of-district counsel." *McClain v. Lufkin Industries, Inc.,* 649 F.3d 374, 381 (5th Cir. 2011). But the only evidence presented here was the declaration of the defendants' local counsel, Margaret Sams Gratz. Docket 356-5. It simply says that "Mr. Salcido's expertise was necessary for this litigation, which presented complex theories of FCA liability." *Id.* at 3. She then states that her

6

firm "does not have a practice focused on FCA litigation" and she is "aware of no other firms with similar specialized FCA expertise." She concludes her declaration by saying she reviewed the websites of the eight largest offices in the Oxford, MS, area and determined that the websites did not feature "any practitioners who hold themselves out as False Claims Act practitioners" or "mention[] any particular experience with False Claims Act litigation."

But in the very case the defendants cited, docket 357 at 8, for the proposition that "FCA *qui tam* litigation normally involves complex issues," *Aldridge on behalf of United States v. Corp. Mgmt. Inc.*, 2022 WL 983167 (S.D. Miss. March 30, 2022), the decision shows the defendants were represented by Mississippi lawyers from the Bradley Arant firm, the Musgrove Smith firm, and the Carr Allison firm in Gulfport and then two lawyers from the Birmingham office of the Carr Allison firm. The court in *Aldridge* cited another Mississippi FCA case, *United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 2014 WL 691500 (S.D. Miss. Feb. 21, 2014), in which the reported list of defense counsel is composed of several Mississippi lawyers from the Butler Snow firm and one colleague from their Montgomery office.

Further, the court in *Rigsby*, while reviewing a claim from a Washington, D.C., lawyer that he should be paid D.C. rates for his representation of the relator, noted that the defendant "has presented evidence that 'retention of Washington, D.C., counsel was not required' because '[n]umerous Mississippi lawyers are capable of handling this type of case . . . .' Decl. of David W. Mockbee [1107-2] at 15-16. Mr. Mockbee, who graduated from law school in 1974 and practices in Jackson, Mississippi, identifies by name some of the Mississippi attorneys who could handle a complex case of this nature. *Id.* at 17-18." 2014 WL 691500, at *11. The *Rigsby* court added: "Relators have not persuaded the Court by a preponderance of the evidence, much less the 'abundant and uncontradicted evidence' referenced by the Fifth Circuit in *McClain*, that

it was necessary for them to turn to out-of-district counsel to prosecute this case. *McClain*, 649 F.3d at 382." *Id.* at *12.

While the declaration of Ms. Gratz states that she surveyed the websites of the 8 largest legal offices in the Oxford, Mississippi, area, that is only a small subset of the legal market in Mississippi. Typing in "False Claims Act" on the Butler Snow website leads to references to the firm's White Collar, Compliance, & Government Investigations Group, which specifically includes the False Claims Act, and to four different Mississippi lawyers (Amanda Barbour, Davis Frye, J. Lott Warren, and Matthew Sitton) and one Memphis lawyer (Ann Lundy) who have litigated and/or written about the False Claims Act.

https://www.butlersnow.com/search?butlersnow_main%5Bquery%5D=False%20Claims%20Act

. The website shows that Amanda Barbour is the Team Leader of that Group, has significant FCA litigation experience, and delivered a presentation on "The False Claims Act --- Northern and Southern Districts of Mississippi" to a Federal Bar Association meeting two years ago. https://www.butlersnow.com/professionals/amanda-barbour#

The website of Watkins & Eager describes its False Claims Act practice as follows:

Watkins & Eager has successfully represented clients in all aspects of False Claims Act (FCA) and qui tam litigation cases. We have obtained favorable results on behalf of clients in a wide variety of subject matters and legal issues. Our practice is led by a former federal prosecutor and also includes white collar criminal defense and commercial litigators skilled in responding to civil investigative demands and subpoenas, persuading the government not to intervene, procuring early dismissals of cases, obtaining advantageous settlements, and, when necessary, litigating cases through all stages of trial and appeal.

https://www.watkinseager.com/practices-false-claims-act-litigation. The site specifically lists two FCA lawyers in Mississippi, Scott Gilbert and Rusty Comley. Gilbert's biographical description states that he "represents clients in the federal and state courts throughout the United States in criminal matters, civil False Claims Act matters, and in both civil and criminal asset

8

forfeiture cases." Prior to joining the firm, he handled both civil and criminal health care fraud cases as an Assistant United States Attorney in the Southern District of Mississippi. https://www.watkinseager.com/professionals-j-scott-gilbert.

Indeed, the defendant in another FCA case that recently was resolved in the Northern District was represented solely by Gilbert and Comley along with two other lawyers from Watkins & Eager. *United States of America ex rel. Kevin Gray v. Mitias Orthopaedics, PLLC*, No. 3:15-cv-127-MPM. Ex. 1 to Relator's Response.

Typing "false claims act" into the Baker Donelson website leads to its Government Enforcement and Investigations Group. According to the website, that Group has "experience" and "substantive specialization" in the "False Claims Act and related qui tam or whistleblower actions." https://www.bakerdonelson.com/search.aspx?q=false+claims+act&t-bio=1&t-practice=1&t-industry=1&t-experience=1&t-media=1&t-other=1#results. The lawyers linked to that practice include Mississippi attorney Michael Dawkins whose biography states that "[w]ith regard to investigations and lawsuits under the civil Federal False Claims Act he has decades of experience defending individuals and companies, including government contractors." https://www.bakerdonelson.com/Michael-T-Dawkins. They also include Mississippi attorney Scott Newton, whose biography states: "Mr. Newton has 25 years of experience prosecuting and defending virtually every type of provider . . . in parallel criminal/civil/administrative False Claims Act (FCA) and qui tams." https://www.bakerdonelson.com/J-Scott-Newton.

