# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. CAMERON JEHL,<br><br>Plaintiffs,<br><br>v.<br><br>GGNSC SOUTHAVEN LLC D/B/A GOLDEN LIVING CENTER-SOUTHAVEN et al.<br><br>Defendants. | Case No. 3:19cv091-NBB-JMV |

**REPLY DECLARATION OF ROBERT SALCIDO IN SUPPORT OF DEFENDANTS' APPLICATION FOR ATTORNEYS' FEES AND OTHER EXPENSES**

I, Robert Salcido, having personal knowledge of the facts contained in this Declaration and being competent to testify to them, hereby state as follows:

1. Defendants undertook several steps early and often to notify Relator of the frivolous nature of his lawsuit and that it was unsupported in fact and law.

**A. Initial Complaint**

2. Relator's initial wide-ranging complaint alleged eight separate defendants breached the FCA and asserted common law causes claims of payment by mistake and unjust enrichment. ECF 2, ¶¶ 14-21, 103-110. Defense counsel immediately informed Relator's counsel that, based upon FCA principles, he could not sue several named defendants and that under uniform FCA precedent he could not bring common law claims against any Defendant. ECF 32, at 19-22, 26. As a result, five defendants were dismissed and the common law claims were dismissed. *See* ECF 39 at 1 & n.1.

B.     **First and Second Amended Complaints**

3.     Relator's initial and First Amended Complaint falsely asserted that Nurse Trofort did not possess a Virginia multistate license. *See, e.g.,* ECF 59 at ¶ 60 ("Ms. Trofort did not possess a valid multistate license or other privilege during the Relevant Time Period that allowed her to practice nursing in Mississippi. Before Golden Living hired her, Ms. Trofort held a multistate license issued by the State of Virginia. However, on or around February 27, 2013, the State of Virginia revoked her multistate license and changed it to single-state status. **It was never reinstated to multistate status.** Thus, Ms. Trofort did not possess a valid multistate license during the Relevant Time Period").

4.     Because defense counsel knew that an FCA action cannot be established unless there is an actual false statement or claim made to the government, *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674-75 (5th Cir. 2003), Defendants focused on demonstrating that Relator's contention was demonstrably false. Thus, in the very first opposition, Defendants supplied Relator with direct evidence that Defendants obtained proof from Virginia demonstrating that at the time of her employment and at the time she left her employment, Nurse Trofort possessed a current active multistate license. *See* ECF 31-1, 31-2.

5.     Relator's response was to indicate that Southaven's documents confirming that Nurse Trofort held a current active license during her employment may not be authentic and that the Court, in any event, should not evaluate the documents at the motion to dismiss stage but that, instead, should solely address the issue at summary judgment after discovery. *See* ECF 39 at 18; ECF 64 at 19-20. Relator neither at this time, nor as part of any pre-suit investigation, inquired of Virginia regarding whether Nurse Trofort held a current active license although Relator alleged in its Complaint that she did not possess such a license.

2

6. Thus, when initial efforts to get Relator to dismiss the action by showing evidence that Southaven had confirmed her license was valid and when Relator refused to confirm that fact for himself despite Nurse Trofort informing him under oath, on multiple occasions, that she held a valid license, Defendants bore the cost of obtaining an affidavit from Virginia confirming that she always held a Virginia multistate license and, again, based upon FCA principles, urged Relator's counsel to dismiss the action.

7. Specifically, when Relator refused to drop the case after viewing evidence that Defendants confirmed that Nurse Trofort held a valid Virginia multistate license, Defendants delivered to Relator undisputed evidence directly from the State of Virginia that Nurse Trofort always possessed a valid multistate license and again urged Relator to dismiss the lawsuit since that evidence directly undermined Relator's claim that Virginia had revoked her multistate license and "it was never reinstated to multistate status." ECF 59, ¶ 60; *see also* June 15, 2020 e-mail from R. Salcido to Relator Lead Counsel N. Sanders (attached hereto as Ex. A). Defense counsel in other e-mails had also provided notice to Relator's counsel that an action, such as this, based upon a false factual premise—that an individual is unlicensed when, in fact, the person is licensed—is frivolous and sanctionable under the FCA's fee-shifting provision.

