IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. CAMERON JEHL, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 3:19-cv-091-GHD-JMV |
| GGNSC SOUTHAVEN LLC D/B/A GOLDEN LIVINGCENTER-SOUTHAVEN; GGNSC ADMINISTRATIVE SERVICES LLC D/B/A GOLDEN VENTURES; AND GGNSC CLINICAL SERVICES LLC D/B/A GOLDEN CLINICAL SERVICES, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF-RELATOR'S MOTION TO ENFORCE SETTLEMENT AGREEMENT AND DISTRIBUTE THE APPEAL BOND FUNDS IN THE COURT'S REGISTRY IN ACCORDANCE WITH THE SETTLEMENT**

**I. INTRODUCTION**

The Plaintiff-Relator moves for an order distributing one million dollars ($1,000.000.00) of the appeal bond in the Registry of the Court to the Defendants and the remaining $192,807.15 plus interest back to the Relator to satisfy a binding settlement agreement reached by the parties on August 12, 2024 through written correspondence. Unfortunately, the Defendants subsequently refused to go forward with the settlement unless the Relator complied with conditions they added after the fact that are irrelevant, unreasonable, and appear to violate the Mississippi Rules of Professional Conduct. Because the case law and the correspondence demonstrate the agreement was final before the Defendants added the new conditions, the Relator is moving to distribute the appeal bond in accordance with the agreement.

1

"Federal courts have the inherent power to enforce settlement agreements entered into by the parties litigant in a pending case, to determine compliance with procedural prerequisites, and to determine when, if ever, a party may repudiate a contractually binding settlement agreement." *White Farm Equipment Co. v. Kupocho,* 792 F.2d 526, 529 (5th Cir. 1986). In this False Claims Act qui tam case, the Court granted summary judgment for the Defendants and subsequently awarded attorneys' fees to the Defendants in the amount of $1,058,373.97. Doc. 378. When combined with the amount of costs already awarded, plus prior interest and future interest for the next year to account for the time an appeal is likely to take, the appeal bond set by the Court was $1,192,807.15. Doc. 391.

With the potential for an appeal and a cross-appeal of the Court's award of fees, counsel for the Relator reached out to counsel for the Defendants and offered a proposed settlement of $850,000.00 to avoid the necessity of an appeal. The Defendants made a counter-offer of $1,000,000.00 through their counsel. The Relator's counsel made a written counter by offering to split the difference and pay $925,000.00. But the Defendants responded in writing by saying they would not take less than $1,000.000 to settle the case. On August 12, 2024 the Relator accepted the Defendants' original counter-offer of $1,000,000.00 in writing. Under the case law, a clear and binding settlement through written correspondence had been reached. [1]

After reaching the agreement, however, the Defendants started adding conditions. First, the Defendants required an assurance from "Relator and Counsel for Relator . . . that they have filed no other lawsuits or initiated any other proceedings against Defendants that are currently pending . . ." Then, they expanded that provision to insist that it applied to the Relator individually

---

[1] The specifics of the written communications and the citations to the supporting exhibits will be set forth later in this memorandum.

and also as a lawyer at Jehl Law Group PLLC (which is not a party and is not counsel in this action). Then they expanded it again to insist that it applied not just to lawsuits against the Defendants but their affiliates as well, which defense counsel initially said numbered over three hundred (300) different business entities and later said was approximately five hundred (500). Despite the fact that the Relator and his counsel do not have any pending cases against the named Defendants and do not believe they have any against the hundreds of affiliates, they cannot confirm that because the Defendants refuse to provide a list of the affiliates. Instead, the Defendants insist that Relator, his counsel, and Jehl Law Group PLLC turn over the list of entities they have pending cases against. Given the Defendants' evolving demands and conditions, which are irrelevant and unreasonable, the Relator is reluctant to provide the case lists of Jehl Law Group PLLC and Neal & Harwell (the firm that represented him throughout this qui tam action) to the Defendants or their attorneys. This was not part of the original settlement agreement. Moreover, if it turns out that Jehl Law Group PLLC or Neal & Harwell has a case against one of the affiliates, the only way for the Relator to obtain the benefits of the settlement would be for the relevant firm to abandon any client who has sued the affiliates, which would violate Mississippi Rule of Professional Conduct 5.6(b) and Tennessee Rule of Professional Conduct 5.6(b). Tennessee is where the firms of the Relator and his counsel are located.

