IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. CAMERON JEHL, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:19-cv-091-GHD-JMV |
| GGNSC SOUTHAVEN LLC D/B/A GOLDEN LIVINGCENTER-SOUTHAVEN; GGNSC ADMINISTRATIVE SERVICES LLC D/B/A GOLDEN VENTURES; AND GGNSC CLINICAL SERVICES LLC D/B/A GOLDEN CLINICAL SERVICES, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFF-RELATOR'S MOTION TO ENFORCE SETTLEMENT
AGREEMENT AND DISTRIBUTE APPEAL BOND FUNDS IN THE
COURT'S REGISTRY IN ACCORDANCE WITH THE SETTLEMENT**

Plaintiff-Relator submits this reply to address the arguments in Defendant's Memorandum of Law in Support of Defendants' Response in Opposition to Relator's Motion to Enforce Settlement Agreement and Distribute the Appeal Bond Funds in the Court's Registry in Accordance with the Settlement [Doc. 401] ("Defendants' Memorandum"). The parties' settlement agreement would resolve the appeal and the cross-appeal that were filed in this case but that have not yet been briefed. First, Relator addresses Defendants' assertions regarding jurisdiction, and then Defendants' arguments regarding the settlement agreement itself.

1

### I. THIS COURT HAS JURISDICTION TO RULE ON RELATOR'S MOTION.

The Defendants claim this Court has no jurisdiction because a notice of appeal has been filed and because there is no federal jurisdiction when final judgment has been entered and a case has been dismissed. As explained in Relator's memorandum in support of the motion [doc. 399], it is well settled that district courts retain jurisdiction to act "in aid of the appeal[.]" *Winchester v. U.S. Attorney for the S. Dist. of Tex.*, 68 F.3d 947, 949 (5th Cir. 1996) (quoting *Travelers Ins. Co. v. Lijeberg Enterprises, Inc.*, 38 F.3d 1404, 1407 n.3 (5th Cir. 1994)). This motion operates "in aid of the appeal" as it would moot the appeal if granted and conserve judicial resources.

Moreover, the motion seeks a disposition of the funds that are held in this Court's registry. This Court has ongoing jurisdiction over those funds. Order Granting Motion to Approve Security Bond [Doc. 391] ("The Clerk of the Court is directed to deposit the funds…as specified in the Order Regarding Deposit and Investment of Registry Funds, dated February 8, 2017… and to retain such funds on deposit until further order of the Court.") *see also* Order Regarding Deposit and Investment of Registry Funds ("Funds held in the [Court Registry Investment System] remain subject to the control and *jurisdiction* of the Court") (available on the Court's website, emphasis added)

Furthermore, as discussed in Plaintiff-Relator's memorandum, Federal Rule of Civil Procedure 62.1 provides this Court with the authority to address the motion even though a notice of appeal has been filed and even if this Court has no jurisdiction. Indeed, the presence of Rule 62.1, which was adopted in 2009, undermines the Defendants' separate argument that no federal jurisdiction exists because final judgment has been entered in this case and enforcement can only be sought in state court. [Doc. 401 at 4]. In most appeals, final judgment has been entered, yet

Rule 62.1 provides a procedure for district courts to address motions like this one even if a notice of appeal deprives the district court of jurisdiction. Although this rule was discussed in Relator's memorandum, the Defendants fail to address it in any meaningful way.

"Federal courts have the inherent power to enforce settlement agreements entered into by the parties litigant in a pending case . . ." *White Farm Equipment Co. v. Kupocho,* 792 F.2d 526, 529 (5th Cir. 1986). This obviously is a pending case in federal court. Parties frequently settle cases that are on appeal. The authorities Defendants cite are procedurally distinct. In both *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 376-82 (1994) and *Goudelock v. McLemore*, 985 F. Supp. 2d 816, 817-18 (N.D. Miss. 2013), the cases were dismissed pursuant to Federal Rule of Civil Procedure 41(a), and the parties did not have pending appeals when they filed their motions to enforce a settlement agreement. In *Peacock v. Thomas*, the plaintiff filed a separate action in federal court relating to the underlying judgment —not a motion to enforce a settlement agreement in a case on appeal. 516 U.S. 349, 351-60 (1996) ("federal courts" do not "possess ancillary jurisdiction over new actions in which a federal judgment creditor seeks to impose liability for a money judgment on a person not otherwise liable for the judgment.") These cases do not support Defendants' assertion that this Court cannot address this motion.