As part of its description of its Stark and Fraud & Abuse Practice Group, the Wise Carter website states: "Our experience includes . . . [w]histleblower litigation involving the federal and state False Claims Act, the Medicare Anti-Kickback Statute, the Stark law and other civil and criminal statutes." https://www.wisecarter.com/practice-area/healthcare/stark-and-fraud-abuse/.

This page links to attorney Mark Hodges who "has successfully concluded hundreds of lawsuits, including commercial contract disputes, qui tam whistle blower actions, and professional liability claims." https://www.wisecarter.com/attorneys/r-mark-hodges/.

All of this is corroborated by the declaration of Cliff Johnson, an attorney with significant prior experience in FCA *qui tam* cases, who states:

> I am able to identify a number of lawyers in practice in Mississippi during the past five years (2018-2023) with the experience and skill to defend complicated False Claims Act qui tam cases. These include Scott Gilbert and Rusty Comley at Watkins & Eager, Amanda Barbour at Butler Snow, Mike Dawkins and Scott Newton at Baker Donelson, and Mark Hodges at Wise Carter.

Exhibit 3, ¶ 6.

While many of these attorneys are located in the Jackson area, this Court can take judicial notice that many Southern District attorneys also practice in the Northern District, and many Northern District attorneys also practice in the Southern District. The defendants did not have to pay Washington, D.C., rates to obtain skillful representation in this case.

Indeed, in a large FCA case pending in the Southern District, each of the various defendants is represented solely by Mississippi counsel, including Mr. Warren from Butler Snow, Mr. Newton from Baker Donelson, Mr. Hodges from Wise Carter, and a host of other lawyers from around the state (including two colleagues of Ms. Gratz at the Tupelo office of Mitchell McNutt). *United States of America et al v. Performance Accounts Receivable, LLC, et al*, No. 1:16-cv-00038-HSO-BWR. Ex. 2 to Relator's Response.

The availability and suitability of in-state counsel is also supported by the defendants' earlier claim that this case was based on "clear" and "unequivocal" federal law and this Court's similar holding. If the law was that clear, it was not necessary to hire the author of a thousand-page treatise to litigate the case. The defendants have not explained why they needed Mr.

Salcido, rather than one of the several qualified lawyers in Mississippi, to present this "clear" and "unequivocal" argument.[2]

In their memo, the defendants claim that Mr. Salcido's "experience [was] necessary to litigate this case" because it involved "shifting theories of FCA liability." Docket 357 at 8. But there were really only two theories. The first was that Nurse Trofort's multistate license had been revoked by the State of Virginia. Once the defendants discovered that the license had actually been reinstated after its revocation (which they said required only "a 5 minute check," docket 355 at 9), the relator then realized that Trofort had persuaded Virginia to reinstate it by (to quote the second amended complaint) "fraudulently misrepresent[ing] to the Virginia Board of Nursing that she was still a resident of Virginia," which led Virginia to "mistakenly chang[e] its record-keeping system to reflect that Ms. Trofort had an active Virginia multi-state license." Docket 90 at 18. Obviously, Mr. Salcido's expertise was not necessary to conduct the "5 minute check" necessary to discover that the license had been reinstated. And then with respect to the fraudulent misrepresentation theory in the second amended complaint, the defendants say that was disproved by "clear" and "unequivocal" federal law. As mentioned earlier, if that is the case, Mr. Salcido's expertise was not required to argue that issue. Accordingly, this change in theories did not require the payment of the rates he is seeking to recover.

In summary, as in *Rigsby*, the defendants have not proven "by a preponderance of the evidence, much less the 'abundant and uncontradicted evidence' referenced by the Fifth Circuit in *McClain*, that it was necessary for them to turn to [out-of-state] counsel to [defend] this case.

---

[2] Of course, now that they have filed their exorbitant fee application and have decided to seek out-of-state rates, defense counsel have contradicted themselves and said the case "presented complex theories of FCA liability." Docket 356-5 at 3. The Relator agreed with the latter assessment in the motion for reconsideration, arguing that his position was not frivolous. But as mentioned earlier, if the Court rejects the motion to reconsider, this matter will be evaluated under the Court's holding that this case was controlled by "the plain language of federal law."

*McClain*, 649 F.3d at 382." *Rigsby*, 2014 WL 691500, at *12. Accordingly, Mr. Salcido should

be paid local rates, which in this case would be no more than $450 per hour. *See Aldridge*, 2022

WL 983167, at *8-9 (awarding $450 per hour to Brad Pigott, who has practiced law for over 40

years with a focus on complex litigation, served as U.S. Attorney for the Southern District of

Mississippi, is highly experienced as a relator's counsel in FCA litigation, and is "in the upper

echelon of trial counsel in Mississippi").