8. Four days after receiving undisputed evidence that contrary to its contention that Nurse Trofort held a multistate license that she did in fact possess a multistate license, rather than dismiss the action, Relator informed Defendants that he would simply file a Second Amended Complaint. It was only at the time of the Second Amended Complaint, Relator decided, for the first time, to delete its contention paragraph 60 that Nurse Trofort's multistate license was invalid because it was revoked and "never reinstated" and instead pursued the theory that it was invalid simply because Relator believed it to be invalid.

3

C.     FCA Litigation Experience

9.     As detailed at length in my initial Declaration, incorporated herein by reference, I have approximately 35 years' worth of experience litigating FCA cases. *See* ECF 356-1 at ¶¶ 1-2. Over the course of my career, both at DOJ and at Akin, I have litigated numerous FCA cases. A Westlaw Litigation Analytics search of FCA cases I have litigated returns 40 results. *See* Ex. B.

10.    There are six attorneys Relator appears to explicitly identify as having the skill and experience required to defend a complex FCA action. ECF 363 at 8-10. The same search Westlaw Litigation Analytics search for those six attorneys cited by Relator, attached at Ex. C, suggests that they have litigated a combined 48 FCA actions. Of these six attorneys, the one with the most cases had merely 12 results. *Id.*

11.    A review of the websites of the Southern District attorneys cited by Relator indicates that these attorneys have broad regulatory and litigation practices. *See* ECF 363 at 8-10; *see also, e.g.,* R. Mark Hodges, Wise Carter, https://www.wisecarter.com/attorneys/r-mark-hodges/ (last visited May 26, 2023) ("Mark regularly counsels clients on regulatory compliance issues, including Stark, HIPAA and Medicare Fraud and Abuse rules. He handles a wide variety of commercial transactions for the firm's clients, including acquisitions, leases, management service agreements, employment and recruiting contracts, and alternate payment model arrangements. On the litigation side of his practice, Mark has successfully concluded hundreds of lawsuits, including commercial contract disputes, qui tam whistle blower actions, and professional liability claims."); J. Scott Newton, Baker Donelson, https://www.bakerdonelson.com/J-Scott-Newton (last visited May 26, 2023) ("Mr. Newton's national defense practice focuses on government investigations and prosecutions, parallel criminal and civil health care fraud cases,

4

independent monitorships, complex internal investigations, and 'bet the company' commercial litigation.").

12. As noted in my initial Declaration, the FCA is a specialized area of law, with attorneys, such as myself, who practice primary or exclusively as FCA litigators. ECF 356-1 at ¶ 5.

13. Given the relatively limited experience of these attorneys with complex FCA litigation, they do not have the level of specialized FCA expertise required to defend a $30 million action involving complex and shifting theories of FCA liability involving CMS and state licensure permeated by frivolous claims and discovery violations

### D. Dismissal of Drumm Merger Corp. and Ronald Silva

14. On December 16, 2019, Defendants filed a joint motion to dismiss. ECF 32. Not only was Relator's claim generally meritless, but Relator could not have demonstrated the causation element required by the FCA, *see* 31 U.S.C. § 3729(a)(1)(A), with regards to Drumm Merger Corp. and Mr. Silva. ECF 32 at 5-6.

15. About six weeks after Defendants argued in their joint motion to dismiss that Relator's claims were entirely meritless, Relator filed a Notice of Voluntary Dismissal without Prejudice on January 27, 2020 that it was dismissing without prejudice his claims against Drumm and Mr. Silva. ECF 37.

### E. Invoices in Support of Attorneys' Fees and Expenses

16. I provided redacted invoices reflecting attorneys' fees and expenses billed to Defendants for legal services performed by Akin as of August 2022. ECF 356-3.