During the time the Defendants were adding their conditions, the Relator filed a notice of appeal to preserve his rights. Doc. 396. The Defendants followed by filing a notice of cross-appeal. Doc. 397. The parties continued to communicate but in the end, the Defendants refused to comply with the settlement absent the Relator acceding to the problematic demands the Defendants added after the fact. That refusal led to this motion.

    **II.**     **JURISDICTION**

Given the notices of appeal and cross-appeal, there is a question as to whether this Court currently has jurisdiction to resolve this motion. This Court's standing Order Regarding Deposit and Investment of Registry Funds states that "[f]unds held in the CRIS [Court Registry Investment System] remain subject to the control and jurisdiction of the Court." *See* Order Regarding Deposit and Investment of Registry Funds, (https://www.msnd.uscourts.gov/sites/msnd/files/forms/Ord_Regard_Deposit_Investment_Registry_Funds.pdf). On the other hand, "[a] notice of appeal divests the district court of jurisdiction except to take action in aid of the appeal until the case is remanded to it by the appellate court, or to correct clerical errors under Rule 60(a).'" *Winchester v. U.S. Attorney for the S. Dist. of Tex.*, 68 F.3d 947, 949 (5th Cir. 1996) (quoting *Travelers Ins. Co. v. Liljeberg Enters.,* 38 F.3d 1404, 1407 n. 3 (5th Cir. 1994)). The Relator's motion, which is a motion to enforce the settlement agreement and distribute the appeal bond accordingly, would operate "in aid of the appeal" inasmuch as it would moot the appeal if granted. Accordingly, this Court has jurisdiction to resolve it.

However, should this Court conclude it lacks jurisdiction, it can and should utilize the procedure set forth in Federal Rule of Civil Procedure 62.1:

62.1: Indicative Ruling on a Motion for Relief that is Barred by a Pending Appeal:

(a) Relief Pending Appeal. If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may:

   (1) defer considering the motion;

   (2) deny the motion; or

   (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.

(b) Notice to the Court of Appeals. The movant must promptly notify the circuit clerk under Federal Rule of Appellate Procedure 12.1 if the district court states that it would grant the motion or that the motion raises a substantial issue.

    (c) Remand. The district court may decide the motion if the court of appeals remands for that purpose.

FED. R. CIV. P. 61.1. In accordance with this rule, if this Court determines it lacks jurisdiction, it nevertheless can and should evaluate the Relator's motion and state that it would grant it if the Court of Appeals remands for that purpose or, if it concludes the motion has no merit, deny it. Or this Court can refrain from resolving the motion but nevertheless issue an order stating that the motion raises a substantial issue, thus allowing the Court of Appeals to remand the case so that this Court can resolve the motion.

    At present, the Relator-Appellant's brief in the Court of Appeals is due October 16, 2024. The Relator will promptly file a motion in that court informing it of the filing of this motion in this Court and seek a stay of the appeal and the briefing schedule pending this Court's ruling on this motion.