## II. THE PARTIES REACHED A VALID AND ENFORCEABLE SETTLEMENT AGREEMENT.

As explained in the Relator's memorandum, after Relator orally proposed a settlement figure of $850,000.00, Defendants made a counteroffer of one million dollars ($1,000,000.00) without any other conditions. Relator then proposed $925,000.00 but Defendants stuck with their counteroffer to settle the case for one million dollars ($1,000,000.00). Again the counteroffer was made without any other conditions. Relator accepted it. [Docs. 398-1, 398-2]. Defendants now attempt to circumvent this agreement with three arguments, which are each addressed in turn.

3

First, Defendants claim that "Relator's Purported Acceptance [of defense counsel's one-million-dollar counteroffer] included material, additional settlement terms" that were not part of defense counsel's emails. Defendant's Memorandum, p. 10 [Doc. 401]. The Defendants quote two particular terms from the proposed stipulation of dismissal that Relator's counsel drafted in order to conclude the case. One listed $1,000,000 "as a compromise amount to resolve the prior court-ordered payment of a larger amount of attorneys' fees" and the second stated that "[b]oth parties agree not to appeal the attorneys fee award." *Id.* at 10-11, quoting doc. 398-5 at 2. Defendants assert that "requir[ing] *both* parties to agree not to appeal the attorneys' fee award," doc. 401 at 11 n.5 (emphasis added), was not contemplated by the earlier correspondence. They insist that this "material term" "had the effect of rejecting Defendant's Purported Counteroffer" to settle for one million dollars. *Id.* at 10-11. In other words, according to Defendants, when Defendants made their one million dollar counteroffer, they were proposing that the Relator would forego his right to appeal but the Defendants would retain theirs. This after-the-fact contention is a complete fabrication.

Defense counsel Robert Salcido never said in his emails regarding the counteroffer that Defendants would retain their right to appeal. In fact, he said the contrary. In his August 9, 2024 email, he stated: "They [the Defendants] will not take less than $1 million and *would prefer going through the appellate process than take less*." Doc. 398-2 (emphasis added). That indicates that if one million dollars was paid, neither the Defendants nor the Relator would be "going through the appellate process." It would have made no sense for the Relator to pay one million dollars and give up his own right of appeal while leaving the Defendants free to appeal anyway and seek hundreds of thousands of additional dollars in fees from the Relator. Both sides understood this. After Relator's counsel sent the draft Stipulation of Dismissal stating that "[b]oth parties agree not

4

to appeal the attorneys fee award," [doc. 398-5 at 2], defense counsel readily agreed and proposed only minor cosmetic changes to the draft. [Doc. 398-4]. At no point did defense counsel claim that requiring both parties to forego their appeals was somehow a new wrinkle that had not been contemplated in the emails leading to the one-million-dollar agreement. It is also notable that in his three page declaration in support of the Defendants' response, [doc. 400-1], Mr. Salcido never mentioned, and certainly never swore under oath, that Defendants' one million dollar proposal was intended to encompass only the Relator foregoing the right to appeal and not the Defendants. Clearly it was not.[1]

Second, the Defendants contend that even if an agreement was reached by email, it was only a "preliminary agreement" that is "unenforceable" until "a formal writing for a full expression of the covenants and promises" has been finalized and agreed to by both parties. [Doc. 401 at 11-12]. Mississippi law is clear that agreements reached by written correspondence are enforceable even if formal writings have yet to be drafted. Thus, in *Morris v. Liberty Mut. Ins. Co.,* Judge Senter applied Mississippi law and held that the parties had reached a "contract by correspondence" through an exchange of letters containing an offer and acceptance even though no releases or other formal writings had been prepared. 659 F. Supp. 201, 204 (N.D. Miss. 1987).