Defendants also seek D.C. rates for three other lawyers in Salcido's firm between $500

and $740 per hour—Catherine Creely, Maureen McDonald, and Emily Gerry. Docket 357 at 6,

356-1 at ¶ 23. Again, they have not proven the work done by these three could not have been

done by less expensive Mississippi attorneys. Moreover, defendants have not provided any

information about how long each of them have practiced law and therefore the Court has no basis

to assess a proper hourly rate from the Mississippi legal market for their work. Salcido simply

says in his declaration that they have assisted him in prior FCA cases but states nothing beyond

that about their experience. Docket 356-1 at 8. The party seeking fees bears the burden of

"produc[ing] satisfactory evidence . . . that the requested rates are in line with those prevailing in

the community for similar services by lawyers of reasonably comparable skill, experience and

reputation." *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984). For that to happen, the Court must

be apprised of basic details such as how long the person has been practicing law. In the absence

of defendants meeting their burden of providing that basic information with the application, no

fees should be granted for the work of those lawyers. In *Fidelity & Deposit Corp. v. Henderson*,

1994 WL 189084, at *2 (N.D. Miss. Nov. 21, 1994), this Court excluded the time of two lawyers

whose names were listed in the application but the accompanying affidavit contained no

description of them. Here, the names and rates were provided in Salcido's declaration, and the

fact they have helped him before, but he gave no other information about them. Alternatively, if the Court does not exclude their time altogether, they should be paid at the lowest Mississippi hourly rate charged by the Mitchell McNutt firm in this case, which is $140 per hour. Docket 357 at 16.

## IV. THIS IS NOT ONE OF THE RARE CASES IN WHICH THE UPWARD ADJUSTMENT OF THE LODESTAR IS APPROPRIATE.

In addition to the $770 Washington, D.C., hourly rate he seeks, Mr. Salcido requests an upward adjustment so that his time is compensated between $930.78 per hour and $1,259.16 per hour depending on the year the work was done. Docket 357 at 9, 13-16. The Supreme Court has made it clear that an upward adjustment should occur only in rare and exceptional cases:

> [T]he lodestar method yields a fee that is presumptively sufficient to achieve this objective [of reasonably compensating counsel]. Indeed, we have said that the presumption is a "strong" one. [A]lthough we have never sustained an enhancement of a lodestar amount for performance, we have repeatedly said that enhancements may be awarded in " 'rare' " and " 'exceptional' " circumstances. . . .[W]e have noted that "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee," and have held that an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation. We have thus held that the novelty and complexity of a case generally may not be used as a ground for an enhancement because these factors "presumably [are] fully reflected in the number of billable hours recorded by counsel." We have also held that the quality of an attorney's performance generally should not be used to adjust the lodestar "[b]ecause considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate." . . . . [T]he burden of proving that an enhancement is necessary must be borne by the fee applicant. . . . [A] fee applicant seeking an enhancement must produce "specific evidence" that supports the award. . . . This requirement is essential if the lodestar method is to realize one of its chief virtues, i.e., providing a calculation that is objective and capable of being reviewed on appeal.

*Perdue v. Kenny A.*, 559 U.S. 542, 552-553 (2010) (citations omitted).

Despite this admonition that is repeated throughout the case law, the defendants simply roll through the laundry list of *Johnson* factors, docket 357 at 13-15, and conclude by saying "[t]aken together, the *Johnson* factors indicate that an upward adjustment to the loadstar [sic] is

appropriate in this action." *Id.* at 15. But that is not sufficient to carry their burden given that "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee,' and . . . an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation." *Perdue,* 559 U.S. at 543.

The defendants make no showing that these are rare and exceptional circumstances. At most, they claim that "this case has involved difficult legal questions" (which is at odds with their earlier claim that it was governed by "'clear' and 'unequivocal[]' federal law") "compounded by Relator's switch in legal theory and multiple acts of discovery abuse." Docket 357 at 14. As stated in a prior section of this response, the switch in theory from the original complaint to the second amended complaint was not inherently difficult for the defendants. As for the "multiple acts of discovery abuse," there were two acts they have labeled as "abuse" and they involved submissions of materials after the close of discovery for summary judgment purposes and in response to the order to show cause. *Id.* at 3. The defendants addressed them by objecting to one and moving to strike the other. These two instances did not turn this case into one of the "rare" and "exceptional" instances where an upward adjustment is warranted.

The heading to this subsection of the defendant's memo states that "the Court should adjust the lodestar upward under *Johnson* to make it commensurate with the amount billed to defendants using Akin's *discounted rates.*" *Id.* at 12 (emphasis added). But the motion itself indicates that $770 is the discounted amount Mr. Salcido charges his longtime client while the proposed enhanced rates of $930.78 to $1,259.16 are the average of what he has charged to other clients. *Id.* at 9, 13. It seems misleading to suggest that the enhanced rates are somehow "discounted."

14

To the extent the defendants are saying Mr. Salcido's rate should be adjusted so that he is paid more than the "discounted" rate his clients paid him in this case, he cites no precedent holding that discounts to long-time corporate clients are the sort of "rare" and "exceptional" circumstances that justify an enhancement. Discounts to long-term and frequent clients are a common marketing tool in the profession to enhance repeat business and increase the volume of billings. Law firms use this tool in their own financial interest and opposing parties are not required to make up the difference.

## V. THE COURT SHOULD EXCLUDE SEVERAL CATEGORIES OF FEES CHARGED BY WITNESSES AND ATTORNEYS WHO DID NOT SERVE AS DEFENDANTS' PRIMARY COUNSEL.

Not only do Defendants seek over $2 million in fees for their primary counsel, they also ask for thousands of dollars in fees charged by witnesses and other attorneys who did not appear for the three Defendants remaining in this action. Several categories of such fees should be excluded from any fee award.