5

17. Akin's redacted invoices for April 2023 are attached as Ex. D to this Declaration. These invoices were not provided as part of the original submission, as they had not yet been billed to Defendants.

18. These invoices solely reflect legal services performed or expenses incurred in defense of this litigation.

19. Redactions to these invoices were in light of attorney-client privilege and the work product doctrine, such as where time entries reflected legal advice given to the client, strategies, mental impressions, theories, or specific areas of research.

**F.    Attending Depositions**

20. I did not attend a number of the depositions taken in this case. In contrast, I understand that out-of-district and out-of-state counsel for Relator did attend every deposition.

21. Because Ms. Sams Gratz was required to attend every deposition under the local rules, *see* ECF 363 at 22, I did not attend depositions unless my FCA expertise was needed. In that event, I attended to collaborate with Ms. Sams Gratz so that I could consult with her during breaks. When, for a given witness, it was not necessary for me to attend, I did not attend.

22. This practice was reasonable and appropriate under the circumstances.

**G.    Akin Timekeepers**

23. I detailed the substantive FCA experience of Catherine Creely, Maureen McDonald and Emily Gerry and their roles as associates/counsel at Akin, who were responsible for the vast majority of the time billed on this matter outside of the services I provided, in my initial declaration. *See* ECF 356-1 at ¶¶ 23-24.

24. Counsel serve the role of what is sometimes referred to as senior associates at other law firms.

25. Ms. Creely, who has since left the firm, joined the firm in 2007 following her graduation from law school. She had approximately 12 years of legal experience when assisting me in this matter, much of which was FCA-related experience. She was a counsel during the relevant time period.

26. Ms. McDonald, who has since left the firm, joined the firm in 2015 following her graduation from law school. She had approximately 4-5 years of legal experience when assisting me in this matter, much of which was FCA-related experience. She was an associate and became a counsel during the relevant time period.

27. Ms. Gerry joined the firm in 2020 following her graduation from law school. She has had approximately 1-2.5 years of legal experience when assisting me in this matter, much of which has been FCA-related experience. She has been an associate during the relevant time period.

28. There have been a number of other timekeepers on this matter who have billed for a small volume of work. These include health care partner Kelly Cleary (whose rate was $770, who has been practicing law since 2006 and who was formerly Deputy General Counsel & Chief Legal Officer for CMS); health care counsel Daniel Graver (whose rate was $720 and who has been practicing law since 2013); appellate counsel Kristen Loveland (whose rate was $770 and who has been practicing law since 2016); litigation counsel Jillie Richards (whose rate was $495 and who has been practicing law since 2013); litigation associate Samantha Block (whose rate was $520 and who has been practicing law since 2018); and paralegal Risa Slavin (whose rate was $280-$445 and who has been practicing as a paralegal since 1988).

29. Akin will also charge fees, as of April 2023, for timekeeper Jenna Becker (whose rate is $660, a 10% discount off of her standard rate, and who has been practicing law since 2022). Because all timekeepers—other than Mr. Salcido and Ms. Gerry, who billed at rates discounted

7

48% and 40%, respectively, from their standard rates at the firm—billed at a 10% discounted rate, and because a number of timekeepers contributed hours to briefing in April 2023, in an effort to limit costs, Akin intends to write off fees for any timekeeper who billed less than $5,000 on this matter and thus will only seek fees for Mr. Salcido, Ms. Gerry and Ms. Becker billed during this month. *See* Ex. D.

30. Consistent with my initial Declaration, *see* ECF 356-1 at ¶ 23, all of these rates are commensurate with the rates of other similarly experienced and educated partners, associates/counsel and paralegals at both Akin and other large Washington D.C. firms.

    **G.    Reasonableness of Hours Spent**

31. As noted in my initial Declaration, given what was at stake in this case—Relator seeking an award of more than $30 million dollars—as well as the burden and cost associated with responding to multiple, shifting theories of liability Relator raised and discovery abuse that occurred, the number of hours that all Akin attorneys spent on this matter is reasonable for what was required to defend this matter. ECF 356-1 at ¶ 34.