    **III.    IF THE OBJECTIVE MANIFESTATIONS OF THE PARTIES' WRITTEN COMMUNICATIONS DEMONSTRATE THAT ONE PARTY HAS MADE AN OFFER OR A COUNTER-OFFER AND THE OTHER HAS ACCEPTED IT, AN ENFORCEABLE SETTLEMENT AGREEMENT HAS BEEN CREATED.**

    As previously noted, "[f]ederal courts have the inherent power to enforce settlement agreements entered into by the parties . . ." *White Farm Equipment Co. v. Kupocho,* 792 F.2d at 529. As the Fifth Circuit explained in *White Farm Equipment,* the issue of whether an enforceable settlement agreement has been reached "is determined by reference to state substantive law governing contracts generally." *Id.* The Mississippi Court of Appeals explained that substantive law as follows:

> "[F]or there to be a settlement [agreement,] there must be a meeting of the minds," and the party seeking to enforce the agreement has the burden of proving "by a preponderance of the evidence that there was a meeting of the minds." *Dunn*, 117 So. 3d at 672 (¶10) (quoting Vaughn v. Rettig, 912 So. 2d 795, 799 (¶21) (Miss. 2005)). A meeting of the minds, or "[t]he manifestation of mutual assent[,] ... ordinarily takes the form of an offer

5

> or proposal by one party followed by an acceptance by the other party." Restatement (2d) of Contracts § 22(1) (1981). *In the context of negotiations conducted by written "correspondence, one party must make a proposition and the other accept the same as made; in other words, the minds of the parties must meet upon a definite proposition," and the terms must be identical.* Morris v. Liberty Mut. Ins. Co., 659 F. Supp. 201, 204 (N.D. Miss. 1987); *see also* Howard v. TotalFina E & P USA, Inc., 899 So. 2d 882, 889-890 (¶¶21-22) (Miss. 2005).

*Thompson v. White*, 328 So. 3d 210, 216 (Miss. Ct. App. 2021) (emphasis added).

The Mississippi Court of Appeals in *Thompson* quoted this Court's decision in *Morris v. Liberty Mut. Ins. Co.,* 659 F. Supp. 201, 204 (N.D. Miss. 1987). In *Morris,* this Court stated: "It is well established in Mississippi that to make a contract by correspondence, one party must make a proposition and the other accept the same as made; in other words, the minds of the parties must meet upon a definite proposition, and the acceptance of the proposal must be made." *Id.* Once that happens, the parties are bound and neither can back out because of second thoughts. *See Williams v. Winona Manor Healthcare, LLC,* 2014 WL 5090620 (N.D. Miss. Oct. 19, 2014) ("Though the plaintiff now regrets her decision to compromise her claim, there was indeed a meeting of the minds and an enforceable contract for settlement.").

In *Morris,* the Court held there was "a meeting of the minds" on a settlement agreement made after an administrative law judge ruled against a workers compensation claimant and the claimant filed a petition for review with the Mississippi Workers' Compensation Commission. 659 F. Supp. at 202. While that petition for review was pending, an initial offer and counter-offer were made and neither was accepted. *Id.* The attorney for the insurance company, Liberty Mutual, then made another offer: "I am in a position to settle this case with you at the level of $ 8000.00 and will agree to pro-rate the settlement amount on a 2 - 6 basis" and will "recommend that Liberty pay whatever medical is outstanding and unpaid for which it would be liable under Section 7 of the Act." *Id.* The claimant's lawyer responded by saying that the plaintiff had "decided to accept

6

[the insurance company attorney's] offer to settle this claim in the amount of $8,000" and that "this is an unconditional acceptance of your offer." *Id.* This Court noted that even though the Liberty Mutual's lawyer later claimed that he did not intend to make a firm settlement offer, "it is one's objective manifestations, not one's subjective intent, which determines whether an offer was made." *Id.* at 204. The Court held that Liberty Mutual's lawyer's "language is unambiguous, the amount proposed is definite, and the terms are complete" and that his written communication "constituted a valid offer of settlement." *Id.* Similarly, the Court said that the claimant's attorney's response was "clear [and] unambiguous" and constituted "a meeting of the minds." *Id.*[2]

### IV. THE PARTIES NEGOTIATED AND REACHED AN AGREEMENT TO SETTLE.

The written correspondence that comprised the settlement agreement in the present case is similar to the "meeting of the minds" that this Court found to exist in *Morris*. Here, a counter-offer was made for a specific sum of money to settle a dispute about money, specifically the amount of attorneys' fees to be paid to the Defendants. When negotiations commenced and when the counter-offer later was made and accepted, there was no mention of any other conditions of settlement.