More recently, the Mississippi Court of Appeals quoted Judge Senter's opinion in *Morris* when describing the legal principles surrounding such a contract:

> "[F]or there to be a settlement [agreement,] there must be a meeting of the minds," and the party seeking to enforce the agreement has the burden of proving "by a preponderance of the evidence that there was a meeting of the minds." Dunn, 117 So. 3d at 672 (¶10) (quoting Vaughn v. Rettig, 912 So. 2d 795, 799 (¶21) (Miss. 2005)). A meeting of the minds, or "[t]he manifestation of mutual assent[,] . . . ordinarily takes the form of an offer or proposal

---

[1] As noted, Defendants also claimed that the language from the draft stipulation that $1,000,000.00 was "a compromise amount to resolve the prior court-ordered payment of a larger amount of attorneys' fees" constituted an "additional settlement term[]." [Doc. 401 at 10-11]. That makes no sense. $1,000.000.00 is obviously an amount lower than the $1,058,373.97 awarded as fees and the $1,192,807.15 appeal bond. Therefore, the $1,000,000.00 settlement proposed by Defendants constituted a compromise.

>by one party followed by an acceptance by the other party." Restatement (2d) of Contracts § 22(1) (1981). In the context of negotiations conducted by written "correspondence, one party must make a proposition and the other accept the same as made; in other words, the minds of the parties must meet upon a definite proposition," and the terms must be identical. Morris v. Liberty Mut. Ins. Co., 659 F. Supp. 201, 204 (N.D. Miss. 1987)."

*Thompson v. White*, 328 So. 3d 210, 216 (Miss. Ct. App. 2021) (emphasis added, brackets in original). *See also Terrain Enterprises, Inc. v. Western Casualty and Surety Co.*, 774 F.2d 1320, 1321 (5th Cir. 1985) ("Mississippi law . . . looks with favor upon compromise and settlement of litigation.") Neither *Thompson* nor *Morris* held that a a formal writing is necessary before a written agreement by correspondence becomes an enforceable settlement.

While formal documents are sometimes prepared and signed, they are not opportunities to insist on new conditions before a party will carry out its obligations under a settlement that was previously reached through written correspondence. The Defendants cite the email by the Relator's counsel asking defense counsel if "you all [are] in a position to draft the order and any other papers necessary to memorialize[] *this agreement*." [Doc. 398-2 at 2 (emphasis added), cited in doc. 401 at 12]. But far from suggesting that the agreement was not final and conditions could still be added in any subsequent papers, Relator's counsel specifically referred to the agreement already reached, which he described as "this agreement."

In his declaration filed with the Court, Mr. Salcido stated that all of his False Claims Act settlements contained "a written agreement that included written releases." [Doc. 400-1 at 2]. Here, the lawyers did reach agree on the language of written releases, which were contained in paragraphs 2 and 3 of Defendants' after-the-fact draft settlement agreement. Docs. 398-4, 398-7. Thus, the practice of preparing releases was no impediment to the Defendants complying with the agreement reached when Relator accepted the Defendants' one million dollar counteroffer .

Mr. Salcido also stated in his declaration:

6

> [B]ecause FCA actions are filed under seal, no defendant wants to be placed in the position of settling one lawsuit against a relator and not knowing whether the same relator has another action pending against the same defendant that is under seal. Thus, common in this practice area . . . is to obtain assurances that no other such action is pending and to obtain mutual releases.