First, the Court should exclude the $21,022.18 in fees and expenses (using out-of-state rates) charged by Lily North and the Benesch firm and the $5,676 in fees and expenses charged by Michael Phillips and Hagwood and Tipton, P.C., because those fees and expenses were incurred by entities that did not prevail in this action and did not seek fees. As averred in the Declarations of Ms. North and Mr. Phillips, they and their firms appeared in this action solely on behalf of Drumm Merger Corp. and Ronald Silva. Dkt. No. 356-8 at ¶ 1; Dkt. No. 356-18 ¶ 2. Neither Drumm Merger Corp. nor Mr. Silva joined Defendants' Joint Motion for Attorneys' Fees granted by the Court or the instant fee Motion pending before the Court. Dkt. Nos. 330, 357. Nor did those former parties have a basis for joining the fee motions, as neither is a "prevailing" party entitled to obtain fees. Both Drumm Merger Corp. and Mr. Silva were

voluntarily dismissed without prejudice, Dkt. Nos. 37, 40, which is insufficient to confer them

with "prevailing-party status." *Hacienda Records, L.P. v. Ramos*, 718 F. App'x 223, 236 (5th

Cir. 2018) ("[P]revailing-party status is not conferred through a party's voluntary dismissal

without prejudice." (citing *Alief Indep. Sch. Dist. v. C.C. ex rel. Kenneth C.*, 655 F.3d 412, 418

(5th Cir. 2011))).

Moreover, even if those parties had prevailed and joined the remaining Defendants' fee

motions, their request for fees would be time-barred because those motions were filed *years* after

the voluntary dismissal on January 28, 2020. Dkt. Nos. 37, 40; *see Western Wind Energy Corp.

v. Savitr Capital, LLC*, 2013 WL 3286190, at *4 (N.D. Cal. June 27, 2013) (holding that notice

of voluntary dismissal triggered 14-day deadline to file fee application under Rule 54); *Hill v.

Clark*, 2012 WL 13018385, at *5 (N.D. Ga. Aug. 16, 2012) (same); *Cherry Group, LLC v. D.B.

Zwirn Special Opportunities Fund, L.P.*, 2011 WL 13176154, at *3 (M.D. Fla. Nov. 29, 2011)

(same).[3]

Second, the Court also should exclude the $14,197.50 in fees charged by Ms.

Almefty. Relator served notice on October 29, 2020, that he would be taking a 30(b)(6)

deposition of Defendant GGNSC Administrative Services, LLC ("Admin"), *see* Ex. 13 to

Relator's Response, and that entity ultimately designated Ms. Almefty to serve as its 30(b)(6)

representative during the company's March 16, 2021, deposition, *see* Ex. 14 to Relator's

Response, Tr. of Almefty 30(b)(6) Depo. at 19:21-21:1. It is clear from the redacted statements

attached to Ms. Almefty's Declaration that the time she billed to the company between

---

[3] The Exhibit to the North Declaration reveals that Defendants' fee request includes $10,963 in fees and expenses charged by Ms. North and the Benesch firm for their work in responding to a subpoena served on Drumm Merger Corp. after that entity was voluntarily dismissed from the case. Dkt. No. 356-9 at pp. 14-24. Defendants do not cite to any authority permitting a third party to recover attorneys' fees incurred in responding to a subpoena under the fee-shifting provision of the FCA, and Relator was unable to locate any such authority.

December 2020 and April 2021—$13,320—related to preparing for and giving testimony as Admin's 30(b)(6) representative.  Dkt. No. 356-13 at pp. 13-19.  Defendants are not entitled to reimbursement for the fees charged by Ms. Almefty for her service as a 30(b)(6) witness.  *See Hancock v. Chicago Title Ins. Co.*, 2013 WL 2391500, at *12 (N.D. Tex. June 3, 2013) (holding that party "cannot recover fees for the time that [an attorney] spent in his capacity as a fact witness" (citing *Emmenegger v. Bull Moose Tube Co.,* 33 F. Supp. 2d 1127, 1138 (E.D. Mo. 1998))); *accord Widman v. Keene*, 2015 WL 5918396, at *3 (D. Utah Oct. 9, 2015).  And the fees charged by Ms. Almefty before December 2020—just $877.50—also should be excluded because the billing statements attached to Ms. Almefty's Declaration do not establish whether Ms. Almefty was providing legal services as an attorney, or whether she was providing information as a fact witness given her previous employment by the company.  Ex. 14 to Relator's Response, Tr. of Almefty 30(b)(6) Depo. at 5:15-6:13.

Nor should Defendants be permitted to recover $6,188.50 in fees charged by Mark Brennan and Vandeventer Black or the $43,498.60 in fees charged by Defendants' experts because, pursuant to Defendants' argument and the Court's holding as to the frivolousness of this case, it was not reasonable or necessary for Defendants to retain that firm or three different experts.  Defendants retained the Vandeventer firm "to investigate the licensure in the Commonwealth of Virginia of Lionelle Trofort, R.N."  Brennan Decl. ¶ 2, Dkt. No. 356-16.  It was unreasonable for Defendants to hire a separate law firm to investigate Trofort's licensure status in Virginia if, as Defendants have repeatedly claimed, a "five-minute check" would have revealed Trofort's licensure status.  Dkt. No. 355 at 9.  Similarly, it was not reasonable or necessary for Defendants to incur expert witness fees of over $40,000 if, as Defendants have argued and the Court held, this was a frivolous case barred by clear federal law.  Indeed, there is

no justification for Defendants hiring an expert, Rick Harris, to expound upon the meaning of the CMS survey guidance when Defendants have repeatedly argued that the guidance is so clear that Relator should have known it was dispositive from the outset of this case.

## VI. THE COURT SHOULD EXCLUDE A SIGNIFICANT NUMBER OF HOURS FROM THE LODESTAR CALCULATION BECAUSE NUMEROUS TIME ENTRIES ARE VAGUE, DUPLICATIVE, EXCESSIVE, AND REFLECT A LACK OF BILLING JUDGMENT.