32. The amount of time expended on the tasks listed by Relator in his response, *see* ECF 363 at 23-24, is all eminently reasonable in this context.

33. *First*, aside from possessing FCA expertise, defense counsel must know the cases being cited against its client.

34. Relator invariably briefed the full amount of the page limit allotted under the Local Rules, and his briefs were replete with case citations. Reading those cases and the cases cited in Defendants' brief alone would account for the time expended in the briefing.

8

35. For instance, Relator's response to the Show Cause Order in this matter had approximately 64 separate case citations. *See* ECF 312. It is reasonable that Defendants expended 147.2 hours on a response, particularly given the discovery abuse that also occurred at this juncture.

36. *Second*, whether a particular motion is successful or not has no bearing on whether the hours spent preparing that motion were reasonable.

37. *Third*, attempting to measure the reasonableness of preparation time for a deposition of an adverse witness based upon the time period used to depose the witness is not correct. The purpose of the preparation time used with Relator's damages expert Scott Mertie, for example, illustrates this point. Although the deposition of Relator's damages expert lasted 2.5 hours (*see* ECF 356-3), approximately 30 pages of the 80 pages of that deposition were eventually highlighted and cited back to the Court—illustrating that Relator's expert did not know anything about nurse licensure law, did not know anything about the FCA or how to compute damages under the FCA, did not seek to offset the substantial amount of costs Southaven incurred in providing care (which exceeded the amount of reimbursement from federal payors), and identified no billing discrepancy or substandard care that would figure into damages. He also admitted that the full amount of $30 million in damages claims resulted from his analysis that an appropriately trained and educated nurse should have been licensed in one State rather than another State, all of which, as Defendants pointed out, resulted in Relator pursuing a damages theory that one circuit court described as "fairyland" and as ignoring damages concepts that are "familiar to any first-year student [in] law school" when awarding defendants hundreds of thousands in attorney's fees in that action. *See* ECF 243 at 5-12; *see also* ECF 275.

38. The purpose of preparation of an adverse witness is to maximize the yield of testimony favorable to the client's position, such as what occurred here, and definitely not to spend

9

excessive time with the adverse witness. This also illustrates the need for skilled, experienced counsel undertaking the preparation and conducting the examination even when the underlying action is frivolous.

39. *Fourth*, using more junior counsel lacking the storehouse of knowledge of the more than 10,000 published FCA cases (*see* ECF 356-1 at ¶ 6) would have been particularly inefficient, as these counsel would have to research essentially from scratch. Using my storehouse of historical knowledge and knowledge of case law, while billing at a lower rate, ensured that costs were reasonable.

40. These hours are entirely consistent with, and in fact probably lower than, the hours typically billed in defending FCA actions of this complexity and magnitude. As noted, attorneys' fees billed in other cases litigated for this client on the merits— *U.S. ex rel. Jamison v. McKesson Corp.*, 900 F. Supp. 2d 683 (N.D. Miss. 2012) and *U.S. ex rel. Lawson v. Aegis Therapies, Inc.*, 2015 U.S. Dist. LEXIS 45221 (S.D. Ga. Mar. 31, 2015)—were higher than the amount billed in this action (at $4.3 million and $2.3 million, respectively). *See* ECF 356-1 at ¶¶ 12, 21. Another large law firm, Gibson Dunn, was recently awarded $12 million in attorneys' fees in *Amphastar Pharms. Inc. v. Aventis Pharma SA*, No. 5:09-CV-00023-SHK, 2020 WL 8680070, at *1 (C.D. Cal. Nov. 13, 2020), in a decision not on the merits.

41. In sum, all hours and all rates billed by Akin attorneys were reasonable.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Robert Salcido*
_____
Robert Salcido

Executed on this 26th day of May, 2023

10