Final judgment in this case was entered on July 12, 2024, when this Court denied the Relator's motion to alter or amend the fee award. Doc. 393. On Wednesday, August 7, 2024, the undersigned counsel for the Relator, Rob McDuff (who had entered the case to represent the Relator on the fees issue), left a voicemail for defense counsel Robert Salcido proposing a

---

[2] Although the Court concluded that there was a "meeting of the minds," it held that the agreement was voidable because Liberty Mutual's lawyer was unaware at the time he made the offer that the Workers' Compensation Commission had issued a ruling the day before rejecting the claimant's petition for review. *Id.* at 204-206. By contrast, the Claimant's lawyer had learned of the ruling prior to accepting the company's offer. *Id.* This unilateral mistake by Liberty Mutual's lawyer was sufficient to void the agreement. *Id.*

7

settlement in the amount of $850,000.00. Mr. McDuff also sent an email suggesting Mr. Salcido check his voicemails for the message. Mr. Salcido responded by email to say he was traveling but would reach out the next day. *See* Exhibit 1. Mr. Salcido later called back and stated that the Defendants declined that offer but would be willing to settle for $1,000,000.00. *Id.*

On Friday August 9, 2024, Mr. McDuff emailed Mr. Salcido and said: "We believe $1 million is a bit high to give up our appeal. But we are willing to meet you in the middle and pay $925,000." *See* Exhibit 2. Mr. Salcido responded later that day stating: "[T]hanks for the quick response. I passed this on. They will not take less than $1 million." *Id.* On Monday morning, August 12, 2024, at 7:33 AM, Mr. McDuff emailed back and stated, "we accept your counter-offer." The email further stated:

> Cameron [referring to Relator Cameron Jehl] agrees to forego the appeal and will pay the slightly reduced amount of $1 million instead of the larger amount currently owed. We can present the Judge with a joint proposed order distributing $1 million of the deposited amount [of the appeal bond] to your client and the remainder to Cameron. Are you all in a position to draft the order and any other papers necessary to memorialized this agreement?

*Id.* Later that morning, Mr. McDuff emailed again to ask if "the $1,000.000.00 figure includes the $32,355.68 in costs that you have already received." *See* Exhibit 3. Mr. Salcido responded at 1:50 PM to say "[t]he payment amount we will need to settle is $1,000,000, exclusive of any costs previously received." *Id.* At 2:11 PM, Mr. McDuff sent a response email saying "OK" and attaching a draft stipulation of dismissal and proposed order that recited the terms of the settlement and directed that the full $1,000,000.00 appeal bond in the Court Registry be distributed to the Defendant with the remainder being returned to the Relator. *Id.*[3]

---

[3]The draft stipulation and proposed order, as later edited by defense counsel and agreed to by both parties, are contained in Exhibit 5 and Exhibit 6. *See* Exhibit 5; Exhibit 6.

At this point, the written correspondence consisted of a counter-offer by Defendants to settle the case for $1,000,000.00 and an acceptance of that offer. No other provisions or conditions were included. As in *Morris*, the "objective manifestations" contained in the email correspondence reflect a counter-offer to settle the case for $1,000,000.00 and an acceptance that were clear and unambiguous and constituted a "meeting of the minds."

V. **THE DEFENDANTS REFUSE TO COMPLY WITH THE AGREEMENT UNLESS THE RELATOR, JEHL LAW GROUP PLLC, AND HIS COUNSEL'S FIRM DEMONSTRATE THEY REPRESENT NO OTHER PARTIES IN LITIGATION AGAINST ONE OF FIVE HUNDRED (500) UNNAMED AFFILIATES.**

Given that the emails constitute a binding settlement, what happened after does not change that. However, the subsequent events can give a more complete picture of the dispute before the Court.