[Doc. 400-1 at 2-3]. He offered no corroboration of this contention and he did not mention such an assurance when he made the Defendants' counteroffer to settle for one million dollars. But even if this were a "common" practice that all litigants should know about when discussing a potential settlement after fees are assessed against relators in FCA cases, *the Defendants were given that assurance.* The Relator has no pending cases against the Defendants. Thus, this is no impediment to compliance by the Defendants.

Mr. Salcido added the following to his declaration:

> Requiring attorneys *who are signatories to FCA settlement agreements* resolving claims to attorneys' fees, costs, and expenses to represent that they have filed no other lawsuits or initiated any other proceedings against defendants that are currently pending, see ECF 398-7 at 4, is a common term in FCA settlements.

Doc. 400-1 at 9 (emphasis added). Again, Salcido offered nothing to corroborate this claim and he did not mention such an assurance when making the one million dollar counteroffer. While the Relator here, Cameron Jehl, is also an attorney, the settlement was made in his individual capacity as the Relator. He was not settling any claims on behalf of any of the clients of his law firm. And his attorneys in this case were not signatories to any settlement agreement because they were not settling any claims for themselves or any of their clients. Indeed, requiring them to be signatories would have violated the rules of professional conduct in Mississippi and many other states.[2] Yet Mr. Salcido and his co-counsel insisted on assurances that Mr. Jehl had no pending

---

[2] "23 state and local bar associations…have issued ethics opinions stating that it is a violation of their ethical rules for a lawyer to sign a release that calls for the lawyer to agree or approve an indemnification agreement." Miss. Ethics Opinion No. 266 (Nov. 3, 2022). "[I]t is a violation of the Mississippi Rules of Professional Conduct for a lawyer to ask another lawyer to sign a release that would require them to 'approve' or 'agree to' any of the terms of the settlement." *Id.*

7

claims against the Defendants as an attorney for others through his law firm and insisted on the same from his counsel in this case. Because Mr. Jehl and his law firm had no such cases against the Defendants, and neither did his lawyers in this case, that assurance was given to the Defendants as an accommodation in an effort to move forward with the settlement. [Doc. 398-10]. That satisfied the condition contained in paragraph 5 of the Defendants' proposed settlement agreement. [Doc. 398-7].

But that turned out to be not enough. As stated more thoroughly in the memorandum supporting the motion to enforce, [doc. 399 at 12], defense counsel Emily Gerry sent an email on August 19, 2024 that went beyond paragraph 5 and added the following additional condition:

> To move towards settlement, our clients still need confirmation that there are also no pending lawsuits against their affiliates. Given that there are over 300 entities our clients own or control, they have asked that Mr. Jehl and Mr. Jehl's counsel provide a list of entities against whom they have any pending claims. As we noted previously, it is crucial for our clients to know that they are truly achieving peace with this settlement.

Doc. 398-10. Even then, Ms. Gerry implied that the Defendants might not comply with the settlement agreement: "Once we learn what you folks can reasonably offer in this vein, we can communicate that to our clients to see whether we can come to a final resolution." *Id.* Defense counsel later expanded their new condition even further, stating that the 300 affiliates was now approximately 500. *Id.*

Even Mr. Salcido, in his declaration, does not go so far as to say that it is common in settlements to insist on a list of entities against whom a relator and his lawyers have pending claims in order to confirm that those entities do not include one of hundreds of corporate affiliates. Mr. Salcido does state that the proposed settlement agreement drafted by defense counsel, doc. 398-7, is "typical" of other settlement agreements in his experience. But that settlement agreement said nothing about hundreds of affiliates and did not require a list of entities that Mr. Jehl's law firm or

8

his attorneys have claims against. Those additional conditions were added by email after the draft settlement agreement was sent.³