Regardless of whether the Court concludes that Defendants may recover their fees for the entire case or, as argued above, for a more limited portion of time, the Court should exclude a significant number of hours charged by the Akin and Mitchell McNutt firms when determining a reasonable number of hours as part of the Court's lodestar calculation.

In *Hensley v. Eckerhart*, the Supreme Court emphasized that a party seeking an award of attorney's fees should exercise billing judgment. 461 U.S. 424, 434 (1983). The district court must determine what fee is "reasonable." *Id.* at 433. The Court explained that hours not "reasonably expended" should be excluded from a district court's calculation of the reasonable hours. *Id.* at 434. "Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Id.* Accordingly, the fee applicant should present records evidencing "billing judgment" that provide the district court a meaningful basis to determine a reasonable award. *Id.* at 437. As explained later in this section, "billing judgment" often is exercised when lawyers voluntarily reduce their fee request to account for excessiveness, duplication, and inefficiency. But here, in the course of seeking over two million dollars in fees, the Defendants apparently have declined to exclude voluntarily a single hour of time or to decrease their request by a single dollar.

Defendants have inundated the Court with documentation of this two million dollars in fees and expenses, but much of this is non-compensable and unreasonable and includes excessive, redundant, and unnecessary hours. Accordingly, Relator respectfully requests that this Court exercise its broad discretion to exclude unreasonable hours and substantially reduce the award Defendants seek. The remainder of this section will discuss specific categories of problematic time entries and, at the end of the section, provide calculations regarding the appropriate amounts to be awarded after particular reductions.

## A.      Vagueness

Critical to the Court's determination of the reasonableness of the hours expended is the extent to which the party seeking fees and costs carries its burden of presenting adequate evidence for the court to determine what hours should be reimbursed. As sufficient detail is required in any application to determine an accurate award, unreasonably vague submissions are not compensable. *Childers v. Benton County School Dist.*, 1995 WL 1945495, at *1 (N.D. Miss. Apr. 11, 1995) (citing *Hensley*, 461 U.S. at 433; *Von Clark v. Butler*, 916 F.2d 255, 259-60 (5th Cir. 1990)). Billing records that contain vague entries such as library research, analyzing documents, reading background documents, and phone interviews with no further explanation have been deemed "woefully inadequate" in the Fifth Circuit. *See Winborne v. Sunshine Health Care, Inc.*, 2009 WL 2900011, at *2 (N.D. Miss Sept. 3, 2009) (abrogated on unrelated grounds); *Walker v. U.S. Dep't of Housing & Urban Devel.*, 99 F.3d 761, 773 (5th Cir. 1996). A court may properly reduce or eliminate hours when the supporting documentation is too vague to permit meaningful review. *La. Power & Light Co. v. Kellstorm*, 50 F.3d 319, 324 (5th Cir. 1995).

In this case, Defendants have submitted heavily redacted invoices for the Akin and Mitchell McNutt firms. Dkt. Nos. 356, 356-3, 356-6. The decision to extensively redact the

billing records has rendered voluminous entries so vague that determining the reasonableness of those entries is impossible. Unless, however, the time entries contain privileged information, such as entries discussing a confidential communication with a client, most time entries do not reveal privileged information. For example, if defense counsel held a meeting to discuss the CMS guidance issue in the case, or did research on it, that time entry would not reveal anything confidential. Everyone knows that is an issue in the case.

The Defendants carry the burden of presenting adequate evidence to support their fee motion. But they have not done that. Instead, for example, Akin's invoices include entries such as "Participated in Call" on November 25, 2019, for .4 hours; "Reviewed case law 'redacted'" on March 25, 2020, April 8, 2020, and April 10, 2020; and "Prepared 'redacted'" on April 21, 22, and 26, 2021, for a total of 8.8 hours. There are numerous other examples of such entries in the Akin invoices submitted by Defendants. In total, and as set forth in detail in Exhibit 4 to Relator's Response, Defendants' impermissibly vague entries account for 212.1 hours for a total of $147,990  in fees at Akin's requested D.C. rates.

Similarly, Mitchell McNutt's billing records contain impermissibly vague entries accounting for 173 hours and fees totaling $26,489.20 at Mississippi rates. Prominent examples include 31 entries described as "Read and analysis of 'redacted.'" *See* Ex. 5 to Relator's Response. Further, Mitchell McNutt submitted two entries on October 30, 2020, and May 12, 2021, where, in addition to being impermissibly vague ("Telephone call to 'redacted'" and "Research case law 'redacted'"), Defendants redacted the number of hours billed for the entries. Dkt. No. 356-6 at pp. 55, 127.

The Court should exclude time entries rendered so vague through redaction that it makes it difficult, if not impossible, for the Court to determine the reasonableness and relevancy of the

20

time expended. *See Hamilton v. Sheridan Healthcare, Inc.*, 2015 WL 13540999, at *5 (S.D. Fla. Dec. 23, 2015); *Housing Opportunities Project for Excellence*, *Inc. v. Map Legacy, Inc.*, 2018 WL 11476164, at *5 (S.D. Fla. Dec. 18, 2018).

Defendants knew they had an obligation to provide sufficient detail for the Court to determine the reasonableness of the fees. They did not do that. It is too late for them to come back in a reply and provide that detail by unredacting the time entries. That will require the Relator to file a surreply and go back through all of the time entries once again to see if there is a basis for objecting. "A request for attorney's fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437. The Relator objects to any effort by the Defendants to do so. The Relator also objects to any *ex parte*, *in camera* submission to the Court of the unredacted time entries since very few time entries are likely to be privileged and that would deprive the Relator of a fair opportunity to oppose the request for those particular fees.