After the settlement agreement was reached, the Defendants stated they would not follow through with the settlement absent assurances that neither the Relator nor Jehl Law Group PLLC (which is not a party to this action) nor Neal & Harwell (which also is not a party) represent any other parties with lawsuits pending against the Defendants or their hundreds of unnamed affiliates. This additional condition, which was never mentioned prior to or during the negotiation, is irrelevant, unreasonable, and raises ethical concerns by suggesting that if there are such parties, the only way the Relator can benefit from the settlement is for the firms to discharge them.

This began later on August 12, 2024 at 5:07 PM, when another defense counsel at Mr. Salcido's firm, Emily Gerry, emailed Mr. McDuff with "minor proposed edits to the stipulation and proposed order" and a "proposed draft settlement agreement, which sets forth mutual releases to protect both parties." *See* Exhibit 4. The settlement agreement contained new substantive provisions, including a paragraph 5 stating that "Relator and Counsel for Relator represent that

9

they have filed no other lawsuits or initiated any other proceedings against Defendants that are currently pending other than the Civil Action." *See* Exhibit 7.

In an email at 5:32 PM, approximately 25 minutes after Ms. Gerry's email, Mr. McDuff told her that her changes to the draft stipulation and proposed order --- both of which recited the terms of the settlement --- were fine. Exhibit 4. The agreement on those changes, which are attached as Exhibit 5 and Exhibit 6, conform to and confirm the agreement reached through the earlier emails between Mr. McDuff and Mr. Salcido. *See* Exhibit 5; Exhibit 6. Mr. McDuff also told Ms. Gerry that he and the Relator would be reviewing the settlement agreement. Exhibit 4.[4]

At 5:55 PM, Ms. Gerry follow up her earlier email and asked all counsel for the Relator to "confirm they have filed no other lawsuits or initiated any other proceedings against Defendants that are currently pending other than the Civil Action per proposed paragraph 5." Exhibit 4. She also stated that "[i]f you can confirm that you folks agree to the release language, we are fine with you filing the stipulation." *Id.* Mr. McDuff responded at 7:49 PM by asking, "when you say "agree to the release language," do you mean the language of the two mutual release paragraphs?" *Id.*

Ms. Gerry responded at 6:51 PM and said: "Re 'agree to the release language,' that is correct: paragraphs 2 ('Relator's Release') and 3 ('Defendants' Release')." *Id.* But in addition, she expanded the new condition in paragraph 5 to include not simply proceedings against the Defendants but also their "affiliates." *Id.* Specifically, Ms. Gerry said: "Are you able to ask whether they have any pending lawsuits against Defendants *or their affiliates*? It is material to us

---

[4] Because some of the emails were not part of a single string, some of the email exhibits will also contain emails that were included in an earlier exhibit. Also, on occasion, the time notations on an email will suggest it was sent earlier than the email to which it responds. This presumably results from the fact that the attorneys were in different time zones when they corresponded.

insofar as our client's intent in entering into this agreement is to achieve peace going forward." *Id.* (emphasis added). In another email at 7:46 PM, Ms. Gerry stated that "the language of paragraph 5 (No Other Actions) *is intended to refer both to lawsuits filed or proceedings initiated by Mr. Jehl in his individual capacity and in his capacity as an attorney.*" *Id.* (emphasis added). At the same time, Ms. Gerry agreed that the release language in paragraphs 2 and 3 referred only to the Relator in his individual capacity and with that understanding, Mr. McDuff confirmed the release language was acceptable. *Id.* In a final email that night, Mr. McDuff stated:

> In light of the settlement agreement you all asked for this afternoon, which contains some provisions that were not previously discussed and that don't seem appropriate, and given that the time for noticing an appeal expires today, I'm going to file a notice of appeal in an abundance of caution. It will be withdrawn once we the documentation related to the settlement is in place.