In summary, the settlement was reached after Defendants made their one-million-dollar counteroffer without other conditions and Relator accepted it. It was enforceable even though no other documents had been drafted or signed. While releases and settlement agreements incorporating the terms of a settlement are common, they are not opportunities to insist on new conditions before complying with the settlement already reached. Here, after the settlement was reached, the attorneys agreed on the language of mutual releases contained in paragraphs 2 and 3 of the Defendants draft settlement agreement. Further, the Defendants received assurances that the Relator as an individual did not have any pending cases against the Defendants. And even though the Defendants added a new and inappropriate condition as paragraph 5 to the draft settlement agreement seeking assurances that Relator's law firm and his attorneys had no pending claims against the Defendants, those assurances were provided because there are no such claims. The Defendants have no right to add still another condition requiring that the Relator's law firm and his attorneys provide lists of the entities they have sued before the Defendants will consider complying with the settlement already reached.

Third, the Defendants claim that no settlement existed because there was no signed settlement agreement and the parties continued discussing various terms after counsel for the parties agreed to settle the case for one million dollars ($1,000,000.00). Defendants' Memorandum at 12-13 [Doc. 401]. However, that occurred only because the Defendants'

---

³ As explained in Relator's memorandum [doc. 399 at 15-16], this condition could require the Relator and his attorneys to violate ethical rules as the price for keeping the settlement. Nothing in the Defendants' response [doc. 401 at 14-16] changes that. While the Defendants claim they could simply refuse to settle with Relator if he or his lawyers had claims against the affiliates, they did not insist on such an condition when they made the counteroffer that was accepted.

9

counsel drafted a settlement agreement that contained new and additional terms and then continued expanding their demands and insisting on additional terms by email. Relator attempted to accommodate the Defendants but the effort was unsuccessful. None of these subsequent events change the fact that an enforceable settlement was reached after Relator's counsel proposed a settlement figure, Defendants' counsel counteroffered to settle the case for one million dollars without any additional conditions, and Relator's counsel accepted the counteroffer. [Docs. 398-1, 398-2]. As previously stated, no subsequent formal writing was necessary to make that settlement enforceable.

Defendants cite a number of cases where courts held that no settlement agreement had been reached. Defendants' Memorandum at 12-13 [Doc. 401]. But the language the parties used in those cases demonstrates those cases were very different than this one. *See, Howard v. TotalFina E & P USA*, Inc., 899 So. 2d 882, 890 (Miss. 2005) ("whether or not this case ultimately settles… if the settlement is ever consummated"); *Thompson v. White*, 328 So. 3d 210, 215 (Miss. 2021) ("my clients are concerned about the lack of transparency regarding Mr. Thompson's law firm… [and] are hesitant to negotiate further without knowing if Mr. Thompson has significant assessments or funds in his law firm"); *Gulf Coast Hospice, LLC v. LHC Group Inc.,* 273 So. 3d 721, 73 (Miss. 2019) (the parties letter of intent required certain "mutually agreeable terms and conditions" that were never met); *Logan v. RedMed, LLC*, 377 So. 3d 956, 965 (Miss. 2024) (holding that the parties did not reach a settlement because they did not agree on the amount of a promissory note, and "price is an essential term that must be stated with specificity.").

By contrast, in the present case, the parties discussed a settlement in order to avoid an appeal of a decision awarding a certain amount of money to the Defendants as attorneys' fees.

Figures were proposed in an offer by the Relator, a counteroffer of one million dollars was made by the Defendants without any other conditions, and the counteroffer was accepted. At that point, an enforceable settlement was reached. [Docs. 398-1, 398-2].

  Accordingly, for all the reasons discussed herein, Relator respectfully requests that this Court enforce the parties' settlement agreement.

                Respectfully submitted,

                /s/ *Robert B. McDuff*
                Robert B. McDuff (MSB # 2532
                Law Office of Robert B. McDuff
                767 North Congress Street
                Jackson, MS 39202
                601.259.8484 (Telephone)
                rbm@mcdufflaw.com

                *Counsel for Relator*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of October, 2024, the foregoing was served on all counsel of record by operation of the Court's electronic filing system.

/s/ *Robert B. McDuff*
Counsel for Relator