Exhibits 4 and 5 list the vague time entries and add the totals, and the charts at the end of this section deduct those entries from the total award that Defendants seek.

**B.     Duplication in Depositions**

Defendants may not recover duplicative attorneys' fees attributable to the attendance of two different lawyers at the same deposition. *See Miss. State Chapter Operation Push v. Mabus*, 788 F. Supp. 1406, 1416 (N.D. Miss. 1992) ("No more than one lawyer should appear for the plaintiffs at a deposition of a witness."); *accord Fidelity & Deposit Co. of Md. v. Henderson*, 1994 WL 1890834, at *2 (N.D. Miss. Nov. 21, 1994) (Biggers, J.). As reflected in Exhibit 6 to Relator's Response, Mr. Salcido and Ms. Gratz attended and billed for the same deposition on nine different occasions. The hours of the attorney who was not taking or defending the

21

deposition should be excluded from the lodestar calculation.[4]  While there is a local ruling requiring at least one local lawyer to appear even if out-of-state counsel is conducting or defending the deposition, the double staffing is the result of the defendants' choice to use an out-of-state lawyer.  The opposing party should not have to pay two lawyers because of that choice.

This results in the exclusion of 18.6 hours from the Akin lodestar and 21.5 hours from the Mitchell McNutt lodestar.  *See* Ex. 6.

## C.     Timekeepers Who Are Not Described in Defendants' Affidavits

The Court also should exclude fees associated with timekeepers for the Akin firm that are not mentioned or described in Mr. Salcido's affidavit.  *See Henderson*, 1994 WL 1890834, at *1 ("Two of the ten persons listed in the summary are not identified in Selph's affidavit. The court finds that the time for [them] . . . is not compensable.").  Exhibit 7 shows that 48.2 hours should be excluded from the lodestar for this reason.

## D.     Excessive and Unnecessary Hours and Fees

In addition to the foregoing hours that should be categorically excluded from any fee award, the Court should also reduce the hours billed by the Akin firm by at least 75% because the invoices submitted by Defendants' attorneys demonstrate that they billed an excessive and unnecessary amount of time on many of the briefs, pleadings, and other tasks that arose in the case and also failed to efficiently staff the case, using lead counsel Salcido to perform extensive legal research and drafting that should have been done by younger and less expensive lawyers. Hours which are excessive, redundant, or otherwise unnecessary are not reasonably expended and should be excluded from the lodestar calculation.  *See Hensley*, 461 U.S. at 434.  The

---

[4] Mr. Salcido billed for attending the three fact witness depositions in March 2021 that Ms. Sams Gratz defended. Ms. Sams Gratz billed for attending six expert depositions that Mr. Salcido either took or defended.  *See* Ex. 6.

following examples, which are depicted in detail in Exhibit 8,[5] show a staggering number of

hours expended and fees (at D.C. rates) charged by the Akin firm:

- 123.8 hours for a total of $91,394.50 in fees preparing Defendants' first motion to dismiss and reply brief;

- 69.5 hours for a total of $53,040 in fees preparing Defendants' response to a motion to amend;

- 81.8 hours for a total of $62,986 in fees preparing Defendants' second motion to dismiss and reply brief;

- 68.6 hours for a total of $52,822 in fees preparing a 12-page brief in support of a motion for protective order, Dkt. No. 74, as well as a reply brief that was never filed;

- 10 hours for a total of $7,700 in fees preparing a two-page letter to Judge Mills that was sent on co-counsel's letterhead;

- 33.2 hours for a total of $25,564 in fees lobbying the Government— unsuccessfully—to dismiss the case;

- 11.6 hours for a total of $8,932 preparing a response to Relator's second motion to amend, which response was never filed;

- 153.7 hours for a total of $118,349 preparing Defendants' third motion to dismiss and reply brief, which the Court denied;

- 15.6 hours for a total of $12,012 in fees preparing Defendants' six-page response to Relator's motion to release Lionelle Trofort's tax records;

- 74.1 hours for a total of $57,057 in fees preparing to take Relator's deposition, which lasted just 3.2 hours according to Mr. Salcido's billing records;

- 89.1 hours for a total of $68,607 in fees preparing to take depositions of Relator's three experts, which lasted only 2.5, 2.9, and 3.5 hours according to Mr. Salcido's billing records;

- 349.7 hours for a total of $245,456 in fees preparing briefing for Defendants' summary judgment and *Daubert* motions;

---

[5] Exhibit 8 contains additional examples of unreasonable and excessive hours expended by Akin in this matter. *See* Ex. 8 to Relator's Response at pp. 4, 6, 9, and 16.