*Id.* The notice of appeal was filed that evening of August 12, 2024. Doc. 396.

As indicated by the foregoing emails, the parties were easily able to document the settlement for $1,000,000.00 through agreed language reciting the terms of the settlement in the stipulation of dismissal and the proposed order. *See* Exhibit 4; Exhibit 5; Exhibit 6. They also agreed to the language of mutual releases in paragraphs 2 and 3 of the Defendants' draft. *See* Exhibit 7. This all corroborates the original agreement. However, the Defendants insisted on and constantly expanded their interpretation of the new paragraph 5.[5]

---

[5] In an email at 9:29 PM on August 12, 2024, after Mr. McDuff's email stating that the notice of appeal would be filed in an abundance of caution, Mr. Salcido sent an email that said:

> We all tried the best we could to get this done. We only learned of the possibility of settlement this morning, about 12 hour ago when sufficient funds were proposed and accepted. I have done nothing but False Claims Act actions for 36 years and the terms we proposed with Relator to settle are present in every FCA case I have done in 36 years so there are no surprises there. . . . In any event, as long as our client permits, we are more than pleased to keep the dialogue going.

11

Nevertheless, in an effort to satisfy the Defendants regarding the original language of paragraph 5, which was not a part of the settlement reached earlier on August 12, 2024, Mr. McDuff informed Defendants' counsel on August 16, 2024, that the lawyers had no cases pending against the Defendants.

> Cameron [who is the Relator and also an attorney] confirms that his firm does not have any pending lawsuits against Defendants and Neal & Harwell [Relator's counsel throughout the District Court proceedings] confirms the same. We agree to the release language in paragraphs 2 and 3. Consistent with the emails below, may I go ahead and file the latest version of the stipulation with your edits?

Exhibit 10. Ms. Gerry responded on August 19, 2024 by stating the Defendants would file a precautionary notice of cross-appeal. *Id.* She also made it clear that they were formally expanding the language their original paragraph 5 (which had been satisfied by Mr. McDuff's August 16, 2024 email) to encompass Defendant's "affiliates" of which there were over 300, and she demanded a list of entities against whom these lawyers have pending claims:

> To move towards settlement, our clients still need confirmation that there are also no pending lawsuits against their affiliates. Given that there are over 300 entities our clients own or control, they have asked that Mr. Jehl and Mr. Jehl's counsel provide a list of entities against whom they have any pending claims. As we noted previously, it is crucial for our clients to know that they are truly achieving peace with this settlement.

*Id.* Even then, Ms. Gerry implied that might not be enough: "Once we learn what you folks can reasonably offer in this vein, we can communicate that to our clients to see whether we can come to a final resolution." *Id.*

---

Exhibit 8. Actually, the possibility of settlement was clear when the lawyers began communicating a few days earlier and the fact of settlement occurred when they agreed on a $1,000,000.00 payment without any other conditions. Moreover, to the extent every FCA case includes a confirmation that there is no other litigation between the parties, all counsel knew this was the only case between the Relator and the Defendants.

12

On August 27, 2024, Mr. McDuff emailed Mr. Salcido and Ms. Gerry to say that the Relator would not provide Jehl Law Group PLLC's list of defendants in pending cases and would not ask Neal & Harwell to do so. *Id.* The emailed also stated:

> In response to your client's request, we are not going to provide a list of all the defendants in all of Cameron's pending cases and will not ask Neal & Harwell to do so. As a courtesy, we have already informed you that Cameron has no pending cases against the Defendants and neither does Neal & Harwell (and neither do I). As an additional courtesy, I will tell you that neither Cameron nor Neal & Harwell think they have any pending cases against any of the Defendant's affiliates but we can't be sure since you now say there are over 300. (And I don't have any).
>
> . . .
>
> You have said your clients want "peace" going forward. As mentioned earlier, neither Cameron nor Neal & Harwell have any claims against the Defendants and they don't think they have any against the affiliates. . Accordingly, your clients have more "peace" (if you define "peace" by the likelihood these lawyers don't have any cases against the Defendants and their affiliates) now than they did when they made the $1 million counteroffer that we accepted. But if it turns out that Cameron or Neal & Harwell are wrong and one of them does have a case against one of 300 plus affiliates, are you saying that your clients will only achieve "peace" and will only go through with the settlement if the lawyers withdraw from representing that client?
>
> We are prepared to file a motion asking the Court to distribute the money in the Court's registry in accordance with the settlement agreement we reached by email on August 12 before your client added conditions. . . . Of course, we would prefer not to file a motion and not to spend any further time on this if you are willing to go forward and agree to that distribution without the additional conditions. Please let me know at your earliest convenience whether we can do so.

*Id.*

Neither Defendants' attorneys responded. In the meantime, Mr. McDuff and Ms. Gerry spoke by telephone. Mr. McDuff referred to these communications in a subsequent email on September 8, 2024:

> Neither of you has responded to my email of August 27, set out below, or to the question I posed in it: "[I]f it turns out that Cameron or Neal & Harwell . . . ha[s] a case against one of 300 plus affiliates, are you saying that your clients . . . will only go through with the settlement if the lawyers withdraw from representing that client?" However, Emily stated in a subsequent telephone conversation that one of your clients' corporate counsel

13

> confirmed that any representation by these lawyers of a plaintiff suing one of the affiliates would be a "material" consideration that might lead them to refuse to finalize the settlement. . . .
>
> Emily has assured me in recent phone conversations that *your clients have made a commitment to finalize the settlement if Cameron's firm does not represent anyone suing them or their hundreds of affiliates but that if he does, this is a "material" consideration that might prevent them from finalizing it.* For reasons already mentioned, this is troubling. However, in an effort to expedite matters, I have informed you as a courtesy that neither Jehl Law Group PLLC nor Neal & Harwell have any pending cases against your three clients and do not think they have any against their hundreds of affiliates. I have advised Emily that if you give us a list of the 300 plus affiliates, Cameron will, as a further courtesy, review it to determine if he has suits pending against any of them (I also note that in our phone conversations since my August 27 email, Emily says your client is now concerned about approximately 500 affiliates, not just the 300 plus mentioned previously). But your clients have refused to do that and instead insisted that Jehl Law Group PLLC's list of defendants (and maybe Neal & Harwell's) be given either to your firm so you can conduct the review. It is unclear why your clients want your firm to have the list of everyone Jehl Law Group PLLC (and Neal & Harwell) are suing at the moment but we are not going to provide that.
>
> In summary, we have tried to expedite matters but your clients through their corporate counsel seem to be insisting that they will not go through with the settlement unless Cameron and Neal & Harwell prove that they will not be pursuing any current litigation against any of your clients' 500 affiliates. However, if I am misunderstanding your clients' position, or if they and you will reconsider this insistence, perhaps we can move forward and finalize this settlement on the basis previously discussed. . . . If you and your clients are willing for finalize this settlement without us filing motions before the District Court and the Court of Appeals, please let me know as soon as possible.

*Id.* The email also explained why the Defendants' insistence on this condition appears to violate Mississippi Rule of Professional Conduct 5.6(b). *See* MISS. R. PRO. COND. 5.6(b).

Mr. Salcido replied on September 9, 2024. Exhibit 10. He stated that the Defendants needed to know "whether your client, or his agents, is undertaking additional lawsuits against Defendants" so "the parties [can] assure themselves that a settlement will indeed end all litigation between the parties." *Id.* With respect to the concern regarding Rule 5.6(b), he stated that "Defendants are not seeking to restrict any lawyer's right to practice as part of a settlement." *Id.* But given that this settlement does "end all litigation between the parties," who are the Relator and

14

the named Defendants, Mr. Salcido never explained why the Defendants nevertheless hinge settlement on whether there is pending litigation between other parties who might be represented by the Jehl Law Group PLLC or Neal & Harwell against any one of five hundred (500) other unnamed business entities who might be "affiliated" with the Defendants.