- 94.8 hours for a total of $68,740.50 in fees preparing briefing in response to Relator's summary judgment and *Daubert* motions;

- 69.5 hours for a total of $41,299 in fees preparing a reply brief in support of Defendants' effort to exclude one of Relator's declarations;

- 147.2 hours for a total of $105,487 in fees preparing a response to Judge Mills' Show Cause Order, which was filed after Judge Mills had already recused himself;

- 145.5 hours for a total of $95,350 in fees preparing Defendants' first motion for attorneys' fees;

- 56.9 hours for a total of $31,742 in fees preparing a 12-page response to Relator's motion objecting to the taxation of costs; and

- 178.5 hours for a total of $121,547.50 in fees preparing an appellate brief.[6]

These figures are all the more remarkable when one considers that Defendants used case citations and parentheticals that were lifted directly from Mr. Salcido's treatise and, in some instances, recycled multiple times throughout the case. For example, the case citations and parentheticals attacking Relator's common law claims in the original motion to dismiss quote, nearly verbatim, portions of Mr. Salcido's treatise that was published in 2018, *i.e.*, before this case was filed. *See* Ex. 9 to Relator's Response. Defendants' counsel also used citations and parentheticals from Mr. Salcido's treatise in making their "per diem" rate argument, which were repeated in at least *four* different briefs. *See* Ex. 10 to Relator's Response. These are just examples of the type of repetition and copying that counsel engaged in that should have precluded the type of unreasonable research and drafting charges included on Defendants' invoices.

---

[6] Also, a paralegal for Mitchell McNutt billed over 80 hours working on a chronology and charged a total of $7,290 in fees. *See* Ex. 8 at 17.

In sum, Akin's exorbitant and unnecessary hours far exceed hours that this Court previously reduced by 50% for being "excessive and unreasonable." *Stuart C. Irby Co. v. Bayview Electric Co., LLC*, 2014 WL 670230, at *1-2 (N.D. Miss. Feb. 20, 2014) (Biggers, J.) (applying a 50% reduction to "time spent on Irby's initial Motion for Summary Judgment (19.25 hours) and Rebuttal Brief (27.75 hours)," "time spent on Irby's Motion to Dismiss Bayview's Counterclaim (23.0 hours) and Rebuttal Brief (22.0 hours)," "time spent on Irby's Motion to Amend Complaint to add a claim for punitive damages (13.75 hours) and Rebuttal Brief (9.25 hours)," and "time spent propounding basic written discovery (10.25 hours)").

The excessiveness goes far beyond the particular examples listed here and is compounded by the lack of efficiency and billing judgment displayed by Akin. Mr. Salcido, the senior lawyer on the defense team, charged $770 an hour for basic tasks that could have and should have been handled by a junior lawyer, including drafting discovery, drafting pleadings, researching case law, and drafting briefs. *See Calsep A/S v. Intelligent Petroleum Software Sols., LLC*, 2022 WL 508334, at *4 (S.D. Tex. Feb. 18, 2022) (reducing reasonable hours for lodestar calculation based on overstaffing, noting that usually "the partner will bill less hours than the associates because of experience and efficiency"). Indeed, despite the fact that Mr. Salcido and his colleagues had ready access to Mr. Salcido's 1050-page FCA treatise throughout the case, he spent an astonishing 427.1 hours performing legal research and 931.4 hours drafting pleadings, briefs, and other documents in a lawsuit Defendants have repeatedly claimed was plainly barred by clear federal law. By comparison, all other Akin attorneys referenced in the invoices spent 101 hours on research and 139.7 hours drafting. Exs. 11-12 to Relator's Response.

Moreover, there is no indication that Akin ever applied a voluntary reduction to its invoices to account for the firm's excessive hours and lack of efficiency. *See Saizan v. Delta*

25

*Concrete Prods. Co., Inc.*, 448 F.3d 795, 799 (5th Cir. 2006) ("Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant. The proper remedy for omitting evidence of billing judgment [is] . . . a reduction of the award by a percentage intended to substitute for the exercise of billing judgment." (footnote omitted)). This Court reduced certain redundant hours by 50% in the *Stuart Irby* case. The Court in *Calsep* reduced fees by 20% for inefficient staffing and cited another case that reduced fees by 30%. The extreme nature of Akin's excessive billing, overstaffing, inefficiency, and failure to exercise billing judgment justifies combining the 50% figure for excessive billing with another 25% for inefficient top-heavy staffing and the absence of billing judgment, for an overall 75% reduction in the number of hours remaining in the lodestar after removing vague time entries and those for duplicative deposition coverage.

## E.     Relator's Fee Calculations

Application of the rates and exclusions discussed above to the billed hours reflected in Defendants' exhibits, *see* Dkt. Nos. 356-3, 356-4, yields various estimated fee calculations for certain time frames. Section I of this memorandum contended that the Court should award fees only for the time expended after the Defendants raised the CMS Guidance in an expert report served on April 19, 2021. Alternatively, Section II contended that fees only should be awarded for the time spent prior to the denial of the motion to dismiss on December 14, 2020. The following charts address the calculations for those two options as well as the scenario in which the Court disagrees with both contentions and awards fees for the entire case. The first chart includes fees for the entire case. The next chart lists fees from the time period before the motion to dismiss was denied. And the chart after that lists fees for the time period after the CMS Guidance was raised in an expert report.

26

For all of these charts, the hours expended by the Akin attorneys who were not described in Salcido's declaration are not included.  The Mississippi rates described in Section III of this brief are used for the Akin attorneys.  The rates billed by Mitchell McNutt are used for their chart.

| Akin Fees for Entire Case | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Attorney** | **Hours Billed** | **Vague Hours** | **Duplicate Hours** | **Reduction for Excessiveness/ Inefficiency/ Lack of Billing Judgment (75%)** | **Total Hours** | **Local Rate** | **Adjusted Fees** |
| Salcido | 1,893.7 | -154.1 | -18.6 | (1,721 x 25%) | 430.25 | $450 | $193,612.50 |
| Gerry | 285.8 | -56.9 | N/A | (228.9 x 25%) | 57.225 | $140 | $8,011.50 |
| Creely | 46.9 | -1.1 | N/A | (45.8 x 25%) | 11.45 | $140 | $1,603 |
| McDonald | 11.8 | N/A | N/A | (11.8 x 25%) | 2.95 | $140 | $413 |