### *Ethical Concerns*

For reasons already stated, a settlement agreement was reached on August 12, 2024, prior to the series of emails in which the Defendants added their evolving conditions. Thus, the agreement should be enforced irrespective of whether those conditions violate any ethical rules. But it is important to point out the sense in which they do.

Mississippi Rule of Professional Conduct 5.6(b) states: "A lawyer shall not participate in offering or making: . . . (b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties." MISS. R. PRO. COND. 5.6(b). The comment to the rule states: "Paragraph (b) prohibits a lawyer from agreeing not to represent other persons in connection with settling a claim on behalf of a client." *Id.* In Tennessee, where the Relator, Jehl Law Group PLLC, and Neal & Harwell are located, Rule 5.6(b) of the Rules of Professional Conduct is almost identical: "A lawyer shall not participate in offering or making: . . . (b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy." TENN. SUP. CT. R. 8, RPC 5.6(b). The comment is identical to that in Mississippi. "Paragraph (b) prohibits a lawyer from agreeing not to represent other persons in connection with settling a claim on behalf of a client." *Id.*

Either Jehl Law Group PLLC and/or Neal & Harwell have a case against one of the hundreds of unnamed affiliates or they do not. The Defendants have insisted they demonstrate that they do not before the Defendants will finalize the settlement. This insistence indicates that

if the lawyers do have such cases, the only way the Defendants will finalize the settlement is for the lawyers to withdraw from any such cases. This would, in effect, require the lawyers to "agree[] not to represent" their current clients in order to "settl[e] [the] claim" for fees that the Defendants have against the Relator. This violates Rule 5.6(b). *See* Tennessee Formal Ethics Opinion 2016-F-161 ("if a [settlement] provision does affect a lawyer's ability to represent another client and that effect is negative, the provisions would be impermissible under Rule 5.6(b)"; ABA Formal Ethics Opinion 93-371 ("a lawyer cannot agree to refrain from representing present or future clients against a defendant pursuant to a settlement agreement on behalf of current clients . . .").

Perhaps the Defendants could have decided in advance not to negotiate a potential settlement with the Relator because Jehl Law Group PLLC or Neal & Harwell might be representing someone who has sued one of their hundreds of affiliates. But once the Defendants negotiated and reached an agreement on August 12, 2024, without any mention of other conditions, their subsequent insistence that Jehl Law Group PLLC and Neal & Harwell have no clients with pending cases against the affiliates violates the rule.

### VI. CONCLUSION

As demonstrated by the case law cited earlier in this memorandum, particularly this Court's decision in the *Morris* case, a "meeting of the minds" occurred and a settlement agreement was reached on August 12, 2024 by written communications. That understanding was subsequently corroborated by the attorneys' agreement on the language of a stipulation of dismissal and a proposed order which recited the terms of the agreement. This settlement agreement cannot be altered by the Defendants' later refusal to follow through with the agreement unless they had assurances from the Relator, Jehl Law Group PLLC, and his attorneys' law firm sufficient to meet the Defendants' evolving, irrelevant, and possibly unethical demands about their pending cases.

16

Accordingly, Relator respectfully requests that this Court grant this motion and distribute the appeal bond in accordance with the parties' settlement agreement reached on August 12, 2024.

Respectfully submitted,

/s/ *Robert B. McDuff*
Robert B. McDuff (MSB # 2532
Law Office of Robert B. McDuff
767 North Congress Street
Jackson, MS 39202
601.259.8484 (Telephone)
rbm@mcdufflaw.com

*Counsel for Relator*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of September, 2024, the foregoing was served on all counsel of record by operation of the Court's electronic filing system.

/s/ *Robert B. McDuff*
Counsel for Relator