**Grand Total:    $203,640**

27

| Akin Fees Before Motion to Dismiss Denied (Beginning to December 14, 2020) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Attorney | Hours Billed | Vague Hours | Duplicate Hours | Reduction for Excessiveness/ Inefficiency/ Lack of Billing Judgment (75%) | Total Hours | Local Rate | Adjusted Fees |
| Salcido | 745.1 | -68 | N/A | (677.1 x 25%) | 169.28 | $450 | $76,173.75 |
| Gerry | 0 | N/A | N/A | (0 x 25%) | 0 | $140 | $0 |
| Creely | 46.9 | -1.1 | N/A | (45.8 x 25%) | 11.45 | $140 | $1,603 |
| McDonald | 6.3 | N/A | N/A | (6.3 x 25%) | 1.575 | $140 | $220.50 |

**Grand Total: $77,997.25**

| Akin Fees After Defendants Raised Guidance Argument (April 19 2021, to present) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Attorney | Hours Billed | Vague Hours | Duplicate Hours | Reduction for Excessiveness/ Inefficiency/ Lack of Billing Judgment (75%) | Total Hours | Local Rate | Adjusted Fees |
| Salcido | 895.1 | -33.1 | N/A | (862 x 25%) | 215.5 | $450 | $96,975 |
| Gerry | 285.8 | -56.9 | N/A | (228.9 x 25%) | 57.225 | $140 | $8,011.50 |
| Creely | 0 | N/A | N/A | (0 x 25%) | 0 | $140 | $0 |
| McDonald | 2 | N/A | N/A | (2 x 25%) | 0.5 | $140 | $70 |

**Grand Total: $105,056.50**

As for the Mitchell McNutt fees, the following adjustments should be made for each potentially applicable time period (*see* Dkt. No. 356-6):

| Time Period | Fees Sought | Vagueness | Duplication | Excessiveness | Adjusted Fee |
|---|---|---|---|---|---|
| Entire Case | $174,383.30 | -$26,489.20 | -$4,300 | -$5,467.50 | $138,126.60 |
| Beginning to 12/14/2020 | $35,296.30 | -$8,392.20 | N/A | N/A | $26,904.10 |
| 04/19/2021 to Present | $56,661.73 | -$11,430 | N/A | N/A | $45,231.73 |

Finally, Relator does not dispute that, if a fee award is warranted, Defendants may recover fees for Paul Killeen and Jan Ahrens, as well as e-discovery expenses. Depending on the time period deemed relevant by the court, the following fees and expenses are as follows (*see* Dkt. Nos. 356-11, 356-15, 356-21):

| Time Period | Killeen | Ahrens | E-Discovery | Total |
|---|---|---|---|---|
| Entire Case | $18,125 | $6,454.80 | $14,464.32 | $39,044.12 |
| Beginning to 12/14/2020 | $0 | $0 | $0 | $0 |
| 04/19/2021 to Present | $0 | $4,455 | $11,975.32 | $16,430.32 |

When all of these figures are added together, the maximum total fees and expenses that should be awarded are **$380,810.72** if Defendants can recover fees for the entire case; **$104,901.35** if Defendants can only recover fees prior to the denial of their Motion to Dismiss; and **$166,718.55** if Defendants can only recover fees after they raised their guidance argument near the close of discovery.

## VI. THE EXCESSIVE AMOUNT OF FEES SOUGHT HERE SUPPORT THE RELATOR'S PENDING MOTION FOR RECONSIDERATION.

As of now, the motion for reconsideration is still pending. The additional points made in this response about the excessive nature of the two-million-dollar fee request support the

equitable arguments made in that motion. Given the unusual course of events in this case, it is unfair to require the Relator to pay fees to the Defendants, particularly when those defendants have been so cavalier and excessive in their pursuit of those fees, seeking two million dollars without exercising any billing judgment whatsoever. Accordingly, the Relator re-urges his motion for reconsideration.

Respectfully submitted,

/s/ *Robert B. McDuff*
Robert B. McDuff (MSB # 2532)
Law Office of Robert B. McDuff
767 North Congress Street
Jackson, MS 39202
601.259.8484 (Telephone)
rbm@mcdufflaw.com

Richard R. Barrett (MSB #99108)
Law Office of Richard R. Barrett, PLLC
2086 Old Taylor Road
Suite 1011
Oxford, MS 38655
662.380.5018 (Telephone)
rrb@rrblawfirm.net

Philip N. Elbert (admitted *pro hac vice)*
Kendra E. Samson (admitted *pro hac vice*)
Nathan C. Sanders (admitted *pro hac vice*)
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
(615) 244-1713 – Telephone
pelbert@nealharwell.com
ksamson@nealharwell.com
nsanders@nealharwell.com

*Counsel for Relator*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of May, the foregoing was served on the following counsel by operation of the Court's electronic filing system:

Margaret Sams Gratz, Esq.
Mitchell, McNutt & Sams, P.A.
P. O. Box 7120
Tupelo, MS 38802-7120
mgratz@mitchellmcnutt.com

Robert Salcido, Esq.
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street NW
Washington, DC 20006-1037
rsalcido@akingump.com

*Counsel for Defendants*

J. Harland Webster, Assistant U.S. Attorney
Office of the United States Attorney
Northern District of Mississippi
900 Jefferson Avenue
Oxford, MS 38655-3608
joseph.webster@usdoj.gov

*Counsel for the United States of America*

/s/ *Robert B. McDuff*

31